# EXHIBIT 5

```
 1                IN THE UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF NORTH CAROLINA
 2

 3   DEMOCRACY NORTH CAROLINA,        )   Greensboro, North Carolina
     THE LEAGUE OF WOMEN VOTERS       )   July 21, 2020
 4   OF NORTH CAROLINA,               )   9:05 a.m.
     DONNA PERMAR, JOHN P. CLARK,     )
 5   MARGARET B. CATES,               )
     LELIA BENTLEY, REGINA WHITNEY    )
 6   EDWARDS, ROBERT K. PRIDDY II,    )   File No. 1:20CV457
     SUSAN SCHAFFER, and              )
 7   WALTER HUTCHINS,                 )
                                      )
 8        Plaintiffs,                 )
       v.                             )
 9                                    )
     THE NORTH CAROLINA STATE BOARD OF )        TRANSCRIPT OF
10   ELECTIONS, DAMON CIRCOSTA, in his )     EVIDENTIARY HEARING
     official capacity as CHAIR OF THE )        Volume 2 of 3
11   STATE BOARD OF ELECTIONS, STELLA  )
     ANDERSON, in her official         )     BEFORE THE HONORABLE
12   capacity as SECRETARY OF THE      )     WILLIAM L. OSTEEN, JR.
     STATE BOARD OF ELECTIONS, KEN     )     U.S. DISTRICT JUDGE
13   RAYMOND, in his official capacity )
     as MEMBER OF THE STATE BOARD OF  )
14   ELECTIONS, JEFF CARMON III, in    )
     his official capacity as MEMBER   )
15   OF THE STATE BOARD OF ELECTIONS,  )
     DAVID C. BLACK, in his official   )
16   capacity as MEMBER OF THE STATE   )
     BOARD OF ELECTIONS, KAREN BRINSON )
17   BELL, in her official capacity as )
     EXECUTIVE DIRECTOR OF THE STATE   )
18   BOARD OF ELECTIONS, THE NORTH     )
     CAROLINA DEPARTMENT OF            )
19   TRANSPORTATION, J. ERIC BOYETTE,  )
     in his official capacity as       )
20   TRANSPORTATION SECRETARY,         )
     THE NORTH CAROLINA DEPARTMENT OF  )
21   HEALTH AND HUMAN SERVICES,        )
     and MANDY COHEN, in her official  )
22   capacity as SECRETARY OF HEALTH   )
     AND HUMAN SERVICES,               )
23                                     )   COURT REPORTER:
          Defendants.                  )   Joseph B. Armstrong, FCRR
24                                     )   324 W. Market, Room 101
       and                            )   Greensboro, NC  27401
25
```

Evidentiary Hearing Volume 2 of 3 - July 21, 2020

```
 1  PHILIP E. BERGER, in his          )
    official capacity as              )
 2  PRESIDENT PRO TEMPORE OF THE      )
    NORTH CAROLINA SENATE, and        )
 3  TIMOTHY K. MOORE, in his          )
    official capacity as SPEAKER      )
 4  OF THE NORTH CAROLINA HOUSE       )
    OF REPRESENTATIVES,               )
 5                                    )
          Defendant-Intervenors.      )
 6  _____  )

 7
    IN COURT APPEARANCES:
 8
    FOR THE PLAINTIFFS:
 9
               HILARY H. KLEIN
10             SOUTHERN COALITION FOR SOCIAL JUSTICE
               1415 W. HWY. 54, STE. 101
11             DURHAM, NC 27707

12             ALLISON JEAN RIGGS
               SOUTHERN COALITION FOR SOCIAL JUSTICE
13             1415 W. HWY. 54, STE. 101
               DURHAM, NC 27707
14
    FOR THE DEFENDANTS:
15
               ALEXANDER MCCLURE PETERS
16             N.C. DEPARTMENT OF JUSTICE
               POB 629
17             RALEIGH, NC 27602-0629

18  FOR THE INTERVENORS:

19             NICOLE JO MOSS
               COOPER & KIRK, PLLC
20             1523 NEW HAMPSHIRE AVE., NW

21             DAVID H. THOMPSON
               COOPER & KIRK, PLLC
22             1523 NEW HAMPSHIRE AVE., NW
               WASHINGTON, DC 20036
23
               PETER A. PATTERSON
24             COOPER & KIRK, PLLC
               1523 NEW HAMPSHIRE AVE., NW
25             WASHINGTON, DC 20036
```

Evidentiary Hearing Volume 2 of 3 - July 21, 2020

```
 1              I N D E X

 2 WITNESSES FOR THE PLAINTIFF:                        PAGE

 3     Video testimony of Marshall Tutor, Continued      4
       Video testimony of Paul Gronke, Ph.D             11
 4     Video testimony of Theodore Plush, D.O.          27

 5

 6 WITNESSES FOR THE DEFENDANT:

 7 KAREN BRINSON BELL

 8     Direct Examination By Mr. Peters                 33
       Direct Examination By Ms. Moss                   56
 9     Cross-Examination By Ms. Riggs                   69
       Redirect Examination By Ms. Moss                122
10     Redirect Examination By Mr. Peters              123
       Recross-Examination By Ms. Riggs                135
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Evidentiary Hearing Volume 2 of 3 - July 21, 2020

P R O C E E D I N G S

1
2          (At 9:05 a.m., proceedings commenced.)

3          **THE COURT:**  Is Ms. Bell an attorney?

4          **MR. PETERS:**  She is not, Your Honor.

5          **THE COURT:**  She's still going to have to sign one of

6    those forms.

7          **MR. PETERS:**  We have alerted her to that, and I think

8    she was going to print it off and bring it signed and

9    everything, so I think we're straight on that.

10         **THE COURT:**  Sounds good.

11         **MR. PETERS:**  Thank you so much.

12         **THE COURT:**  All right.  Everyone is back, and we're

13   ready to continue this proceeding.  So where were we?  We were

14   getting ready for Mr. Peters's cross-examination of

15   Mr. Bartlett.  Ms. Klein, you can start playing when you're

16   ready.

17         **MS. KLEIN:**  Yes.  Thank you, Your Honor.  I'm sorry,

18   Your Honor.  I realize that I'm a little bit off with the

19   timestamp, so we might hear a little bit of testimony that was

20   heard yesterday.  I apologize for that.

21         **THE COURT:**  That's all right.

22         (At 9:07 a.m, video testimony continued.)

23         (At 9:22 a.m. video testimony concluded).

24         **MS. MOSS:**  Your Honor, I would just like to make

25   clear, early on, I had an objection to Mr. Bartlett offering an

1   opinion related to the uniform hours requirements following --

2           **THE COURT:**  The MATS addition, and since we were

3   getting toward the end, is there -- I understand the basis of

4   the opinion, and -- I mean the objection.  I think it's the

5   same for both.  Is there anything you want to add to that

6   objection?

7           **MS. MOSS:**  The only thing I would say is Ms. Klein

8   suggests that it only goes to weight.  I certainly agree it

9   establishes that no weight should be given to these opinions.

10  I think it also goes to whether the opinion should be allowed

11  in the first instance.

12          It would be the equivalent of a doctor who, you know,

13  may be qualified by their medical licensure to offer an

14  opinion; but if they haven't examined the records of the

15  patient, if they haven't reviewed anything to bring them

16  up-to-date on the current situation, they haven't spoken to

17  anybody, then they're just offering opinions that have no

18  basis.  And the point of opinion testimony is that it is an

19  expert who has brought his expertise to bear, and Mr. Bartlett

20  has not established that he has that expertise with respect to

21  either uniform hours or his speculations about how the MATS

22  would function given that he did no research and admits that he

23  has no personal knowledge about that situation or how they're

24  going to be ruled out or anything else related to that.

25          **THE COURT:**  All right.

 1          **MS. MOSS:**  So that's --

 2          **THE COURT:**  Anything you want to add?

 3          **MS. KLEIN:**  I do, Your Honor, and I'll be brief.  I

 4  won't repeat myself from yesterday.  But as far as the uniform

 5  hours, it's very relevant, you know, what impacts flexibility

 6  had on county boards of election when they have flexibility in

 7  hours.  That is directly relevant to how -- what county boards

 8  will do if given that flexibility again.  So, you know, that's

 9  the patient.

10          **THE COURT:**  So your question to Mr. Bartlett was the

11  downtime has expenses, labor, and that's -- labor is the single

12  largest expense.  You then asked Mr. Bartlett if they didn't

13  have that labor expense associated with downtime as a result of

14  uniform hours, would that then allow the county boards to have

15  more polling places?  I mean, how does he say that, just out of

16  curiosity?

17          **MS. KLEIN:**  I think it's -- I mean --

18          **THE COURT:**  Isn't that -- let me ask it more

19  specifically.  Isn't that a function of how much money would be

20  saved, how much money it would cost to have additional polling

21  places, and what decision the county board of elections made

22  with respect to any savings from flexibility?

23          **MS. KLEIN:**  I think the opinion and the principle

24  that he is speaking to, Your Honor, is a lot more basic than

25  that.  It's just the connection between -- the point is that

1  when counties manage their budgets, they have limited

2  resources.  The uniform hours requirement require them to spend

3  money during downtime when voters in a particular area are not

4  likely to be able to come, right, because of work schedules or

5  geographically specific schedules and then that drain on

6  resources naturally prevents counties from spending their

7  resources on other things, one of which is offering other

8  voting sites.

9  **THE COURT:**  So what is his expertise that allows him

10  to say if the county has more money available, then they might

11  spend it on polling places?  They might spend it on salaries

12  for the election board members.  They might -- I mean, what

13  expertise does he bring to the table to suggest the correlation

14  between any potential sales, whatever that number might be, a

15  hundred bucks, a thousand dollars, ten thousand dollars,

16  whatever that number might be in polling places?

17  **MS. KLEIN:**  His expertise comes from having oversight

18  over early voting plans, reviewing early voting plans in five

19  presidential elections, having the post hoc meetings with

20  county boards taking the surveys.  He has oversight -- we

21  established this more on the direct, but he had oversight and a

22  common view, right, of -- an overall view that I don't think

23  anybody else in this case --

24  **THE COURT:**  I mean, I have a common view.  We all in

25  this room, anybody who wants to pick up the documents,

```
 1  understands the budget process.  What makes his expertise any
 2  more valuable on the question of how might extra money be spent
 3  on a budget than any person sitting in here who's a voter?
 4          MS. KLEIN:  Because he reviewed -- specifically,
 5  during his time, he reviewed county board of elections' early
 6  voting plans and saw how they managed their budgets together,
 7  which I -- you know, nobody else that I'm aware of has reviewed
 8  that for five --
 9          THE COURT:  Did he ever participate in the budget
10  process?  Does he have any idea how much money might be saved
11  if the uniform voting hours plan is not in effect?  Any idea at
12  all?
13          MS. KLEIN:  Again, he's providing a qualitative
14  analysis on how -- what he observed how county boards are using
15  the resources that they have.
16          I would also note that early voting plans are still
17  in process here, like that that data -- that specific data is
18  not yet available, and, therefore, his overview and opinion of
19  how county boards allocate resources is relevant and useful to
20  the Court.  And it is a qualitative opinion.  It's not
21  quantitative.  We plan to elicit testimony the Court will hear
22  that's more of a quantitative analysis, but his --
23          THE COURT:  The expert opinion doesn't have to be a
24  quantitative analysis, not in the least, but there still has to
25  be some basis within the expertise to offer the opinion.  In
```

terms of management of elections, he certainly has that
expertise.

It seems to me in terms of his own budget, the budget
that the North Carolina Legislature from what, '93 to 2013, 20
years, I'm assuming he had participated in that process because
he talks about the honorables down in Raleigh, and he talks
about how money is spent, but I don't hear him saying -- and
he's clearly familiar with county commissions.  But in terms of
the budget process and whether any excess money, whatever
amount that might be, that might be generated from any savings
from abandoning the uniform hours process, I mean, they're
expenditures, and the honorables who sit within the county
commissions and within the local boards of election are the
ones who get to make the decision -- it seems to me, maybe I'm
wrong about this -- in terms of how money is spent.

And for him to say if this, then that will occur, if
savings, then more polling places, I just -- in the absence of
some information as to how he reaches that conclusion, the
amounts of saving, the cost of additional polling places, why
county boards might be incentivized in some fashion to create
these polling places, how that county board budget -- how those
decisions are made, anything -- some basis to say here's why
I'm an expert.

But having said those things, I hear your response in
terms of this is a quantitative thing.  As I've done before,

1 I'm going to take it under advisement.  I'll make a

2 determination of whether I think it's admissible in terms of

3 his particular expertise; and then, if so, how much weight to

4 apply to that particular testimony.  So I'll takes it under

5 advisement.

6       **MS. KLEIN:**  Thank you.  May I address MATS very

7 briefly?

8       **THE COURT:**  The what?

9       **MS. KLEIN:**  The Multi --

10       **THE COURT:**  Yes.

11       **MS. KLEIN:**  I just want to highlight for the Court

12 that his experience with MAT teams during his service is

13 relevant and useful to the Court's analysis because this would

14 be a very different situation if Mr. Bartlett were to come and

15 say we have robust, long-standing MATS, never had any issues,

16 no disparities in any county, and that's been a long-standing

17 tradition in North Carolina.  And it's very relevant to the

18 Court's analysis that that is absolutely not the case, and that

19 that's his observations.

20       So, again, consistent with uniform hours, even if

21 that one isolated opinion, you know, the Court, you know,

22 decides whether or not to assign expert weight to that one

23 isolated opinion, all of the testimony that Mr. Bartlett in his

24 declarations and in the video gave regarding his experience

25 with those and his experience overseeing the flexibility of --

1  when the uniform hours requirement was not in effect, the
2  underlying information, I believe, is very relevant to the
3  Court's analysis, and I hope that the Court would take that
4  into consideration, notwithstanding any weight assigned to the
5  final opinion.
6         **THE COURT:**  I will.
7         **MS. KLEIN:**  Thank you.
8         **THE COURT:**  You may continue.
9         **MS. KLEIN:**  Your Honor, Plaintiffs call by video
10 testimony Professor Paul Gronke.
11        **MS. RIGGS:**  Your Honor, may I approach with the
12 transcript?
13        **THE COURT:**  You may.  Thank you.  You may proceed.
14        (At 9:34 a.m, video testimony begins.)
15        **THE COURT:**  Can you pause it just a second.  Let me
16 ask.  Is anybody using the big television screen?  The way I'm
17 set up, it's easier for me to look at that than this one, and I
18 think the picture is little better.  I'm going to turn it a
19 little if nobody is using it.  All right.  You can continue
20 playing.
21        (At 9:35 a.m, video testimony continued.)
22        (At 9:46 a.m., video testimony paused.)
23        **THE COURT:**  You want to address this?
24        **MR. PATTERSON:**  Yes, Your Honor.  This has to do, I
25 think you'll recall, with Dr. Gronke's reply declaration

addressing in-county poll worker requirement that is now the

rule after HB11769, we would object to that, and you had

indicated that you were going to strike those portions of his

declarations from the record.  My understanding was that then

he could not come and give testimony and speak on this issue,

and it will be sharpened a little on the redirect, I believe.

In the answer I believe he gives here, he speaks more in

generalities about the effects of poll worker shortages and

things of that nature.  I don't have an objection to that.  But

the objection is to any specific commentary on the in-county

poll worker requirement.  He could have put in a new

declaration when Plaintiffs submitted their amended preliminary

injunction motion to address those if you wish to address those

topics.

        **THE COURT:**  Ms. Klein?

        **MS. KLEIN:**  Thank you, Your Honor.  First of all, I

would note there's no objection to any discussion of Georgia

and what happened in the Georgia election, so I think that that

stays in regardless.

        As far as this county versus -- I'm so sorry.  I keep

on forgetting to take off my mask.  I'm sorry, Your Honor.

        So the Georgia election information, I believe, stays

in, and he discusses -- he discusses that, and other witnesses

will discuss those as well.

        Additionally, Your Honor, as far as the county

1 requirement or precinct requirement, these are two sides of the
2 same coin.  The underlying issue is a restriction on who can
3 serve as a poll worker, and the original relief requested was
4 to lift that requirement entirely, and the -- what he discussed
5 in his original declaration was about poll worker shortages,
6 generally --
7          THE COURT:  Which related specifically to the
8 requirement that poll workers come from the precinct, right?
9          MS. KLEIN:  Yes, Your Honor.
10          THE COURT:  And 1169 changed that.
11          MS. KLEIN:  It did, Your Honor, but --
12          THE COURT:  It allowed poll workers to come from the
13 county, and he did not submit a new declaration addressing that
14 particular issue.  Right?
15          MS. KLEIN:  He did not.  It was included --
16          THE COURT:  And his declaration didn't provide any
17 context to his opinion about the requirement that the poll
18 workers come from the precinct.  It just said that requirement
19 needs to be lifted.  Otherwise, you're going to have a problem
20 with poll workers, right?
21          MS. KLEIN:  Yes, Your Honor, and --
22          THE COURT:  And that requirement was lifted rendering
23 his opinion moot, didn't it?
24          MS. KLEIN:  No, Your Honor --
25          THE COURT:  It has no effect in the case.

Evidentiary Hearing Volume 2 of 3 - July 21, 2020

1    **MS. KLEIN:**  I would contend that it was modified, not
2    lifted, right?  It's the --

3         **THE COURT:**  Okay.  We'll go with "modified" then.  It
4    was modified to again critique the change in the law that had
5    taken place addressing his opinion in the first instance.  He
6    didn't say anything in his original declaration about, oh, you
7    know, countywide won't be sufficient or statewide won't be
8    sufficient or countrywide won't be sufficient.  He just said in
9    his original declaration that that precinct -- the requirement
10   that the poll workers come from the precinct needs to be
11   lifted.  He didn't say how much or by what.  And then he came
12   back in the reply affidavit and said it -- countywide won't
13   work.  I mean, so what will exactly?

14        **MS. KLEIN:**  I would say two things to that.  The
15   underlying evaluations he has about poll worker shortages and
16   that there will be poll worker shortages, that remains, I
17   believe, admissible and relevant to the Court's opinion -- or
18   to the Court's consideration rather, generally.

19        The second -- the second thing I would say is that,
20   again, referring back to Federal Rule of Civil Procedure 57 --

21        **THE COURT:**  Let me refer you back to something.  In
22   the consented-to motion where the parties agree that a modified
23   preliminary injunction motion would be filed, in that
24   particular motion the parties agreed to a briefing schedule,
25   and the Plaintiffs represented then that they would stand on

1  the original brief and the original affidavits, right?

2          MS. KLEIN:  Yes, Your Honor.

3          THE COURT:  And they didn't say anything in that

4  about filing affidavits in support of the reply, only that they

5  would address the changes in the reply.  Right?

6          MS. KLEIN:  Yes, Your Honor, that we would address

7  within the scope of the reply.  And we -- and just to be clear,

8  we respect the Court's opinion and accepted the Court's opinion

9  to strike those from his declaration.  What I'm referring to

10 here is the testimony, and here I would contend --

11         THE COURT:  What notice did they have in this process

12 that this particular witness would come in and say a

13 requirement that poll workers have to come from the county, or

14 can come from the county, would so severely restrict the

15 ability to recruit poll workers that they couldn't get enough?

16 What notice did anybody have of that?

17         MS. KLEIN:  They had notice in the second amended

18 complaint when those allegations were added in the amended

19 motion --

20         THE COURT:  In the affidavits.  In the affidavits.

21         MS. KLEIN:  And in the affidavits, they had notice

22 because he talked about poll worker shortage --

23         THE COURT:  As it related to the precinct

24 requirement, right?

25         MS. KLEIN:  As it related --

1          THE COURT:  -- specifically.

2          MS. KLEIN:  -- to the precinct requirement, which is,

3    again, you know, this two sides of the same coin --

4          THE COURT:  They are not two -- we're talking about

5    something different, and here's why we're talking about

6    something different.  It's not two sides of the same coin.

7    It's an expert opinion that changes only after all the

8    responses have been filed.  I mean, the point -- the whole

9    point of filing affidavits in support of the motion is to give

10   the other side notice of what's coming so they can prepare to

11   respond, and this changed.  There's no doubt in my mind it

12   changed.  Is there any doubt in your mind that it changed?

13         MS. KLEIN:  It was modified certainly.  I would agree

14   with that, Your Honor.

15         THE COURT:  And so they then -- there's a couple of

16   things they could do in response.  Let me explain it real

17   carefully.  So they can sit on the affidavit and go, you know

18   what?  This opinion is irrelevant because the requirement is

19   county, not precinct.  So that would be a fair response.  Do

20   you agree with that?

21         MS. KLEIN:  I would say the unique --

22         THE COURT:  No, do you agree with that?  Would that

23   be a fair response on their part?

24         MS. KLEIN:  I don't agree because of the unique

25   circumstances of this matter, the fact that depositions were

 1  taken.  So they had notice --

 2          THE COURT:  Those unique circumstances do not excuse

 3  not filing your expert's opinion at the start, but modifying it

 4  in the reply, in my mind.

 5          MS. KLEIN:  Okay.  I understand that, Your Honor.  I

 6  would just point out to the Court that he was examined on this

 7  in his deposition.  He was examined thoroughly on the --

 8          THE COURT:  All right.  So what witness can they call

 9  at this particular juncture?  Let's go back to last week when

10  we were lining up all this discovery.  Which of their witnesses

11  can they call in response to Gronke's opinion that countywide

12  requirement is insufficient to allow recruitment of poll

13  workers?

14          MS. KLEIN:  Well, they've had the opportunity, Your

15  Honor, to cross-examine him in a deposition and --

16          THE COURT:  No, what witness would they call in

17  response to that opinion?

18          MS. KLEIN:  If I'm recalling correctly, their witness

19  Callahan perhaps talked about --

20          THE COURT:  Did he put in his opinion about

21  countywide?

22          MS. KLEIN:  I would have to look back at the specific

23  record, but I'm not -- I'm not certain that no one -- no

24  witness would be able to talk about this.  So I'm not

25  certain -- I would have to look back at the record to answer

Case 1:20-cv-00911-WO-JLW   Document 1-6   Filed 09/26/20   Page 18 of 139

1   that question, Your Honor.

2           THE COURT:  Do you understand how if an expert

3   witness offers an opinion, the other side responds, makes

4   decisions about how to respond in light of the expert's

5   opinion, and the expert's opinion is different from what the

6   facts are --

7           MS. KLEIN:  I understand --

8           THE COURT:  -- then that leads people to do things in

9   reliance on what the opinion is.  And if you come back in a

10  reply and withdraw the first opinion and put a new opinion in,

11  everything's changed for the parties responding.

12          MS. KLEIN:  I understand, and I do appreciate that,

13  Your Honor.  I would just point out a couple of things.  He --

14  it's not as if he never talked about anything related to poll

15  worker shortages at all.  He did talk about poll worker

16  shortages generally, and so this is more of a supplement.

17          The second thing I would say is that here they have

18  had -- they did have some sort of notice in the amended

19  complaint, they had notice in the amended PI motion, and then

20  they also had the opportunity to depose before the --

21          THE COURT:  What notice did they have that this

22  witness would modify his opinion to expand it to say that a

23  countywide requirement was not sufficient to permit recruitment

24  of poll workers?  What notice?

25          MS. KLEIN:  The fact that he talked about the poll

worker requirement at the beginning, and they came back with a
response saying that it was completely alleviated by the county
requirement and his reply was responsive to that.

But I again want to reiterate that we accept that the
Court has struck those from his declaration, and I'm not
arguing for those. What I'm --

**THE COURT:** You're arguing for him to be allowed to
offer his opinion here after I've struck it in a declaration,
aren't you?

**MS. KLEIN:** Yes, Your Honor, and that's because under
Federal Rule of Civil Procedure 37(c)(1), there are exceptions,
specific exceptions to when new information can be considered
by the Court for an expert opinion, and those are if the
nondisclosure was either harmless or substantially justified.

And here, and I understand that the Court might not
consider that substantially justified for the reasons that
we've discussed, but the harmless and the relevance to the
Court's analysis and the fact that it was harmless in that this
was -- they have been since given the chance to depose this
expert. They have been given the chance to -- they already had
notice of poll worker shortages being an issue and having an
expert testify to that. Again, I would have to check the
record, but an expert could be called to testify about that
now. We've had depositions --

**THE COURT:** Suppose they stood up today and said,

1    Judge, if you're going to let this in, then we want to

2    supplement our record with a new expert to explain why the

3    countywide requirement is sufficient.  Are you going to agree

4    to that?  Is that okay with you?

5            **MS. KLEIN:**  It would depend on if it was going to

6    substantially delay the Court's decision in this matter, Your

7    Honor.

8            **THE COURT:**  Let's say they'll have it tomorrow.  Is

9    that okay?

10           **MS. KLEIN:**  In order --

11           **THE COURT:**  It wouldn't be fair, would it, to you if

12   that happened?

13           **MS. KLEIN:**  Your Honor, that -- I would strongly

14   consider that -- if that was the timing that was offered, I

15   would strongly consider -- I would have to strongly consider

16   that --

17           **THE COURT:**  But it really wouldn't be fair because

18   they're being offered a chance to do something with an expert

19   that's new, and you wouldn't have a chance to respond.  That

20   wouldn't really be fair, would it?  Your chance passed with the

21   reply.

22           **MS. KLEIN:**  I understand, Your Honor.  I would just

23   say that he was -- in the deposition, he was questioned

24   extensively about the county requirement.

25           **THE COURT:**  Well, nobody knows what's coming in and

1  what's not as is clear from the objections.

2          MS. KLEIN:  May I just say one more thing, Your

3  Honor?

4          THE COURT:  Um-hum.

5          MS. KLEIN:  And this is to the point that counsel

6  already made.  His responses during his video testimony talk

7  about a variety of different issues.  It's not just about the

8  county requirement.  So I would --

9          THE COURT:  This -- what we're dealing with now is

10 limited to whether the county requirement is sufficient in

11 terms of his expert testimony, and you all do not have the

12 benefit of my order.  It's coming.  It will explain things

13 further.  I did consider whether or not, in light of the fact I

14 was allowing discovery, whether or not I should -- you can call

15 it "reconsider" or whether or not I should do something

16 different because I was allowing discovery, and, for reasons

17 I'll explain in that opinion, I elected not to.

18          One of the reasons is when you're dealing with expert

19 witnesses, the party who's filed the affidavit, the report,

20 whatever you want to call it, in support of the motion, when

21 that expert witness opinion is not based upon the facts as they

22 exist at the time the motion is filed, which was in this case

23 after 1169, I think parties are entitled to rely on that

24 opinion, and I think parties are entitled to make decisions

25 based on how to address that opinion based upon how -- what --

1   how the opinion exists.

2           And here, at least in my mind, the opinion of

3   Dr. Gronke opened the door for two different possibilities.

4   One was a possibility of coming in and saying, hey, the

5   requirement is countywide, and here's why countywide is

6   sufficient.  Now, that's one thing.

7           But, more significantly, and I'm only going off my

8   experience in watching these things unfold in terms of expert

9   witnesses, one perfectly legitimate strategy is to ignore an

10  expert opinion that's clearly not based on the facts of the

11  case, which was the case here, and then come into court and say

12  that expert witness' opinion is either inadmissible or entitled

13  to no weight, whichever one you pick, because it's not based on

14  the facts of the case.

15          So I say all that simply to say that the decisions

16  are made as cases go along.  This is a motion for preliminary

17  relief.  It doesn't mean that this issue is now closed for

18  purposes of the case.  It's a question -- in my mind, it's a

19  question of what in fairness should be considered here, and

20  when a party's opportunity to respond directly and fairly to an

21  expert witness report is cut off because the expert witness

22  report is not based on facts that exist in the case at the time

23  the motion is filed, then in my mind, for several reasons, or

24  at least two reasons that will be more fully explained in my

25  opinion, that becomes inadmissible.

1      So having said that, on this particular objection as
2 it relates to Dr. Gronke's opinion specifically as to whether
3 or not a countywide requirement would allow the recruitment of
4 sufficient poll workers for the November 2020 election, I've
5 struck that opinion from the case because that evidence was not
6 submitted in support of the original motion.  It's just struck
7 for purposes of this proceeding and no other in this case.  But
8 for purposes of this proceeding, that evidence is struck.

9      Now, having said that, I'm going to sustain the
10 objection to further opinions on that same issue in terms of
11 Dr. Gronke's testimony, but I'm also going to let you play it
12 so you can make your proffer of what the testimony would have
13 been.  So you can proceed ahead and play the video.

14      MS. KLEIN:  Thank you.

15      MR. PATTERSON:  Your Honor, may I make one point
16 quickly, just a clarification?  I believe opposing counsel said
17 we were not objecting to testimony about Georgia, but we are
18 objecting to that testimony.  That was the specific state he
19 pointed to in his reply declaration and said they have a
20 similar in-county --

21      THE COURT:  I can't remember.  Was that in those
22 paragraphs?

23      MR. PATTERSON:  Yes, there were in paragraphs 11 to
24 13, and he put some news articles that actually did not
25 attribute poll worker shortages to long lines and those sorts

1  of things.  But that was his opinion.  He said Georgia has a
2  similar in-county requirement as North Carolina, so this is
3  evidence of what's going to happen.
4          **THE COURT:**  Okay.  I don't have Gronke's declaration
5  in front of me, and I don't have my draft opinion in front of
6  me.  But the expert testimony as it relates to the paragraphs
7  previously struck, I'm going to sustain that objection,
8  whatever was contained in those paragraphs, as new opinion that
9  was not submitted in support of the original motion.  That will
10 be further explained in an order -- I would like to say, you
11 know, issued soon, but it's in the process for reasons that
12 I'll explain in the order.
13         That's my ruling.  I'm going to allow the proffer to
14 be made with the testimony.  So you can go ahead and play it.
15         **MR. PATTERSON:**  Thank you.
16         **THE COURT:**  You can go ahead and continue the video.
17         **MS. KLEIN:**  Thank you.
18         (At 10:05 a.m., video testimony continued.)
19         (At 10:08 a.m., video testimony paused.)
20         **THE COURT:**  All right.  Hold for a second.  So on
21 page 16 of the deposition -- of the written transcript, which
22 is coming in as the court transcript, his testimony just now,
23 "If they do not have the flexibility, the likely outcome is
24 precinct salvation."  I think what he said was "consolidation."
25 So I would -- unless somebody objects, I'm amending this to say

1  "consolidation" not "salvation."

2        **MS. KLEIN:**  We would agree with that, Your Honor.

3        **MR. PATTERSON:**  Same here, Your Honor.

4        **MR. PETERS:**  Yes.

5        **THE COURT:**  Is this copy -- I've got the official

6  version we're going to use for exhibit?

7        **MS. KLEIN:**  Your Honor, these are -- I understand

8  this to be the final copy.  But, again, as I mentioned earlier,

9  the witnesses didn't have a chance to, for example, review and

10  sign, and it was a little rushed.

11        **THE COURT:**  Understood.  That's the only one I've

12  seen so far that I thought was a substantive issue.

13        So we will use these.  So we have a day of arguments,

14  and then we will be -- today is Tuesday.  Are the copies out to

15  the witnesses now for review?

16        **MS. KLEIN:**  I believe at least some of them have been

17  sent out.  I would have to double check that, but I'm aware

18  that maybe some of them may have been sent out for review.

19        **THE COURT:**  All right.  I'm going to say the official

20  record of the testimony is the videotape itself, and the

21  transcripts are -- how does that instruction go?  To the extent

22  the written transcript is inconsistent with the video

23  testimony, the video testimony controls.  All right.  You may

24  continue.

25        (At 10:10 a.m, video testimony continued.)

1          (At 10:48 a.m, video testimony concluded.)

2          **THE COURT:**  All right.  So where does that leave us

3    now with respect to Plaintiffs' evidence?

4          **MS. KLEIN:**  Your Honor, that concludes the

5    Plaintiffs' evidence, obviously supplemented by the

6    declarations that have been accepted in the case.

7          **THE COURT:**  All right.  So next will be Dr. Plush?

8          **MR. THOMPSON:**  Yes, Your Honor, that's correct.

9          **THE COURT:**  Okay.  Let's take a break, and what's his

10   first name?

11         **MR. THOMPSON:**  Theodore.

12         **THE COURT:**  So as we break, I will -- you know, being

13   in quarantine, you can talk to anybody you can talk to since

14   nobody else is in the office with you.  I had a very nice time

15   at the birthday party last night.  I thought it was a little

16   strange yesterday when I was talking about that that I so

17   hastily said "it's not my wife's birthday."  I thought that

18   sounded kind of weird of when I said that.  My brain was

19   obviously trying to tell me something, because I walked into

20   the house, and the bad news was that my wife said, "Hey,

21   today's our anniversary."  The good news was that she said, "I

22   forgot."  Thank God.  Because I did, too. We had a nice time

23   anyway.

24         All right.  We'll be in recess for 10 minutes.

25         (At 10:50 a.m., break taken.)

```
 1                (At 11:05 a.m., break concluded.)

 2          THE COURT:  Who is going to be playing Dr. Plush?

 3  Will you all be handling the video?

 4          MS. MOSS:  Yes, Your Honor.  Unfortunately, the

 5  binder isn't big enough for this, but I have his transcript.

 6          THE COURT:  Just lay it right there on that yellow

 7  tape.

 8                (At 11:05 a.m., video testimony begins.)

 9          THE COURT:  Let me get you to hit pause for just a

10  second.

11                (At 11:07 a.m., video testimony paused.)

12          THE COURT:  Ms. Riggs, I hate to do it to you.  I

13  think you like wearing a mask as much as I do.  But in the

14  gallery, because we have to clean it if you don't keep your

15  mask on, if you'll keep it on back there.  Thank you.

16                (At 11:07 a.m, video testimony continued.)

17                (At 12:17 a.m., video testimony paused.)

18          THE COURT:  Hold on.  Back that up.  I think what he

19  said was -- it was real quick, but it was "I believe we should

20  be resolved in favor of the area of prevention."  Do you all

21  want to listen to that sentence again?

22                (Video played back.)

23          THE COURT:  Didn't he say "in favor of prevention"?

24  You want to play it one more time?

25          MR. PETERS:  I think it was "in favor of prevention."
```

 1          **MS. MOSS:**  I understood him to say "in favor of

 2   prevention within reason."

 3          **THE COURT:**  You want to hear it again?  I think it

 4   was "in favor of prevention."

 5          **MS. KLEIN:**  I would like to hear it one more time.

 6          (Video played back.)

 7          **MS. KLEIN:**  Yes, Your Honor.

 8          **THE COURT:**  I think it's "in favor."  I think "we

 9   should be resolved in favor of prevention," not "the area of

10   prevention."  All right.  You may continue.

11          (At 1:02 p.m., video testimony concluded.)

12          **THE COURT:**  All right.  Then we'll come back, and the

13   last evidence will be Bell's testimony?  All right.  I need a

14   few extra minutes.  What do we have, 2 1/2 hours?  Is that what

15   you all allocated?

16          **MR. PETERS:**  Yes, Your Honor.

17          **THE COURT:**  Okay.  I like nice round numbers like

18   coming back at 2:30, but I can come back a little early if you

19   want to start.  We'll just shoot -- let's say 2:20.  We'll be

20   in recess.

21          (At 1:03 p.m., break taken.)

22          (At 2:20 p.m., break concluded.)

23          **THE COURT:**  Mr. Peters, did you have something you

24   want to say?

25          **MR. PETERS:**  I'll put it this way, Your Honor.  I've

```
1   been waiting for the courtroom to reopen to get some exhibits
2   in order that I had held off numbering until I saw what
3   happened this morning.  So I can either move about to hand up
4   exhibits, or if you want to give me about three minutes, I can
5   mark them real fast.
6           THE COURT:  Take your three minutes.
7           MR. PETERS:  I figured that would be easier.
8           MR. THOMPSON:  Your Honor, while we have a moment,
9   may I raise a housekeeping matter?
10          THE COURT:  You may.
11          MR. THOMPSON:  Just want to make sure that for
12  tomorrow, is the lineup 2 hours for Plaintiffs, 2 1/2 hours for
13  us and the State Defendants, Executive Defendants, and then 30
14  minutes of rebuttal?
15          THE COURT:  Are you sure you can't do it in an hour?
16  Is that what you all agreed to?
17          MS. KLEIN:  I think it's what the Court in one of the
18  earlier status conferences indicated might be allowed.
19          THE COURT:  I think you all might have browbeat me
20  into that.  I'm not taking the full credit for that.  If that's
21  what I agreed to do, then that's what it will be.  So it's
22  2 1/2 total?
23          MR. THOMPSON:  Yes, Your Honor.
24          THE COURT:  So 2 hours, 2 1/2, with that 2 1/2 hours
25  split between argument and rebuttal.
```

1          **MR. THOMPSON:** Yes, Your Honor.

2          **THE COURT:** So 4 1/2 hours tomorrow total.

3          **MR. THOMPSON:** Well, I guess that's 5, because

4     they'll kick off with 2, then we'll go 2 1/2, and then the

5     other 30 minutes in rebuttal.

6          **THE COURT:** All right.  Got it.

7          **MR. THOMPSON:** And if it were possible to start at

8     nine, we would take it as a kindness, just I have a flight that

9     I would like to catch, if possible.

10         **THE COURT:** 9:00 will be fine with me if everybody

11    agrees.

12         **MS. KLEIN:** And we'll be addressing the Court's

13    specific questions just right off during that time in our

14    initial oral argument, or do you want us to loop that into our

15    oral argument?

16         **THE COURT:** Nope, I think it would be most helpful to

17    me if you just bang, bang, bang, bang, give your answers.  I

18    won't even ask a question while you answer.  I'll just let you

19    run.

20         **MS. KLEIN:** Okay, understood.  Thank you, Your Honor.

21         **THE COURT:** Let me ask about this witness.  So we've

22    got 2 1/2 hours of testimony total --

23         **MR. THOMPSON:** Yes, Your Honor.

24         **THE COURT:** -- with Ms. Bell?  And is -- how is it

25    divided?  Who's calling her?  Who's direct?

 1          **MR. PETERS:**  I will be calling her, and I believe the

 2  arrangement we have is that I have 45 minutes of direct and

 3  redirect, that the Legislative Defendants have 30 minutes, and

 4  the Plaintiffs have an hour and 15 minutes so that it balances

 5  out.

 6          **THE COURT:**  Who's timing?  Is that my job?

 7          **MR. THOMPSON:**  We're happy to keep the time, Your

 8  Honor.

 9          **MS. MOSS:**  Did you want to go before me?  I can say

10  I'm doubtful that I will have very many questions; and if I go

11  after the plaintiffs, there'll likely be fewer.  But I'm happy

12  to go in whatever order the Court and the plaintiffs want.

13          **THE COURT:**  Why don't you all talk about it.

14  Ms. Welch, did you bring your phone?  Have you got a timer on

15  that phone?

16          **THE CLERK:**  Yes.

17          **THE COURT:**  I'm going to add to your courtroom

18  responsibility.

19          **MS. RIGGS:**  Your Honor, may I go over there?

20          **THE COURT:**  So it's -- so we have 45, 45.  What were

21  those numbers again?  Is any of the 45 -- well, it will be just

22  you.  Is any of the 45 minutes subject to being reserved for

23  redirect examination?

24          **MR. PETERS:**  Yes, Your Honor.

25          **THE COURT:**  All right.

1          **MR. THOMPSON:**  Thank you.  I apologize.

2          **THE COURT:**  That's all right.  All right.  So what's

3   the order?

4          **MR. THOMPSON:**  Well, Your Honor, the order is going

5   to be that Mr. Peters will do the direct, and then we will do a

6   short cross at that point.  Then there will be a long cross.

7   And because we're not really sure if the witness -- whether --

8   you know, if there's a need to cross her, we were going to keep

9   a little bit of time back if we need to do a follow-up, if

10  that's okay, and then she'll do the redirect.

11         **THE COURT:**  Okay.  That's good.  So it will be 45

12  minutes total, 30 minutes total, an hour and 15 total?

13         **MR. THOMPSON:**  Yes, Your Honor.

14         **THE COURT:**  All right.  Ms. Welch has the timepiece.

15  If anybody wants to time -- have a backup timer, you're

16  certainly welcome to do that.  I'm going to try to hold you to

17  it.  But a minute or two either way, I'm not going to worry

18  about too much.

19         The -- I've told Ms. Welch just to yell out at the

20  5-minute mark.  So hopefully -- the reality with timing, having

21  condition some swim meets and some other things, it's

22  occasionally difficult not to get caught up in what happens and

23  forget and that kind of thing.  If that does, it does.  The

24  parties will have to live with it, but we'll do the best we can

25  to give you a five minute alert when the time comes.

1          All right.  Mr. Peters, you may call your witness.

2          **MR. PETERS:**  Thank you, Your Honor.  The State calls

3   Karen Brinson Bell.

4          **THE COURT:**  Ms. Bell, if you will step over right in

5   front of that podium; and once you step inside, unless there's

6   a reason to keep it on, I'll ask you to take it off.

7          (Witness affirmed by the Court.)

8          **THE COURT:**  All right.  You may take the witness

9   stand.  You may proceed.

10         **MR. PETERS:**  Thank you, Your Honor.

11                   KAREN BRINSON BELL,

12           DEFENDANTS' WITNESS, SWORN  AT 2:30 p.m.

13                   DIRECT EXAMINATION

14  **BY MR. PETERS:**

15  Q    Could you state your name for the record, please.

16  A    Yes, Karen Brinson Bell.

17  Q    And what is your occupation, Ms. Bell?

18  A    I'm the Executive Director of the North Carolina State

19  Board of Elections.

20  Q    And I'm going to ask you to look at the stack of papers

21  there on the podium, and do you see what has been marked as

22  Exhibit 1?

23  A    Yes.

24  Q    And can you identify what that document is?

25  A    It's the declaration I provided to the Court.

1  Q    Okay.  So you have provided that declaration, but could

2  you briefly describe for the Court what your responsibilities

3  are as Executive Director of the State Board of Elections?

4  A    I'm the State's chief election official, which means that

5  I'm responsible for the election administration in our state as

6  well as campaign finance compliance and reporting.  I directly

7  oversee the 100 county boards of election in our state and the

8  operations of all elections, federal down to the most local

9  level for our state.

10 Q    Okay.  And what do you understand to be the interest of

11 the State Board and, by extension, your interest as the

12 Executive Director and the chief elections official in

13 administering elections in North Carolina?

14 A    Our fundamental responsibility is to ensure that any

15 eligible voter may do so in our state.

16 Q    All right.  In addition to your experience as Executive

17 Director, do you have other experience as an elections

18 administrator?

19 A    Yes, I've worked in elections administration for 14 years.

20 Q    And what experience other than Executive Director do you

21 have?

22 A    From 2006 until 2011, I worked for the State Board of

23 Elections as a district election technician with the 12

24 westernmost counties of North Carolina.  After that, I was a

25 County Elections Director in Transylvania County for four

1  years.  Then I worked for a software company dealing with
2  elections.  I also was a consultant at a national level dealing
3  with rank choice voting and our experience administering
4  instant runoff voting in North Carolina, and I've also been a
5  precinct chief judge.
6  Q    Okay.  What does being a precinct chief judge involve?
7  A    That means I'm the top -- I was the top official in
8  March 2016 for a precinct in Buncombe County, North Carolina.
9  So I was responsible for the election administration for that
10 precinct on that election day.
11 Q    So does that mean that you have acted in some capacity
12 administering elections at the precinct level, at the county
13 level, and now at the state level?
14 A    Yes, sir.
15 Q    Okay.  We'll go through this in a little bit more detail;
16 but just for a background framework as we start, could you tell
17 us what some of the big picture statutory and administrative
18 deadlines that you and the Board are working with to prepare
19 for the November 3 general election?
20 A    So beyond November 3, we have to be prepared to start
21 early voting, one-stop early voting, on October the 15th.  We
22 have to be prepared to train all the officials that are needed
23 for that in-person voting before we start one-stop or election
24 day.  We also have September 4 as a deadline to administer
25 absentee-by-mail.  That's our deadline for that to start.

1  Q    All right.  What about with regard to one-stop early

2  voting plans?

3  A    Yes.  So the county boards are currently developing those

4  plans.  I issued an emergency order on Friday that extended

5  that deadline from July 31 to August the 7th, and the State

6  Board is going to consider the nonunanimous plans on August the

7  31st.

8  Q    And I'll ask you to look in your stack there at what has

9  been marked as Exhibit 2.

10 A    Okay.

11 Q    Is that the emergency order you just referred to?

12 A    It is.

13 Q    And that was issued on Friday?

14 A    Yes.

15 Q    All right.  We'll come back to that.  You mentioned

16 absentee voting starts on September 4.  What needs to happen in

17 order for absentee-by-mail voting to start on September 4?

18 A    There's considerable preparation that goes into

19 absentee-by-mail.  We have to have all the absentee-by-mail

20 container envelopes prepared, the design for that, and the

21 printing of those envelopes, the printing of the

22 absentee-by-mail instructions that will go out with the

23 packets.  Obviously, we're processing absentee-by-mail request

24 forms currently, and those will be -- based upon the number of

25 forms that have been received, the counties will assemble those

1  packets and make sure that they're out the door by the deadline
2  of September 4.
3  Q    All right.  And what is involved in planning and preparing
4  the container envelopes for absentee ballots?
5  A    We have undergone a redesign of the envelope, and then
6  with the legislative changes we've made further changes to the
7  design of the envelope.  We do have to -- we also work with the
8  Postal Service to make sure that we're in compliance with the
9  Postal Service standards for election mail and also the
10 components of intelligent mail barcoding which we're
11 introducing this election.  Then from there the counties will
12 coordinate to have those printed.  We may also help with the
13 printing, but we have to get in queue with the print houses to
14 have those ballot envelope -- container envelopes printed.
15 We'll also be printing ballots themselves once the nominations
16 are official.
17 Q    You mentioned smart mail barcoding.  What is that?
18 A    Intelligent mail barcoding is going to be applied on a
19 label on the front of the materials that gets sent out as well
20 as what gets returned on the absentee container envelope, and
21 that will allow the voters to track where their ballot is in
22 the system.  We've had the ability for voters to know where it
23 is in the elections office, but this will be the first time
24 that they've been able to actually track it in the postal
25 system.

Q    Okay.  And you also mentioned that you had undertaken a

redesign of the container envelopes.  Why did you do that?

A    If I had the old envelope to show, you would see a

considerable difference.  It was very small print.  It was

very -- we were finding that voters were not completing it

thoroughly, and so we worked with the Center for Civic Design

who has done usability studies about forms and documents

related to elections, and they helped us to design a more

user-friendly envelope so that the voters will better

understand and execute their ballot.

Q    And in terms of getting those envelopes printed and so

forth, where are you in that process?

A    We have -- the Postal Service had a change that they

wanted to make, so we are -- that actually is probably done

while I've been here today, and so then those counties will

have their templates.  They've been in contact with printers.

We know we're on about a four-week schedule, at best, for them

to be able to turn around the envelopes, particularly with the

increased volume that we're -- we already have in absentee

requests.

Q    All right.  Turning to the issue of COVID-19, which, of

course, this litigation is about -- let me ask you first.  Have

you ever administered an election during a global pandemic?

A    Technically, yes, June 23.

Q    And what election was that?

1   A    That was the second primary in the 11th Congressional

2   District Republican runoff, second primary essentially, and

3   then there was a new election called in the Columbus County

4   District 2 Republican primary.

5   Q    Okay.  What -- in your experience both with that election

6   and in planning for the general election in 2020, what are you

7   finding -- what ways are you finding that COVID-19 has an

8   impact on election administration?

9   A    In addition to all the preparatory work that we would

10  normally be doing, we now have to consider public health and

11  social distancing, facilities that will allow for social

12  distancing, protective gear for both the voters and our poll

13  workers, securing poll workers when many of them are in the

14  vulnerable population, and also trying to navigate all of this

15  during supply chain issues that also come up because of the

16  protective gear.

17  Q    Are there any -- other than what you've just mentioned,

18  are there any particular impacts you have either seen or expect

19  for in-person election on voting day?

20  A    We certainly have seen an increase in absentee-by-mail

21  requests.  Typically, we would see about a 4 to 5 percent

22  participation in absentee-by-mail, and right now we're tracking

23  from, you know -- it at least appears that we'll have

24  20 percent, but we're planning for up to 40 percent

25  participation by mail.

1  Q    Okay.  What about the effect on either -- of any kind of

2  in-person voting on election day or early voting?  What does

3  that require you to take into account?

4  A    Certainly, our facilities have to be able to allow for

5  social distancing.  We have to consider whether the voting

6  booths, the check-in stations, where the voters will wait, if

7  those can be properly socially distanced.  We've seen in other

8  states that potentially we could have poll workers not show up.

9  So we're having to account for that.  We could potentially have

10 polling places that have to be closed.  And any of these things

11 account for issues with lines, and, therefore, voters could be

12 standing in line and be exposed to, you know, coronavirus and

13 not have, you know, that ability to go elsewhere.

14 Q    Okay.  And does that have an effect on the planning for

15 polling places?

16 A    It certainly does.  We had to account for that with the

17 June 23 second primary and those facilities, and we're doing so

18 now, and part of the reason for the emergency order was to

19 account for one-stop early voting sites.

20 Q    All right.  Let me ask you.  Other than the emergency

21 order, have you or the State Board taken any action to try to

22 address the challenges that COVID-19 presents?

23 A    We've taken many actions.  Even back in March -- well, we

24 learned the first case in North Carolina was on the March 3

25 primary, so that -- we were already looking at hand sanitizers

1  and things like that because we didn't know what coronavirus

2  meant at that point.  But since then we have had a task force.

3  I've issued an emergency order pertaining to the second primary

4  and to the closure of offices and to how we do our precinct

5  sorts and things of that nature because everything changed.

6           We had to start doing county board meetings in a

7  telephonic or some sort of teleconference format.  We had to

8  limit the number of people who could come into the office and

9  sometimes limit whether the offices could even be opened, so I

10 issued also -- knowing that there was going to be a special

11 session in the legislature, I issued recommendations to them,

12 15 items that we thought would help us to administer the second

13 primary and also the November election.

14          We have formed a task force, if I didn't mention

15 that.  We have also worked with our state emergency management

16 regarding the PPE.  We've done the redesign of the absentee

17 envelope in regards to COVID-19.  We've been holding routine

18 meetings, and I've talked with the counties about the steps

19 they'll need to take in selecting their one-stop sites and how

20 we plan to address precinct mergers as well.  I think I may

21 have covered everything.

22 Q    Okay.  Let me ask you to look in the stack you've got of

23 what, because I was moving quickly and things got out of order,

24 has been marked as Exhibit No. 6.  It says at the top,

25 "Numbered Memo 2020-11."

1    A    Yes.

2    Q    Can you identify what that document is?

3    A    Yes.  So we issued this numbered memo once we knew, you

4    know, the governor and the president had called states of

5    emergency and natural disaster and so forth.  This was to help

6    the counties be prepared to deal with their public meetings, to

7    deal with their canvass issues, because we had not completely

8    wrapped up the primary that was held on March the 3rd, just how

9    they would be able to operate their offices and how they would

10   deal with petitions and voter registration forms that would be

11   dropped off if they were to be closed or could not be open to

12   the public.

13   Q    All right.  And you mentioned writing to the governor and

14   the legislature.  Let me ask you to look at Exhibit Number -- I

15   think this one will be three.

16   A    Yes.

17   Q    Is that the letter that you mentioned writing?

18   A    Yes, this was the memo that we sent with our 15

19   recommendations.

20   Q    All right.  Let me ask you to look on page 3 of that.

21   A    Okay.

22   Q    And do you see a heading that says "reduce or eliminate

23   the witness requirement"?

24   A    Yes.

25   Q    Is there a reason that you said "reduce or eliminate"?

1  A    Yes.  We had recognized that North Carolina up until, you

2  know -- at this point in time North Carolina required two

3  witnesses to an absentee envelope; and because of coronavirus,

4  we knew that would extend the exposure that someone would have,

5  particularly because we know that more than 70 percent of our

6  voters live in a one- or two-person household.  So we made the

7  recommendation to either reduce or to eliminate with the

8  consideration that if they chose to eliminate that we were in a

9  position to consider signature verification.

10 Q    And what is signature verification?

11 A    So states generally -- there's one or two methods that

12 states go about.  They can either have a witness, or they'll do

13 a signature verification to verify who the voter is in an

14 absentee-by-mail, similar to the way when someone votes in

15 person, they would state their name and address to an election

16 official, thereby that election official is essentially

17 witnessing their presence, and there's the opportunity for a

18 challenge.  When you administer absentee-by-mail either by

19 witness or by signature verification, you're verifying that

20 individual.

21 Q    And you said we would have been in a position to utilize

22 signature verification if the General Assembly had eliminated

23 the witness requirement?

24 A    Yes, we were -- I'm aware -- we were aware at that time

25 that there is software that does signature checking or

1  signature matching that can help with that process and is used
2  by most states that use signature verification.
3  Q    If the witness requirement were eliminated now, would you
4  be in a position to utilize signature verification?
5  A    No, we would be hard -- I don't think we could do it at
6  all.  We don't have an exemption from the procurement process
7  at this point.  We would not have time to properly train or
8  implement that system, and I would have to even inquire whether
9  there is a vendor who could meet the deadline because so many
10 other states are going through these processes as well to
11 address COVID-19.
12 Q    Okay.  Let me ask you to look at what's been marked as
13 Exhibit No. 4, and is that one of the numbered memos you listed
14 earlier in the list of things you had done?
15 A    Yes, this is one of the numbered memos.  We did this for
16 the June 23 second primary and election.
17 Q    All right.  And then No. 5, Exhibit No. 5, is that also
18 one of the numbered memos you have issued?
19 A    Yes, this one is the direction we gave to all 100 counties
20 pertaining to their one-stop plans for this upcoming election.
21 Q    Okay.  Can you tell us just a little bit about the
22 Judicial Voter Guide and how that will be utilized with
23 particular reference to COVID-19 this election?
24 A    Right.  We would do -- we still have the funds available
25 to do a Judicial Voter Guide.  So in addition to covering the

1  judicial races, we'll be doing some voter education about not

2  only absentee-by-mail, but the steps we're taking with

3  in-person voting during the pandemic.  We'll also include an

4  absentee-by-mail request form.  It will be in the centerfold

5  for the voter to complete and return to the county board of

6  elections.

7  Q    And that is -- am I correct that that's sent to every

8  household in the state?

9  A    That's right, every household.

10 Q    All right.  What are you doing with regard to recruiting

11 poll workers across the state?

12 A    About a month ago, we launched the Democracy Heroes

13 Campaign.  That's our effort to -- at that point in time it was

14 to put an interest survey up on our website.  We're promoting

15 that through press releases.  So the media is asked and covered

16 that; we've done it through social media; and we are extending

17 that working with civic organizations, veterans groups, the

18 university system as a means to recruit individuals who would

19 be interested in serving for this election.

20 Q    All right.  Let me just ask one question.  With regard to

21 numbered memo 2020-13, did it have any recommendations in it

22 regarding how many days the one-stop locations should be

23 opened?

24 A    Yes, I "strongly encouraged," I think those are my exact

25 words in that memo, that they utilize all 17 days of the early

1 voting period.

2 Q    All right.  Now, let me go to a couple of specific matters

3 that are at issue in this case.  Can you describe briefly what

4 is the process in getting and voting an absentee ballot?

5 A    So the voter can go online and print off a request form.

6 They can call and have one mailed to them, or they can, you

7 know, complete the form and mail it in themselves, fax or email

8 as well, but they do need to complete the state-issued absentee

9 request form.  Once we receive that, it's processed in our

10 system.  Currently, we can't mail the -- we can't fulfill the

11 request, but we will by September 4 once we have the ballots

12 printed.  We -- did you just want to know the request part or

13 the entire process?

14 Q    If you want to run through the whole thing, just the quick

15 overview of it.

16 A    Yes.  That request could also be made by their legal

17 guardian or near relative, I should point that out, and they

18 can drop it off in person before we complete the process.

19        So then they'll receive their packet.  It gives them

20 instruction on having a witness present.  When they do mark

21 their ballot, they'll sign, the witness will sign.  They can

22 have assistance with that process, and that's notated.  They

23 then mark their ballot, put that in the envelope, and then they

24 return it to us either by mail or by dropping it off at the

25 county board of elections or at the one-stop sites during that

1   one-stop period.

2   Q    And are there restrictions upon who can make the request

3   on behalf of the voter, is that correct?

4   A    That's correct.  It's only the voter or their near

5   relative or legal guardian.

6   Q    And are there restrictions with regard to who can deliver

7   the ballot on behalf of the voter?

8   A    It's the same individuals.

9   Q    Okay.  Are there any restriction on who can assist the

10  voter with any other aspect?

11  A    When they're marking their ballot, they can be assisted,

12  but it can't be a candidate, for example, unless that's the

13  near relative.  There's also restrictions if they're in a care

14  facility.  It cannot be someone who is employed by that care

15  facility.

16  Q    Are those the only two restrictions on who can assist in

17  completing the ballot?

18  A    Yes.

19  Q    Okay.  And how can a voter obtain the absentee ballot

20  request form?

21  A    It's available on our website.  They can call the Board

22  office and have one sent to them.  It's also -- we do not

23  restrict others from making copies of blank ballots -- or

24  excuse me -- ballot request forms and providing that to them,

25  but they do have to be blank, and they do have to be the

1  State-issued form.  And then we are currently in development on

2  an absentee portal that will be launched before September 1 or

3  by September 1 to allow them to complete that electronically.

4  That was authorized by the legislation in one of my

5  recommendations.

6  Q    All right.  And how can the completed form be returned?

7  A    That can be faxed; emailed; if it's through the portal, it

8  will be electronically returned; or they can deliver it in

9  person or through the mail.

10 Q    All right.  Let me ask you, are you familiar with what

11 happened in Congressional District 9 in the 2018 election?

12 A    I'm familiar.  I was not Executive Director at the time,

13 but I'm familiar.

14 Q    What is your understanding of what happened?

15 A    A gentleman by the name of McCrae Dowless was hired by one

16 of the candidates in the Congressional District 9.  He was

17 hired by the Republican candidate to essentially -- I mean, he

18 organized a group of individuals who went out and collected and

19 the voter -- excuse me -- absentee request forms.  In some

20 cases they processed those or sent those in fraudulently.  Then

21 with the ballots, once those folks received it, they were

22 witnessing, sometimes improperly, not in the presence,

23 sometimes the voter didn't know that it was being done, and it

24 was -- you know, they were being paid to do all of this.

25 Q    All right.  And that was uncovered when?

1   A    The State Board of Elections uncovered that.  It was

2   during the State Board's canvass meeting that it was first

3   revealed, and then it was investigated.

4   Q    And canvass is what?

5   A    That's the certification period.  There's a county canvass

6   and then the State Board does the final certification.

7   Q    Okay.  Does the term "ballot harvesting" mean anything to

8   you as an election administrator?

9   A    Yes.

10  Q    What -- go ahead.

11  A    I'm sorry.  So, yes, ballot harvesting -- well, in --

12  that's actually the phrase that we use in terms of what McCrae

13  Dowless was doing.  He was ballot harvesting, but the issue was

14  he was ballot harvesting fraud.  That's the issue.

15           Ballot harvesting, you know, is permitted, at that

16  point in time especially, meaning that organizations can help

17  voters.  But he was fraudulently doing it by having people

18  witness who were not really witnessing by, you know, sending

19  them without the voter's knowledge or manipulating the process.

20  Q    And in contrast to ballot harvesting, what do you

21  understand to be voter fraud?

22  A    So voter fraud is typically more about when someone's

23  impersonating another, when a voter presents themselves or

24  tries to double vote or something -- presents themselves as

25  another or tries to double vote as themselves or another.

1   Q    All right.  So what happened in 2018 Congressional

2   District 9, if I understand you correctly, was ballot

3   harvesting rather than voter fraud?

4   A    Yes.  Yes, sir.

5   Q    Okay.  Has the Board -- State Board ever done any other

6   investigation into the incidence about harvesting in North

7   Carolina?

8   A    In 2017, the prior Executive Director ordered an audit.

9   It stemmed from some, you know, concerns that had arisen in the

10  2016 election due to a number of protests and things.  The

11  audit was looking for, you know, any irregularities,

12  particularly, you know, determining if data illustrated, and

13  then there was some investigations conducted based upon that

14  audit.

15  Q    All right.  And was an audit -- a report issued of that

16  audit?

17  A    There was a report issued.

18  Q    And is that a publicly available report?

19  A    It is.

20  Q    Have you done any investigation -- has the State Board

21  done any investigations into the incidence of other types of

22  voter fraud like double voting or voter impersonation?

23  A    When we receive a complaint, we consider, you know, the

24  merits of the situation, and our Investigations Division looks

25  into those situations.  And I know of some circumstances from

1  that audit and so forth that have occurred because of

2  complaints or data they received.

3  Q     And in the course of doing those investigations, has the

4  State Board found any evidence of widespread voter fraud -- in

5  terms of double voting or voter impersonation?

6  A     No, it's -- actually, nationwide, it's very, very minimal.

7  I believe in that particular situation, there were over

8  4 million voters, and the two cases of voter fraud were two

9  individuals.

10 Q     All right.  I want to move to uniform hours requirement

11 for early voting.  You stated earlier that early voting starts

12 on October 15?

13 A     That's right, Thursday, the 15th.

14 Q     And what needs to happen before early voting can start on

15 October 15?

16 A     The counties procure the sites; and in some ways, because

17 of COVID-19, they're actually looking for new facilities,

18 because previous facilities wouldn't be large enough to

19 accommodate social distancing and the spacing that's needed,

20 both while the voter stands in line or while they're voting.

21 So in some cases they're leasing commercial spaces, or they are

22 working with government entities or, you know, community groups

23 that might allow for the use of their buildings to make sure

24 there's no conflict and to also promote that to the public.

25            So mid-September, we will put out a notice of these

1  sites.  They will -- you know, once they identify the number of

2  sites, that will be how they determine how many workers they

3  need.  Workers, because of the number of hours, generally work

4  in shifts, so you'll have more than one team assigned to each

5  site.  That's also important during COVID-19 because if one

6  team were to have an illness due to somebody contracting

7  coronavirus, then we would have a backup team to come in.

8  They'll have to train those individuals.  They'll have to

9  prepare all the laptops for the check-in process.  They'll have

10 to, you know, go through, you know, just -- I mean, those are

11 the basic procedures and prepare for curbside voting during

12 that period, too.

13 Q    What is curbside voting?

14 A    That's when an individual who can't enter the polling

15 place due to age or disability is allowed to vote from their

16 car, and a precinct official or one-stop official basically

17 serves as their feet to and from the polling place.

18 Q    And you mentioned letting people know where the early

19 voting sites are, I think you said in mid-September, is that a

20 statutory deadline?

21 A    Yes, we're required to give notice 45 days before one-stop

22 begins.

23 Q    You've mentioned an emergency order a few times.  Why did

24 you issue that emergency order?

25 A    Are you meaning the one on Friday?

1  Q    Yes.

2  A    Okay.  So in looking at the one-stop period, we -- not

3  only had I stressed in a previous memo that we wanted to

4  utilize all 17 days, the rationale behind that and then the

5  rationale behind the emergency order is because we have seen in

6  other states that if you don't have adequate spaces, if you

7  don't have adequate hours and opportunity, that -- you know,

8  and spread those opportunities, then you wind up with lines,

9  you wind up with closures, you wind up with people being

10 exposed for extended periods of time.

11        And so what I knew that had to be done is we're

12 reaching that point where, you know, if a county is going to be

13 able to procure a site, if they need additional sites, they

14 needed to know through that emergency order that we had

15 determined that they should have additional hours -- or minimum

16 is what we said -- a minimum number of hours on the weekends,

17 the two full weekends.  The final weekend is already set by

18 law.  That's Saturday, eight to three.  But for those first two

19 weekends, we wanted a minimum of 10 hours for each of the sites

20 to be opened.

21        We also looked at data from previous elections and

22 realized the number of people who were turning out and the

23 median of that and then looked at the number of people who had

24 voted on single days, and many sites, large counties/small

25 counties, were having people more than 1,000, more than 1,500,

1   more than 2,000 show up on a single day.  And so we knew if we

2   didn't determine a certain ratio for them to open enough sites

3   that we would be risking lines.

4            So that was the purpose of the emergency order.

5   Q    I believe you mentioned in your declaration that you were

6   working on a process by which county boards could cure problems

7   with absentee ballot requests and absentee ballots.  Do I

8   recall that correctly?

9   A    Yes, that's one of the items of data that we're working on

10  right now.

11  Q    So you're still working on that right now?

12  A    Right.  We haven't issued that, but we're drafting it.

13  Q    What are your plans with regard to that guidance?  I mean,

14  not necessarily the specifics of it, but in terms of relaying

15  it to the counties and that sort of thing.

16  A    The counties would already have a practice that if

17  someone's request form wasn't complete or if their ballot

18  wasn't complete, the staff reviews these before they put them

19  before the board, but the board has an obligation, too, to

20  approve them if completed properly.  But they would reach out

21  to voters, but this will be very specific to ensure uniformity

22  across all 100 counties that be it the request form or be it

23  the actual ballot returned document that if they are not

24  completed properly that there will be a uniform cure.

25  Q    All right.  And would I be correct in assuming that you

1  intend to have that guidance ready in time for counties to be

2  able to train all their election workers on how to implement

3  it?

4  A    Yes.  That guidance pertains primarily to the full-time

5  staff that you would see in the elections office or the

6  temporary staff that they would have.  Like I said, it's --

7  I've seen some degree of a draft.  We've met and talked about

8  it.  It's just not issued yet, but it will be very shortly.

9           **MR. PETERS:**  I believe that's all the questions I

10  have at this point.  Thank you.

11          **THE COURT:**  All right.  Ms. Welch, did you turn the

12  clock off?

13          **THE CLERK:**  Yes, sir.

14          **THE COURT:**  How much time has he got left?

15          **THE CLERK:**  10 minutes, 23 seconds.

16          **THE COURT:**  All right.

17          **THE WITNESS:**  Is there anyway I can get some water?

18  I know we're in strange times for --

19          **THE COURT:**  I'll tell you what we'll do.  I left a

20  couple of things upstairs, so why don't we take five minutes,

21  and you can step down.  There's water on each of the counsel

22  tables.  I'm sure Mr. Peters will be happy to you -- have you

23  got water?

24          **MR. PETERS:**  We have cups --

25          **THE WITNESS:**  There's a water fountain outside.

Case 1:20-cv-00911-WO-JLW   Document 1-6   Filed 09/26/20   Page 56 of 139

 1          **MR. PETERS:**  I have a bottled water that I think has

 2   not been opened yet.

 3          **THE WITNESS:**  Okay.  Thank you.

 4          **THE COURT:**  I lied to you.  I'll tell you what.

 5   There's some small bottles of water in the fridge.  We'll put

 6   six -- we'll get six of them and put them out on everybody's

 7   table.  We'll be at ease for five minutes.

 8              (At 3:05 p.m., break taken.)

 9              (At 3:13 p.m., break concluded.)

10          **THE COURT:**  Ms. Moss?

11          **MS. MOSS:**  Yes, sir.

12                      DIRECT EXAMINATION

13   **BY MS. MOSS:**

14   Q    Good afternoon, Director Bell.  My name is Nicole Moss.

15   I'm one of the attorneys representing the Legislative

16   Defendants.  You may recall we met last year when I took your

17   typings?

18   A    I do.

19   Q    It's good to see you again.  I have just a few quick

20   questions.  It won't be that long.

21          In terms of your projections of the number of

22   absentee ballots by mail that you're going to get this year,

23   you originally thought it would be 30 or 40 percent.  Am I

24   recalling that correctly?

25   A    That's correct.

1  Q    What is your current estimation of the number of

2  absentee-by-mail ballots you expect to get?

3  A    We're still working on that number if for no other reason

4  but to be sufficiently prepared, but we're now -- we're

5  figuring that it will be anywhere from 20 percent might be the

6  low to 30 percent.  Probably going to be tracking for about

7  30 percent participation by mail.

8  Q    And in terms of planning for the various polling sites for

9  early voting, are there reasons other than poll worker shortage

10 that may cause a county to not use a site that it's used in

11 past years?

12 A    Yes.  We -- this happened in the June 23 primary, for

13 example.  There are some facilities that are so small.  I think

14 of one in Madison County that is about 150 square feet, so that

15 doesn't allow for social distancing of the precinct officials,

16 much less of the voters and the voting booths.  It also does

17 not have running water which we find in some of our more rural

18 locations.

19 Q    Were there polling sites that have been traditionally used

20 for early voting that are located in or near nursing

21 facilities?

22 A    Generally, our early voting sites are not in care

23 facilities or retirement communities, but you might find that

24 for an election day site.

25 Q    And you're aware that one of the requirements that is

1  being challenged in this case is what's known as the uniform

2  hours requirement.  Are you familiar with that --

3  A    Yes, I am.

4  Q    -- challenge?  In your emergency order that you discussed

5  with Mr. Peters, did you make any provisions that would

6  allow -- or require, I should say -- counties to offer certain

7  number of early voting sites?

8  A    State your question again, please.

9  Q    Sure.  Did your emergency order have any requirements for

10 counties to offer a certain number of early voting sites?

11 A    We did instruct them that we wanted there to be -- if a

12 county had fewer than 20,000 registered voters, then they could

13 have simply one site, but that one site should have an

14 alternate in case that facility had to be shut down.  We wanted

15 to know that there was a backup staffing and backup site in

16 that circumstance.

17          For counties above 20,000 for, you know, even if

18 they're 21,000 registered voters, that would then say they

19 would have two sites for each 20,000 registered voters or

20 portion of.  They can request a waiver if they can demonstrate

21 that there's adequate social distancing, that they can reduce

22 the wait time, and things of that nature.

23 Q    Just to make sure I understand.  It's one site per 20,000

24 registered voters, unless they get an exception?

25 A    Or portion of, so, yes.  If a county has 21,000 registered

1  voters, we still suggest -- you know, ordering that they would

2  have two sites or request a waiver.

3  Q    When you review the one-stop plans that the counties, I

4  guess, now have to submit by August 7, does the number of sites

5  that they offer come into consideration in determining whether

6  to approve the plan or not?

7  A    The -- if a county board is unanimous and is complying

8  with the emergency order, then that would move forward.  There

9  would be no reason to not allow for that.  If they are

10 nonunanimous, then that goes before the state board.

11 Q    And when it goes before the state board, do you take into

12 account -- or will you consider the number of hours that are

13 being made available to voters to go to the early voting sites

14 in that county?

15 A    That has traditionally been one of the factors.

16 Q    Is one of the factors the number of sites that will be

17 made available for voters?

18 A    They do consider that as well.

19 Q    And can the state board not approve a plan if it doesn't

20 believe either of those things is sufficient?

21 A    They have sort of -- in the past, they have at times

22 issued their own plan, not choosing the minority or majority

23 plan if they felt like there was -- if neither plan provided

24 for the factors that they were considering or the quality of

25 cites that they felt like were needed in the counties.

Case 1:20-cv-00911-WO-JLW   Document 1-6   Filed 09/26/20   Page 60 of 139

1    Q    One last area I want to talk to you about, and that's the

2    assistance that may be provided to individuals in nursing

3    facilities or other similar congregate care facilities and

4    filling out their absentee ballots.  I believe you told

5    Mr. Peters that there are restrictions on who can assist a

6    resident, for example, in nursing facilities, is that right?

7    A    Yes.

8    Q    And are you aware of why the restriction is in place to

9    prevent staff from assisting residents of nursing facilities

10   from filling out absentee ballots?

11   A    Though I didn't write the statute that prohibits it, my,

12   you know, understanding is that it's to ensure there's not, you

13   know, any nefarious acts towards that voter by the care

14   facility person, you know, either mismarking their ballot or

15   misrepresenting that ballot.

16   Q    Is there a concern that the staff may be able to exercise

17   undue influence over the residents?

18   A    Again, I didn't write the statute, but that could be part

19   of the reasoning.

20          **THE COURT:**  All right.  Let's turn the clocks off.

21          All right.  So at present, as you're aware, nursing

22   facilities are on lockdown.

23          **THE WITNESS:**  Yes, sir.

24          **THE COURT:**  Limited entrance and exit.

25          **THE WITNESS:**  Or no entrance or exit.

 1        THE COURT:  Or no entrance or exit.  So a nursing --

 2  when we're talking about nursing care facilities, we're not

 3  talking about independent living retirement homes exclusively.

 4  We're talking about nursing facilities, and in my mind those

 5  are two different things.  Is that your understanding as well?

 6        THE WITNESS:  They could be variations of those.  It

 7  could be a hospital, a Hospice center, a rehab center.

 8        THE COURT:  Okay.  So let's take an extreme example.

 9  A facility where people are in various states of lucidity,

10  physical ability, physical strength, and other things.  So if

11  that's a locked down facility, walk me through how someone who

12  wants to do an absentee ballot perhaps requiring assistance is

13  going to be able to vote, at least in your review of the plan

14  that's coming to fruition.

15        THE WITNESS:  Right, yeah, and I should have stated

16  earlier that a Multipartisan Assistance Team can assist.  I

17  simply said the voter or the near relative or legal guardian.

18  But, yes, so if there's a voter within a facility, there can be

19  a request made to the county board of elections by the voter by

20  someone in that facility.  That's not a problem if they contact

21  the county board and say that there's a need for a

22  Multipartisan Assistance Team to come out.  They can help with

23  the request form and that process, or they can help with

24  witnessing or assisting the voter in their -- you know, with

25  their ballot.  They --

Case 1:20-cv-00911-WO-JLW  Document 1-6  Filed 09/26/20  Page 62 of 139

 1          THE COURT:  Okay, so -- go ahead.

 2          THE WITNESS:  No, go ahead with your question.  I

 3 might can clarify it.

 4          THE COURT:  So I understand that there are these

 5 services available, but how do they get in?

 6          THE WITNESS:  I mean, traditionally, they would

 7 just -- you know, they would have coordinated with the care

 8 facility.  They would know that they were coming.  They

 9 could -- you know, if it's multiple people in the facility,

10 they could set up in their cafeteria or something like that.

11 They can go from room to room --

12          THE COURT:  But, I mean, is -- I don't want to press

13 you too much, but you're the Executive Director and going to be

14 responsible for this.  If the facility is on lockdown, how

15 does -- how do I get in?

16          THE WITNESS:  No, I totally understand.  This was --

17 it was one of my recommendations.  It's the one that's probably

18 weighed on me the most that I actually issued another memo to

19 the legislature saying, you know, if you -- the reason I'm

20 wanting this is because we don't know.  If they're not even

21 allowing family members to go visit someone, how do I send in a

22 Multipartisan Assistance Team, not expose them, not expose the

23 residents when we see the outbreaks.

24          And so what I proposed to the legislature is what is

25 done in some other states like Indiana where two officials --

1    two employees are designated.  It's known.  It's on record.

2    They can be of different political parties.  They can go

3    through training, and they work with the county board of

4    elections to administer.  That's the recommendation that I made

5    to the legislature, but they did not take action to that.

6              And so now we're working with Health and Human

7    Services to develop some sort of guidelines to give a report

8    back to the legislature, but those guidelines have to go into

9    effect now, you know, or soon by August 1, and it's at a time

10   when they're even trying to determine, well, can they let those

11   residents come out in to, say, the courtyard or the front porch

12   or something like that to visit with their family.

13             **THE COURT:**  If we go back to a Hospice facility, the

14   likelihood of somebody being able to get up and walk outside --

15             **THE WITNESS:**  Is very slim.

16             **THE COURT:**  -- is very slim.

17             **THE WITNESS:**  Yeah.

18             **THE COURT:**  So if -- let's say if I were to enjoin

19   that statute and say this limitation that's been put in place

20   that prohibits nursing -- we're going to say employees of the

21   nursing home.

22             **THE WITNESS:**  Um-hum.

23             **THE COURT:**  I get that there can be varying degrees

24   of concern about undue influence.  But if I were to say enjoin

25   the part of the statute that says the director -- no, excuse

 1  me -- enjoin the part of the statute that would prohibit an

 2  employee -- we'll leave the prohibition in place as to a

 3  director or assistant director or other levels of the

 4  statute -- what then in the absence of a statute happens in

 5  terms of how those ballots will be administered by the State

 6  Board?  Are you going to issue -- would you then have to issue

 7  guidance to the local boards to say this part of the statute's

 8  been enjoined so they can use an employee of the facility to

 9  witness or assist in filling out the ballot?  Is that what

10  would happen then?

11          **THE WITNESS:**  That's what we would do, and I think at

12  that point what I envision is if a care facility were not

13  already identified and have the employee identified or

14  employees that we could also -- you know, if they contact us,

15  we could at that point say they need to complete training

16  before we would issue the materials, but we have training for

17  our Multipartisan Assistance Teams so we would utilize that

18  training and just apply it to those employees.  Then we could

19  even go so far as to deliver -- we would still use

20  Multipartisan Assistance Teams to deliver the materials there,

21  you know, but we can coordinate that.  That is what I was

22  recommending.

23          I also just, for your knowledge, will say that not

24  only did they not go towards the recommendation I made, but

25  they expanded what the Multipartisan Assistance Teams can do,

 1  and now we're supposed to provide guidance on how someone,
 2  anyone, can request a Multipartisan Assistance Team, which also
 3  causes us pause, because now if someone requests it, we have to
 4  send them to their home not knowing whether they have
 5  coronavirus, or, you know, if it's -- I mean, candidly, a
 6  domestic violence situation, you know, or someone who still,
 7  you know, is homebound and can't come outside, then I'm sending
 8  those people in as well to someone's home which is even more
 9  limiting in some ways.
10          THE COURT:  So at least in terms of the nursing home
11  thing, though, there is a little bit of an issue with respect
12  to -- assuming nothing changes with respect to coronavirus, and
13  nursing homes or assisted care facilities remain on lockdown in
14  November, there's going to be a problem if people can't come in
15  to assist as is contemplated by the statute.
16          THE WITNESS:  Yes, sir.  If there's a problem for the
17  voter, there's a problem in delivering it, there's a problem in
18  having the people who would even deliver it.  I mean, at least
19  the people who are already working there are taking
20  precautions.  They're already -- you know, they're employees.
21  They're being tested and things of that nature, and they're
22  already working in that facility.
23          But the risk that I have -- I mean, it weighs on me
24  because I have to consider not only am I exposing that voter,
25  but I'm exposing those people, and at that point if you were a

1  member of a Multipartisan Assistance Team and caught

2  coronavirus, would you be willing to continue, or would you --

3  if you heard that one of your teammates had contracted it,

4  would you be willing to continue?  That's a struggle.

5          THE COURT:  Yep, the bad news for you is I get to ask

6  the questions, you don't.

7          THE WITNESS:  I'm sorry.

8          THE COURT:  That's fine.  All right.  Start the

9  timer.  You can continue.

10          MS. MOSS:  Your Honor, you asked some of the

11  questions I was going to ask.

12  BY MS. MOSS:

13  Q    Would you agree that if that provision was going to be

14  stricken, that some regulation should be put in place on how

15  staff could assist nursing facility residents such as limiting

16  the number of staff and training them?

17  A    Yes, that's what I recommended in April to the

18  legislature.

19          MS. MOSS:  Your Honor, I have one exhibit I would

20  like to show her, if I may.  I apologize now for the printing.

21  I printed this at the hotel, and it printed back to front and

22  kind of upside down.  Shall I leave that here for the witness?

23          THE COURT:  Yes, that will be fine.

24          MS. MOSS:  Do you want me to take it to her or --

25          THE COURT:  Yeah, just put it up there on the

 1  bench -- on the witness box.  If you need one back, you can

 2  have it.

 3          THE REPORTER:  Ms. Moss, could you move your

 4  microphone?  I'm having just a tad bit of trouble.  If you can

 5  just move it a little more in front of your mouth, please.

 6  Thank you.

 7          MS. MOSS:  Yes.

 8          THE COURT:  Okay.  So let me show you the microphone.

 9  Well, go ahead.  So it's best if you can get the microphone so

10  as you ask the question, you're talking across the microphone,

11  if that makes any sense to you.

12          MS. MOSS:  It does.

13          THE COURT:  It can be a little bit on the low side.

14  BY MS. MOSS:

15  Q    So, Director Bell, if you could turn to page 2 of this

16  exhibit, which is on the back side of the first page, I'll flip

17  it over.  It's printed upside down.  This is -- and I'll

18  represent to you this is a printout from the website for the

19  Davis Community, which we understand from filings in this

20  record is the nursing facility in the Porters Neck area of New

21  Hanover County where Plaintiff Mr. Hutchins resides.

22          On their website, they have a section that talks

23  about that this week Governor Roy Cooper gave approval for

24  nursing homes in North Carolina to allow for outdoor visits

25  with nursing home residents provided that certain -- or several

1  certain conditions have been met.  Is that something -- are you

2  familiar with the order by Governor Cooper that allows for

3  outdoor visits at nursing facilities?

4  A    I'm generally familiar with it, not detailed.

5  Q    Okay.  And I take it -- do you have any familiarity with

6  what the rules are for each of the nursing facilities in the

7  state as to whether they're at a point where they can comply

8  with the governor's lifting the restrictions at this point?

9  A    I haven't gotten into the details of it, no.

10  Q    Okay.  And this particular printout from the website, it

11  goes on to say that:

12          "Unfortunately, these limitations mean that we

13  cannot yet resume visitations for our residents.  As I've been

14  sharing with you, we are still considered to be in the midst of

15  an outbreak and can't allow visitors right now.  In the

16  meantime, we are developing visitation policies with plans to

17  welcome visitors as soon as possible."

18          I take it you have no specific familiarity with what

19  the Davis Community is doing currently?

20  A    No, I don't.

21  Q    And do you know whether they will, in fact, be open to

22  allow some form of visitation before November?

23  A    I don't think we know what any of the facilities are going

24  to be doing between now and November.

25  Q    So it's possible they could, it's possible they may not?

1    A     That's right.

2            **MS. RIGGS:**  Objection, calls for speculation.

3            **THE COURT:**  I'll overrule it.

4            **MS. MOSS:**  That's all the questions I have.  Thank

5    you.

6            **THE COURT:**  All right.  Cross-examination?  Clocks

7    off.  Just a second, we'll get you the time.  That was 10:58.

8            **MS. RIGGS:**  I'm sorry, Your Honor?

9            **THE COURT:**  That was 10:58, roughly.  We'll call it

10   eleven minutes.  If you need the two seconds, you can ask.

11           All right.  You may proceed.

12           **MS. RIGGS:**  Thank you, Your Honor.

13                          CROSS-EXAMINATION

14   **BY MS. RIGGS:**

15   Q     Good afternoon, Director Bell.

16   A     Hello.

17   Q     A central goal of the State Board of Elections and you, as

18   its Executive Director, is to ensure that all eligible North

19   Carolinians are able to cast their votes safely in the

20   November 2020 election, correct?

21   A     Correct.

22   Q     In recognition of that goal, you made a series of

23   recommendations in two separate letters to the legislature

24   about election law changes that could help protect voters and

25   poll workers, correct.

1  A    Correct.

2  Q    You also formed a task force to make to help you gather

3  best practices and advice with respect to COVID-19 election

4  responses, is that correct?

5  A    Yes.

6  Q    No county board of elections member was part of your

7  COVID-19 task force, is that right?

8  A    No county board member, correct.

9  Q    Okay.  And that would include the declarants from the

10 Cumberland and Wake County Board of Elections offered by

11 Legislative Defendants in this case, correct?

12 A    If they are board members, they are not members, correct.

13 Q    It's true, isn't it, that on March 26 and April 22 of this

14 year, you recommended that the legislature either reduce or

15 eliminate the requirement for witness signatures for absentee

16 ballots?

17 A    Yes, I did.

18 Q    And you made that recommendation because you wanted voters

19 to have less exposure to someone outside of their home, is that

20 right?

21 A    Yes.

22 Q    I believe you talked to Mr. Peters about how approximately

23 70 percent of North Carolina registered voters are within a

24 one- or two-person household.  Did I get that number, correct?

25 A    Yes, it's 70-some percent.

1  Q    Okay.  And do you have any reason to dispute the statistic

2  that 28.42 percent of North Carolina registered voters live in

3  a single-person household?

4  A    I don't know that statistic one way or the other.

5  Q    Okay.  And, likewise, you would have no basis to dispute

6  the statistic that of those 28.42 percent of North Carolina

7  registered voters who live in a single-person household, that

8  37.37 percent of those voters are ages 65 or older?

9         **MS. MOSS:**  Objection, Your Honor.  She just testified

10  she has no basis to know if that statistic is accurate or not.

11         **THE COURT:**  Do you know that statistic?

12         **THE WITNESS:**  Not without looking it up, no.

13         **THE COURT:**  I'll sustain.

14  **BY MS. RIGGS:**

15  Q    And when you made that -- those recommendations to the

16  legislature, you thought that there would be an eight-week

17  window in which the pandemic might be brought under control, is

18  that correct?

19  A    During that time, yes, we were all talking about an

20  eight-week window --

21  Q    Okay.

22  A    -- as the key time period.

23  Q    And as of last Friday when you issued your emergency

24  order, you're aware from the North Carolina Department of

25  Health and Human Services that North Carolina's daily case

1  counts of COVID-19 continue to increase, is that correct?

2  A    That is my understanding, yes.

3  Q    And you're aware from DHHS that the percent of COVID-19

4  tests that are positive remains elevated, is that right?

5  A    That's my understanding, yes.

6  Q    And you're aware from DHHS that Emergency Department

7  visits for COVID-19-like illnesses are increasing, is that

8  right?

9  A    That's right, that's my understanding.

10  Q    And, likewise, from DHHS, you're aware that

11  hospitalizations for COVID-19 are increasing, correct?

12  A    That's correct.

13  Q    And since you issued those recommendations on March 26 and

14  April 22, you've become aware from the North Carolina

15  Department of Health and Human Services of evidence that

16  suggests the probability that COVID-19 transmission indoors is

17  approximately 18.7 times higher than in open air environments,

18  is that right?

19  A    I've been advised, yes, that's an issue.

20  Q    And all in-person voting is conducted indoors, correct?

21  A    Well, actually during the second primary, we had one

22  county that conducted it outdoors.  But, generally, yes

23  in-person voting is conducted indoors except for the curbside

24  voting.

25  Q    Is that the only example of a polling place that wasn't

1   indoors that you're aware of?

2   A     That I'm aware of, yes.

3   Q     Okay.  You stated publicly that it's critical that voters

4   are able to exercise their constitutional right to vote without

5   undue risk, correct?

6   A     Yes.

7   Q     And you're aware from researchers -- you're aware that

8   researchers from Wisconsin found a statistically and

9   economically significant association between in-person voting

10  and the spread of COVID-19 two to three weeks after the

11  election, is that correct?

12  A     That's my understanding, yes.

13  Q     You testified in deposition months after you made these

14  recommendations that, and I quote, we do not have strong mask

15  compliance.  Isn't that correct?

16  A     I don't recall saying that specifically.  In what regard?

17  Are we talking about voters or --

18  Q     Would it --

19  A     -- North Carolinians or --

20  Q     Would it refresh your recollection if I handed you a copy

21  of your deposition transcript from last week?

22  A     You can, but I think if you'll just clarify your question

23  for me, maybe I can respond.

24          MS. RIGGS:  May I use the ELMO to display?  May I

25  approach, Your Honor?

 1          **THE COURT:**  If you've got to use the ELMO, just pop

 2   it up.

 3          **MS. RIGGS:**  Give me one second.  Do you see on

 4   lines 21 through 23 --

 5          **MR. PETERS:**  I'm sorry, which page is this?

 6          **MS. RIGGS:**  Sorry, page 138, lines 21 through 23.

 7   You were speaking, I believe, with Mr. Patterson at the time.

 8   Can you see it, or do you need me to zoom?

 9          **THE WITNESS:**  I can see it.

10   BY MS. RIGGS:

11   Q    Okay.  You said:  "And I know more and more people

12   personally who have been affected by it, and we do not have a

13   strong mask compliance, and we've been told that it will help."

14          You continue on to say:  "So do we fear that we will

15   still be in a pandemic situation in November?  Yes, we do."

16          Do you recall saying that now?

17   A    I do.  I think I was talking about in general overall

18   compliance of North Carolinians or as a country.

19   Q    And in your executive -- sorry -- in your emergency order

20   issued Friday, you noted explicitly that voters will not be

21   required to wear a mask at polling places in November -- or in

22   October/November, correct?

23   A    I stated it on Friday.  I stated it before.  There is no

24   constitutional requirement for an individual to wear a mask in

25   order to vote.

1  Q    And you understand that voters being exposed to other

2  voters who are not wearing masks could increase their risk of

3  transmitting and contracting COVID-19, is that right?

4          **MS. MOSS:**  Objection, to the extent it's asking her

5  to offer a medical opinion.

6          **THE COURT:**  Well, as the Director of the State Board,

7  I think she's entitled -- I think they're entitled to inquire

8  as to what her understanding may be so that they better

9  understand the requirements that they may be putting in place.

10  Her understanding is not a medical opinion, but her

11  understanding certainly would seem to me something that would

12  guide her decision-making process, so I'll overrule.  You can

13  answer the question.

14          **THE WITNESS:**  Could you repeat your question,

15  please --

16          **MS. RIGGS:**  Can the court reporter read it back?

17          (Question read back by the reporter.)

18          **THE WITNESS:**  What I understand is that we are

19  providing masks at all polling places for any voter who wishes

20  to wear one.  We are requiring our poll workers to wear masks,

21  and so that's how we're able to comply with exposure -- risk --

22  lessening the exposure that anyone would have in contracting

23  the virus in terms of masks.

24  **BY MS. RIGGS:**

25  Q    And that didn't quite answer my question.  You're aware,

1  aren't you, based on the recommendations you made to the

2  legislature and the number of memos that you've issued, that

3  voters being around other voters not wearing a mask will

4  increase the risk of transmission and contraction of COVID-19.

5  Isn't that correct?

6  A    We're aware that we need to have masks available and that

7  those will be provided to any and all voters, we'll have social

8  distancing in place, and we'll be providing all voters the

9  opportunity to vote in person or by mail.

10 Q    But an at-risk voter who goes to vote in person will not

11 be guaranteed that the voters around him or her will be wearing

12 a mask, correct?

13 A    They will not be guaranteed, but they can make the choice

14 to wear the mask themselves which reduces their exposure.

15 Q    Not nearly as much, to your knowledge, as other voters

16 wearing masks -- everyone wearing masks, correct?

17 A    I don't know that.  That's -- that is a medical decision.

18 I know I wear my mask because I know that reduces my risk of

19 contracting the virus from someone else.

20           **THE COURT:**  Okay.  Timers off for just a second.

21           Okay.  So I get your point about there is no

22 constitutional requirement to wear a mask to vote.  I get that.

23 But how do you square the presence or absence of a

24 constitutional requirement with the current rules in place with

25 respect to individuals being required to wear masks when,

1  quote, social distancing is not possible indoors -- I don't

2  have the exact language in front of me.  So there's an

3  emergency order, and then there's constitutional issues.

4          **THE WITNESS:**  It is something we're having to

5  reconcile, but we also did state that we will require social

6  distancing, but we have to be mindful that, you know, we --

7  there is nothing in our constitution that says you have to be

8  anything other than a citizen, 18 years of age, and registered

9  to vote properly in order to cast a ballot.  So that's the

10  legal guidance that I've been given is that we don't have a way

11  to restrict that.  Similarly, if -- right now there's an

12  injunction that says we can't require photo ID.

13          So we will -- we are working with the governor's

14  orders, but what you just mentioned is sort of the reason we're

15  going to be enforcing social distancing as well.

16          **THE COURT:**  But if I were to say to you the

17  constitution doesn't require social distancing to vote, so how

18  do you pick and choose which ones to enforce?

19          **THE WITNESS:**  By asking someone to stand 6 feet apart

20  from another doesn't keep them from being able to go and cast

21  their ballot.  But if I say that you must leave because you

22  don't have a mask on, that's different.  I also -- I'm sorry?

23          **THE COURT:**  Wouldn't you also say if they refuse to

24  maintain social distances that you have to leave?  How are you

25  going to address that if you say no?

1          **THE WITNESS:**  We do have to keep order, and that's

2     one of the roles of the chief judge and two judges that are

3     appointed at each polling place, that they do have to maintain

4     order.  If there's not order, they can -- they actually are

5     authorized to call in law enforcement, but we have to be very

6     mindful of that because we don't -- law enforcement is also

7     seen as voter intimidation, so I don't want to be in a

8     situation where we have, you know, law enforcement stay at our

9     polling places.

10          **THE COURT:**  I assume even if you decided you could

11     enforce the governor's order in terms of wearing a mask

12     indoors, the actual language of the governor's order says that

13     if an individual says they can't wear a mask, or they're

14     excepted from wearing a mask, no inquiry is permitted.  So even

15     if you enforce the governor's order and somebody says no,

16     you're bound by that.

17          **THE WITNESS:**  That's right, and similarly when

18     someone presents themselves to vote curbside, if they say, you

19     know, I can't go in because I've had back surgery, I don't ask

20     them to show me the scar.

21          **THE COURT:**  Um-hum.

22          **THE WITNESS:**  So, yeah, it's a difficult, you know,

23     place to balance.  Yes, sir.

24          **THE COURT:**  All right.  Hold on a second.  You can

25     turn the timers back on.  You may proceed.

**BY MS. RIGGS:**

Q    Director Bell, as of your July 14 deposition, you had not
yet reviewed and approved the final proof for the absentee
application or envelope, is that correct?

A    That's correct.

Q    And you were still planning to have counties review that
proof as of the next day, July 15, 2020, is that right?

A    I believe that's right, yes.

Q    You've been working with the Center for Civic Design prior
to the pandemic on redesigning the absentee envelope, is that
right?

A    Yes.

Q    If this Court ordered the elimination of the witness
requirement, you haven't talked to the Center for Civic Design
about whether they could revise the envelope design in a matter
of days, is that right?

A    Actually, I'd like to go back to your last question.  I
think you asked if I was working with the Center for Civic
Design before the pandemic.  Only had there been a conversation
at a conference.  We were in the pandemic by the time we
started doing the work with the Center for Civic Design.

Q    Okay.

A    I just wanted to clarify, so now if you'll --

Q    That's fine.  If the Court ordered the elimination of the
witness requirement, you haven't talked to the Center for Civic

1  Design about whether they could revise the envelope design in a

2  matter of days, is that right?

3  A    I have not spoken with them about that, that's correct.

4  Q    And your position is that the timing concerns in producing

5  absentee envelopes isn't a matter of altering the design in

6  sufficient time, is that right?

7  A    There is -- I may not be understanding your question

8  correctly.  There is time involved in the redesigns.  Is that

9  what you just asked me?

10 Q    I'm asking you, I understood your testimony at your

11 deposition to be that that wasn't the make it or break it, the

12 design of the envelope, is that correct?

13 A    It is a factor, but it's probably not the most

14 time-consuming part in this.

15 Q    And if the Court ordered you at the end of July, say, to

16 remove the witness requirement, you'd work with the Center for

17 Civic Design to reformat and review the redesigned envelope,

18 right?

19 A    I would.

20 Q    And it's true, isn't it, that you haven't personally

21 spoken with any of the printers who might be contracted with in

22 order to print the absentee ballots about what would happen if

23 you sent them a proof at the end of July or early August, is

24 that right?

25 A    I have not personally, but staff has spoken with printers.

1  Q     Did you -- so your position -- did that happen since your

2  deposition?

3  A     They have spoken in the past few days with printers, yes.

4  Q     But as of your deposition, you hadn't instructed staff to

5  have that conversation either?

6  A     If they had conversations, it was not in my instruction.

7  Q     During your tenure as a State Board of Elections Director,

8  when Commercial Enterprises, with whom you have a state

9  contract, was unable to deliver a printed guide on the timeline

10  you wanted it, you were able to shift to a commercial printer,

11  is that right?

12  A     The entity is Correctional Enterprises.  Sorry.  I do that

13  myself.  But, yes, we have a circumstance where they could not

14  meet the order, and we shipped it to a commercial printer.

15  Q     My apologies.  I think you corrected it in your

16  deposition.

17           And you're not aware of any situation where you

18  haven't been able to find an alternative printing vendor when

19  timing became a problem, isn't that correct?

20  A     I only have one circumstance to compare it to, so -- in my

21  time.

22  Q     So the answer is you're not aware of any situation?

23  A     I'm not, but that also was not during a pandemic.

24  Q     And if the Court were to order the witness requirement

25  eliminated, and one or more printers were unable to meet that

1  deadline, you would seek out the service of alternative

2  vendors, right, Director Bell?

3  A    I would need to or the counties would need to.

4  Q    Okay.  You told the Court in your declaration that if

5  envelopes are not ready in mid-August, county boards of

6  elections will not be prepared to send out absentee ballots by

7  the September 4, 2020, deadline, is that right?

8  A    I do agree with that, yes.

9  Q    Okay.  But you're able to print absentee envelopes in

10 batches, isn't that right?

11 A    In some circumstances, they can be printed in batches.

12 Q    And not all absentee applications and envelopes have to be

13 mailed on September 4, correct?

14 A    Actually, I mean, that's the deadline, so, yes.  When we

15 proceed, we should be mailing them at that point by state law.

16 Q    But all absentee envelopes and applications that go out to

17 North Carolina voters don't and can't be sent out on

18 September 4, isn't that right?

19 A    All that we received, we will be sending on September 4.

20 Q    Exactly.  In fact, voters have until the Tuesday before

21 election, October 27, to request an absentee ballot, correct?

22 A    That's correct.

23 Q    So counties will still be mailing absentee application and

24 envelopes after September 4, isn't that right?

25 A    They will be, yes.

1 Q    So they don't need all of the envelopes they may need to

2 send out over the entire election period by September 4, isn't

3 that right?

4 A    Do they need to have all of them right then and there?

5 No.  But it does affect their pricing.  It does affect whether

6 they're able to comply with all that they've received, and

7 they've already received an increased amount over previous

8 presidential election years.  So their volume of what they need

9 right now is even more substantial than what they've had in the

10 past.

11 Q    But the expected participation by absentee mail, you've

12 revised those projections downward since the June 23 election,

13 isn't that correct?

14 A    We do think it may be lower than we projected, but I

15 believe I indicated earlier that we prepare for what we could

16 possibly see so that we don't come up short.  So we are still

17 planning for 40 percent participation in case that does happen.

18 Q    And you'll be monitoring the numbers received up until

19 September 4 certainly to track what those projections will be,

20 won't you?

21 A    We'll continue to monitor, yes.

22 Q    Okay.  And as of your deposition, you've not had any

23 conversations with either -- and I'm going to get this wrong

24 again, I apologize -- Correctional Enterprises or any other

25 printers about your concerns that they may not be able to get

1  print jobs done on a shortened time frame because of COVID-19,

2  is that correct?

3  A     At the time, that's correct.

4  Q     There may be some costs saved by aggregating envelope

5  printing orders if half the counties ask the State Board of

6  Elections to print ballots for them, isn't that correct?

7  A     We have asked what -- we have reached out to Correctional

8  Enterprises about batch ordering, but -- or bulk ordering, but

9  the difference is that we've also moved forward with the

10 ballot -- ballot return envelope design that specifies the

11 county board of elections' phone number.  So it's not like

12 we're printing hundreds of thousands of the exact same

13 envelope.

14 Q     But there may still be some costs saved by the counties

15 ordering through you, isn't that correct?

16 A     I don't know.  I have seen where we've asked for an

17 estimate from Correctional Enterprises in the last few days the

18 time frame, and then we'll be able to share that information

19 with the counties to determine if that's a lesser cost than the

20 vendor they would normally use.

21 Q     Sitting here today, you don't have that information?

22 A     I haven't made a comparison, no.

23 Q     Okay.  And at least as of your deposition on July 14, the

24 question of whether counties will be ordering their absentee

25 envelopes on their own or having the State Board of Elections

1    do it was, in your words, "an evolving process of how we're

2    going to handle printing."  Is that correct?

3    A    That's correct.  It is the counties for them to determine

4    which way they want to go.  Also, when we originally sent out

5    that inquiry to the counties, the legislature had not made the

6    final vote on the CARES Act; and in doing so, they allocated to

7    the counties as sub grants.  So we don't have a fund where we

8    actually place the order.  They can instruct us, we can draw

9    from their funds, but we are not the ones making the purchase.

10   Q    But as of a week ago today, the question of who was going

11   to order it, the State Board or the counties, was still an

12   evolving question, correct?

13   A    It is.

14   Q    And accurate to say it's still an evolving question today?

15   A    That's correct.

16   Q    Thank you.  There are many states that conduct elections

17   either absentee-by-mail or all mail elections that do not have

18   witness requirements, correct?

19   A    Correct.

20   Q    And their voters' perception of the election being secure

21   is fine as far as you know, correct?

22   A    I haven't spoken with voters in those states, but as far

23   as I know.

24   Q    As far as you know, yes?

25   A    As far as I know, yes.

1    Q    Okay.

2    A    But those other states do signature verification, so maybe

3    that's the reason the voters are assured.

4    Q    Do you know if those voters even know about that process?

5    A    All --

6              **THE COURT:**  She hadn't talked to the voters.  I don't

7    want her to speculate about that.

8              **THE WITNESS:**  And I don't know what voter education

9    they do.

10             **THE COURT:**  You don't have to answer that.

11             **THE WITNESS:**  Thank you.

12   **BY MS. RIGGS:**

13   Q    State laws require counties to constitute Multipartisan

14   Assistance Teams, or MAT teams, to assist voters, particularly

15   those residing in certain facilities, in requesting and casting

16   an absentee ballot, correct?

17   A    Correct.

18   Q    In past elections, though, there have been counties

19   where -- that have not made MAT teams available, is that

20   correct?

21   A    That's my understanding.

22   Q    Director Bell, I want to show you an exhibit that we

23   discussed at your deposition and given it to the Court and mark

24   it, if we can.  We'll call this Plaintiffs' Exhibit 1?

25             **THE COURT:**  Are you going to use the overhead?

1          **MS. RIGGS:**  I don't have to for this one if I'm

2    handing one up and it's marked, but I can if you prefer it.

3          **THE COURT:**  So to the extent you can, I do right now

4    prefer using the overhead.  Just put the official exhibit up on

5    the bar right there next to -- on the yellow spot, and then

6    just show it.

7          **MS. RIGGS:**  May I approach, Your Honor?

8          **THE COURT:**  Um-hum.

9    **BY MS. RIGGS:**

10   Q    Director Bell, can you see this?

11   A    Yes, I see it, yes.

12   Q    That's just a description of what it is.

13         **MS. RIGGS:**  Your Honor, this exhibit, which we've

14   marked as Plaintiffs' Exhibit 1, has also been previously filed

15   at ECF 73-8 at pages 7 through 9.  It was authenticated by the

16   witness at her deposition.

17         **THE COURT:**  All right.

18   **BY MS. RIGGS:**

19   Q    Director Bell, do you remember us discussing this exhibit

20   at your deposition?

21   A    I do.

22   Q    In fact, in the March 2020 primary, you're aware that

23   Davidson County did not have a MAT team to assist a voter in an

24   assisted living facility, correct?

25   A    Correct.

1  Q    And you were copied on this email exchange, that is,

2  Exhibit 1?

3  A    Yes, I am copied.

4  Q    And this is an email exchange between the North Carolina

5  State Board of Elections' general counsel Katelyn Love and

6  Kenya Myers who works for Disability Rights North Carolina?

7  A    It is.

8  Q    You discussed Ms. Myers' inquiry with Ms. Love, correct?

9  A    I do remember having some conversation.

10 Q    That in early voting for the primary election this year,

11 Ms. Myers notified you that Davidson County, despite its

12 statutory obligation to do so, did not make a MAT team

13 available to assist a voter that had requested its assistance,

14 is that right?

15 A    That's my understanding.

16        **MS. MOSS:**  Your Honor, may I lodge an objection,

17 please?  The document that is attached -- that she's asking her

18 about was attached to the Myers declaration, which you struck;

19 and while Director Bell may have authenticated that this is an

20 email that was sent, to the extent that she's eliciting hearsay

21 testimony or hearsay information from Ms. Myers who is not here

22 to be cross-examined or, you know, for us to know the veracity

23 or foundation for anything that she's saying to Ms. Love, I

24 would submit that that is hearsay that should not be

25 considered.

 1          **MS. RIGGS:**  Your Honor, may I respond?

 2          **THE COURT:**  No.  Let me hear the rest of the

 3  questions, and then I'll rule because I'm really unclear where

 4  this is going at this particular juncture with respect to the

 5  Executive Director.  So let me hear some more; and then when

 6  we're done, I'll hear from you.

 7          **MS. RIGGS:**  Absolutely.

 8  **BY MS. RIGGS:**

 9  Q    And so you discussed with Ms. Love that in early voting

10  for the primary this year, Ms. Myers notified you that Davidson

11  County, despite its statutory obligation to do so, did not make

12  a MAT team available to assist a voter that had requested its

13  assistance, is that right?

14  A    General Counsel Love made me aware of it.  You can see

15  that the correspondence is really between Ms. Love and

16  Ms. Myers.

17  Q    If Ms. Love had provided Ms. Myers misinformation, would

18  you have followed up with her about that?

19  A    Yes.

20  Q    Okay.  And Ms. Love informed Ms. Myers that unfortunately

21  not every county has a MAT team, isn't that right?

22  A    I believe that's what the email says, yes.

23  Q    Okay.  And she said it may be difficult to find a team of

24  bipartisan volunteers to serve, and the MATS program has no

25  funding allocated to it by the legislature, is that right?

1  A     That's what it states, yes.

2  Q     MAT teams still have no dedicated state funding, is that

3  correct?

4  A     That's correct.

5  Q     You expect that MAT team recruitment may be more difficult

6  because volunteers may be -- sorry -- recruitment may be more

7  difficult because volunteers may be concerned about contracting

8  or transmitting COVID-19, is that right?

9  A     We are concerned about that, yes.

10 Q     And while the State Board of Elections has oversight over

11 elections, if there's a shortage of volunteers, you can't

12 compel people to appear and act as MAT volunteers, is that

13 right?

14 A     No, I cannot compel them.

15        **MS. RIGGS:**  Those are the questions I have about this

16 exhibit, Your Honor.

17        **THE COURT:**  I mean, the Board of Elections told

18 Ms. Myers that another person could assist a voter?

19        **MS. RIGGS:**  Not staff.

20        **THE COURT:**  Yeah.  I mean, the question was can we

21 assist a voter, right?

22        **MS. RIGGS:**  Your Honor, the State and Legislative

23 Intervenors in this case have taken the position that MAT teams

24 somehow are a fail safe, and this evidence which was

25 excluded --

1          THE COURT:  No, the objection goes to the fact that

2  I've struck the exhibit.

3          MS. RIGGS:  Because it was in a reply declaration.

4  Legislative Intervenors wanted discovery --

5          THE COURT:  So one of the reasons that I struck the

6  declaration was a carefully crafted effort to limit the

7  information, as I saw it.  Specifically, there is nothing to

8  confirm the substance of the letter when it was initially filed

9  with the motion, right?

10         MS. RIGGS:  I'm not -- we're not --

11         THE COURT:  And, second, in the reply declaration,

12 Ms. Myers comes in and says there's no MATS team, right?  But

13 Ms. Myers never answers the question that was posed in the

14 letter, which was if a MAT team is not available, can another

15 individual assist the voter?  Right?  That was the question.

16         MS. RIGGS:  Your Honor, I'm sorry.  That's not the

17 reason it's being offered.  We are offering it for the

18 admission by the State Board of Elections that there is not a

19 MAT team in every county despite the statutory obligation

20 that --

21         THE COURT:  So what do we do with the other stuff in

22 email?  The stuff about if there's a MAT team is not available,

23 another person can assist.  Can that come in?

24         MS. RIGGS:  That can come in.  But this is an

25 admission by the State Board of Elections' general counsel

1   there is not a MAT team in every county.

2          THE COURT:  Could you have just asked her the

3   question?

4          MS. RIGGS:  I did, in her deposition.

5          THE COURT:  And what did she say?

6          MS. RIGGS:  She was uncertain until this refreshed

7   her recollection.

8          THE COURT:  Okay.  Recollection refreshed.  There's

9   not a MATS team in every county, is that correct?

10          THE WITNESS:  That's correct.

11          THE COURT:  All right.  This really, really troubles

12   me, because had I -- let's take a recess.  We'll be in recess

13   for 10 minutes.

14          (At 4:05 p.m., break taken.)

15          (At 4:13 p.m., break concluded.)

16          THE COURT:  All right.  Ms. Bell's testimony -- as I

17   understand, Ms. Bell, is that not every county in the state

18   created a MATS team as required, is that correct?

19          THE WITNESS:  That's correct, sir.

20          THE COURT:  In terms of this particular exhibit,

21   these are communications between the general counsel for the

22   State Board of Elections and an individual named Kenya Myers,

23   is that correct?

24          THE WITNESS:  That's correct.

25          THE COURT:  And do you know Ms. Myers?

 1          THE WITNESS:  I believe I've met her or had a meeting

 2    before.

 3          THE COURT:  Did you conduct any investigation as to

 4    the contents of her communication to Ms. Love?

 5          THE WITNESS:  Ms. Love handled it and spoke with the

 6    county, as I recall.

 7          THE COURT:  Ms. Bell's testimony stands with respect

 8    to whether or not every county created a -- whether or not

 9    every county created a MATS team.  The testimony specifically

10    is they did not.

11          To the extent the letters and the communications or

12    the emails and the communications are used to refresh her

13    recollection, which is not ordinarily an exhibit to be admitted

14    into evidence, I do find that apparently -- I will find that

15    they did refresh her recollection as to that fact.  In terms of

16    introduction of the exhibit for any substantive purpose, I'm

17    going to sustain the objection.

18          The statute says that if a MATS team is not

19    available -- or "unavailable" I think is the actual word --

20    then another individual, not otherwise excluded under the terms

21    of the statute, may assist; and for reasons that will be

22    further set forth in a written opinion, I'm going to sustain

23    the objection.  I don't think this has -- even though the rules

24    of evidence don't apply, I'm not going to let Ms. Bell opine or

25    suggest any type of substantive finding based upon information

1  from third parties who have neither submit -- who -- well, at

2  this point don't have an affidavit in evidence or are not

3  before the Court.

4          You may continue.

5          **MS. RIGGS:**  Thank you, Your Honor.

6  **BY MS. RIGGS:**

7  Q    Ms. Bell, you spoke with opposing counsel and Judge Osteen

8  about your recommendation that the legislature temporarily

9  modify restrictions on voter assistance in care facilities so

10 that nursing home staff could assist a voter in requesting or

11 returning an absentee ballot, yes?

12 A    Yes.

13 Q    And should that -- should this Court enjoin the criminal

14 penalties for care facility staff assisting a voter, do you

15 know if staff would be compelled to provide that assistance?

16 A    If there was an injunction to that effect, then, yes, they

17 would be designated, and we would -- they would provide that

18 assistance.

19 Q    If -- sorry.  The injunction would be against the statute

20 that imposes criminal penalties on the assistance.  That

21 doesn't necessarily mean, though, does it, that care facility

22 staff has to help a voter in a lockdown facility, isn't that

23 right?

24 A    I guess it would depend upon what the injunction is and

25 how we would carry -- I don't know.

1  Q    The voter guide that the State Board of Elections sends

2  out goes to every household in North Carolina, not every

3  registered voter, correct?

4  A    It is by household.

5  Q    And so there's only going to be, per your declaration, one

6  absentee request form in each of those voter guides, is that

7  right?

8  A    There would just be one in the guide, yes.

9  Q    So that may be insufficient in households where there's

10 more than one registered voter, isn't that correct?

11 A    It could be, yes, if there's more than one, but there will

12 also be a QR code or something where they can access the online

13 portal that I mentioned or to print their own.

14 Q    If they have access to online and printers, correct?

15 A    Correct.

16 Q    Okay.  And you were not -- you testified that you were not

17 the Executive Director of the State Board of Elections during

18 the CD 9 investigation, is that correct?

19 A    That's correct.

20 Q    So you have no -- you were not even living in North

21 Carolina at the time of that State Board hearing, isn't that

22 right?

23 A    That's correct.

24 Q    So you have no firsthand knowledge of that investigation

25 and hearing, is that right?

1  A    No firsthand, that's correct.

2  Q    You ordered that the Congressional District 11 Republican

3  primary in a Columbus County county-level primary runoff be

4  delayed because of the pandemic, right?

5  A    Actually, I ordered the second primary for the

6  Republican -- well, the Congressional District and the

7  primary -- a new primary for the district to Republican

8  Columbus County election.

9  Q    I'm sorry.  Thank you for that correction.

10         But it was because of the pandemic, correct?

11 A    That's correct.

12 Q    And moved to June 23?

13 A    From May 12 to June 23, yes.

14 Q    And you mandated that any county participating in that

15 election whose office was closed have a secured dropoff box for

16 election materials, correct?

17 A    Yes, a lockbox.  A locked box, yes.

18 Q    For voters to drop election materials in?

19 A    That's right, if they were not open.

20 Q    Okay.  And those election materials would include voter

21 registration forms, although not for that particular primary

22 runoff or redo, correct?

23 A    It could be for the primary, but not for the second

24 primary, correct.

25 Q    Okay.  Those election materials would also include

1 absentee ballots, correct?

2 A    We actually had not issued absentee ballots at that point.

3 It could be the absentee ballot request form.

4 Q    Okay.  So that could be returned by the secure drop box or

5 lockbox, correct?

6 A    That's right.

7 Q    Do you know if any absentee ballots themselves were

8 returned via that lockbox?

9 A    Not that I'm aware of.  I believe that most of the county

10 offices had found a way to -- in those 18 counties that were

11 conducting elections, they resumed operations in some way to

12 retrieve those.

13 Q    Okay.  But while only the June 23 primary runoff for

14 primary counties were mandated to get these secured lockboxes

15 or drop boxes, any of the 100 counties could have obtained a

16 drop box if their office was closed, correct?

17 A    That's correct.  I believe that was a universal

18 instruction in terms of the operations of those counties.

19 Q    Okay.  And you're not aware of how many of the 100

20 counties actually did obtain a drop box, correct?

21 A    No, I did not specifically chart that.  It was indicated

22 in our website where we would update people about the hours and

23 so forth.

24 Q    Okay.  And you're not aware of any counties wanting to

25 procure drop boxes but being unable to do so, is that right?

1  A    I'm not aware.  I know that when we tried to order one for

2  the State Board, it actually took some time for us to receive a

3  small drop box that we could use in our office.

4  Q    What is "some time"?

5  A    It seems like it was over a month.  I don't know exactly,

6  but we went at least a month without one after we had ordered

7  it.

8  Q    But you're not aware of any of the counties -- the 100

9  counties having those issues, isn't that right?

10 A    I do not know one way or another.

11 Q    Okay.  So when -- you're not aware of any counties that

12 used a drop box or a lockbox when their offices were closed

13 that had any security-related issues with respect to those

14 boxes, isn't that correct?

15 A    Not that I'm aware of.

16 Q    There are processes within SEIMS, the State Election

17 Information Management System, that can look for voter

18 registration duplications across counties, is that right?

19 A    Yes.

20 Q    And there are processes within SEIMS that can look within

21 your systems in order to process voter registrations in the

22 order in which they are received if it's the same county, is

23 that right?

24 A    Yes.

25 Q    If a voter misses the voter registration deadline --

1  that's 25 days before the election -- that voter has a

2  fail-safe of going in person to a one-stop early voting site

3  and using same-day registration, correct?

4  A    Correct.

5  Q    But in a pandemic, going in person to a voting site may

6  not be recommended for at-risk individuals, correct?

7  A    That is a recommendation, correct.  They can vote curbside

8  or do same-day registration curbside.

9  Q    Okay.  So let me come back to that.

10        But if a high-risk individual misses the voter

11  registration 25-day deadline and is advised not to vote in

12  person, there's no other fail-safe that allows them to register

13  in time without going somewhere in person to vote in an

14  election conducted during a pandemic, isn't that right?

15  A    Other than same-day registration, if someone wants to

16  register after the 25-day deadline, then they will need to

17  go -- that's their only option.

18  Q    And you have to do that in person, correct?

19  A    That's correct.

20  Q    And you've agreed that there are limited options for

21  someone in that situation, isn't that right?

22  A    Limited options?

23  Q    As a fail-safe, if they've missed the voter registration

24  deadline?

25  A    If they've missed the voter registration deadline, then

1  they would need to same-day register.

2  Q    But you just mentioned curbside voting during early

3  voting; but under North Carolina law, in order to use curbside

4  voting, a voter has to attest to being unable to come into the

5  voting location due to age or physical disability, isn't that

6  correct?

7  A    That is the attestation, yes.

8  Q    And your position under oath in your deposition was that a

9  voter's fear of contracting COVID-19, even if they were at

10 risk, is not a physical disability or age?

11 A    That is the legal interpretation that our agency has made.

12 Q    Okay.  So curbside at early voting really isn't even a

13 limited option for those at-risk people if they miss the voter

14 registration deadline, isn't that right?

15 A    If they're at risk, I actually would consider that to be a

16 physical disability keeping them from coming into the polling

17 place, and they would attest to such, and then we would be able

18 to administer curbside voting.

19 Q    I'm sorry.  I thought you just said that your position was

20 that a voter's fear of contracting COVID-19, even if they were

21 at risk, is not a physical disability?

22 A    I thought you were indicating is fear the reason to not

23 come -- to vote curbside.  I did not recognize it as fear if

24 they are at risk.

25           THE COURT:  As I understand what you're saying, fear

1  is not an excuse to do one-stop -- or curbside voting?

2          **THE WITNESS:**  That is right, sir.  They shouldn't

3  attest to that.

4          **THE COURT:**  If I have asthma or obesity that perhaps

5  puts me at high risk, then that you would consider?  If they

6  say, "I have asthma," you would consider that?

7          **THE WITNESS:**  That's a reason to not come into the

8  polling place, yes.

9  **BY MS. RIGGS:**

10 Q    What education do you plan to share with voters so that

11 they understand that having an underlying medical condition

12 that increases their risk can be used to satisfy the curbside

13 voting?

14 A    I think -- I mean, we can include information in our

15 judicial guide.  As I mentioned, we would be giving information

16 about the pandemic and how we'll conduct voting, but we have

17 indicated -- the way we conduct curbside voting is much like I

18 mentioned to the judge earlier.  If you state that you have had

19 back surgery, I don't ask you to show me the scar in order

20 to -- it's what the voter is attesting to.  So, you know,

21 that's how we administer curbside voting.  We don't -- we don't

22 grill somebody about whether they are attesting correctly or

23 not.  We provide that service to those voters.

24 Q    But a voter needs to know that when he or she attests that

25 they have a physical disability that prevents them from going

Case 1:20-cv-00911-WO-JLW   Document 1-6   Filed 09/26/20   Page 102 of 139

1  into a polling place, that having an underlying condition,

2  which there are numerous ones, satisfies that, and they can

3  legally attest that they have a physical disability.  Isn't

4  that right?

5  A    We ask the voter can they attest to the fact that by age

6  or by disability they are unable to come into the polling

7  place.  If they say yes, they sign it, and we administer

8  voting.

9  Q    Well --

10 A    I'm not sure that I understand your distinction.

11        **THE COURT:**  Let me -- so if a voter rolled up and

12 said, "I'm a vulnerable person, I'm 69, I can't go in," that

13 counts?

14        **THE WITNESS:**  That counts, yes, sir.  I'm not going

15 to ask them to prove their age at that point.

16        **THE COURT:**  If they say, "I have health conditions

17 that prevent me from going inside that building," that counts?

18        **THE WITNESS:**  That counts.

19        **THE COURT:**  All right.  You can continue.

20 **BY MS. RIGGS:**

21 Q    Is the State Board going to issue guidance to the counties

22 about this topic?

23 A    I believe in my time of administering elections in North

24 Carolina, that's how we've operated.  I would have to look back

25 to see if we've actually issued guidance before to that effect;

1  but we have many materials, and that's what it instructs.  I

2  mean, it doesn't say prove -- have the voter prove to you that

3  they can't come into the polling place.

4  Q    But if a voter pulls up and says, "There's people not

5  wearing masks; I don't want to go in there in case I get

6  COVID-19," that would not be a reason for them to be allowed to

7  use curbside voting, correct?

8  A    We would say, "Are you attesting that you are unable to

9  come into the polling place due to age or disability."

10  Q    And is there guidance to county boards specific to this

11  global pandemic that we're in and people's fear about

12  contracting COVID-19 to that effect?

13  A    I believe if I looked back at our guidance that we gave to

14  those conducting the June 23 elections, it does instruct them,

15  I believe -- I would have to go back -- or we've done it in

16  training, and there's nothing to prohibit us from issuing that

17  guidance now.

18  Q    You believe it's in that numbered memo from -- on

19  conducting elections on June 23, is that right?

20  A    I don't recall specifically.  If we can look at it, I'll

21  be happy to see if it's in there.

22  Q    You most certainly can.

23  A    At a glance -- wait a minute.

24        At a glance, I don't see where we specified that.  We

25  talk about the care for the privacy sleeves during curbside

1  voting and disinfecting those.  I do believe it's been

2  discussed during the trainings that we do routinely with the

3  counties through webinars.  And, again, we've got many items of

4  guidance that we still need to put out.  So there's nothing to

5  prohibit us from clarifying that, though I think the counties

6  are aware of how we would handle this because it's something we

7  do already.

8  Q    In the one election we've had in a pandemic?

9  A    In the elections that we conduct -- candidly, I mean, if

10 it rains, I can say that there are people who will come and say

11 that they can't go inside of the polling place, but we don't

12 say, "Prove that to me."  We conduct voting.

13 Q    When you've -- well, in the -- there are frequently

14 complaints about lines for using curbside voting, isn't that

15 correct?

16 A    There have been complaints.  I don't know if I would say

17 frequently.

18 Q    Okay.  Do you know how many North Carolinians possess one

19 of the factors that lead to increased risk of contracting or

20 suffering ill effects from COVID-19?

21 A    I don't know off the top of my head, no.

22 Q    Okay.  Do you know what would happen if all of those

23 voters avail themselves of curbside voting?

24 A    If they're like any voter who presents themselves to vote

25 before 7:30 -- or by 7:30 p.m, we'll conduct voting for them if

1 we have to walk to every single car that's in the parking lot.

2 Q    What if there's more cars than there are spaces in a

3 parking lot?

4 A    Then they'll be lined out into the streets.  We'll do --

5 you know, these are all things that we have to consider.

6 Q    You're aware, aren't you, that in primaries in other

7 states since the onset of the pandemic that tens of thousands

8 of voters report not receiving their requested absentee

9 ballots, is that right?

10 A    That is my understanding, yes.

11 Q    And similar to our earlier conversation, voters who on

12 election day have not yet received their absentee ballots have

13 limited options if they're advised not to go vote in person,

14 isn't that right?

15 A    That's correct.

16 Q    You oppose the relief that Plaintiffs seek to use the

17 Federal Write-In Absentee Ballot if an absentee ballot isn't

18 received, but that would provide such voters an option to

19 participate, isn't that correct?

20 A    The Federal Write-In Absentee Ballot is intended for

21 UOCAVA, Uniformed and Overseas Citizens --

22        **THE REPORTER:**  I'm sorry.  Intended for?

23        **BY THE WITNESS:**  I'm sorry.  UOCAVA.  It's

24 U-O-C-A-V-A.  It stands for Uniformed and Overseas Citizens

25 Absentee Voting Act.

BY MS. RIGGS:

Q    But for the voter who has requested an absentee ballot but
not received it on election day, as tens of thousands of voters
in other states report, having that option would allow them to
participate on election day, isn't that right?

A    We -- that is an option for those particular voters.  If
we were to employ that for civilian absentee voters, the
procedures are different.  The FWAB does not require a witness,
for example.  So we have to -- I mean, there's different
procedures.  We would have to know how to proceed with that.

Q    And Plaintiffs, to your knowledge, don't request that the
Federal Write-In Absentee Ballot be submitted electronically,
do they?

A    I don't recall.

Q    Some agencies that are a part of the North Carolina
Department of Health and Human Services have a wet ink
signature on file from North Carolina customers, correct?

A    There are agencies with wet ink signatures on file, yes.

Q    Recently, duration your tenure, the State Board of
Elections offered online voter registration through the North
Carolina Department of Motor Vehicles, right?

A    That is in place, yes.

Q    And the State Board of Elections worked with the NCDMV and
its State-approved vendor PayIt to offer those services,
correct?

1    A    Over a series of months, yes.

2    Q    But you haven't had any conversations with representatives

3    from PayIt to see whether they would be willing to contract

4    with SBOE or DHHS to similarly offer online voter registration

5    for DHHS customers, correct?

6    A    I have not spoken with PayIt.  We are not their customer;

7    DMV is.

8    Q    You're part of the National Association of State Election

9    Directors, is that right?

10   A    I am.

11   Q    And that group is meeting weekly to share lessons learned

12   from the novel challenge of conducting elections during a

13   pandemic, is that right?

14   A    Most weeks, yes.

15   Q    Through that group and other sources, you've been

16   following primary elections in other states, yes?

17   A    That's correct.

18   Q    Including the recent Georgia primary conducted on June 9?

19   A    Yes.

20   Q    You understand that precinct consolidation in some

21   jurisdictions in that Georgia primary contributed to long

22   lines, correct?

23   A    I do understand that's a factor that happened in Georgia,

24   yes.

25   Q    Those precinct consolidations and long lines reduced the

1  ability to social distance at polling places in Georgia,

2  correct?

3  A    That is my understanding.

4  Q    And that precinct consolidation was caused in part, in

5  your words, by a mass exodus of poll workers fearing

6  coronavirus exposure, is that right?

7  A    That is one of the factors that I understand, yes.

8  Q    And you were not aware of a -- of Georgia Statute

9  21-2-92(a), which is analogous to the changes which were made

10 in House Bill 1169, that would allow a majority of poll workers

11 to be residents of the county as opposed to the precinct, is

12 that right?

13 A    I do not know Georgia law.

14 Q    So you were not aware of that statute?

15 A    I was not.

16 Q    Okay.  And while you haven't tracked it, you're aware that

17 some states only require poll workers to be registered voters

18 in the state in order to serve as a poll worker, right?

19 A    I actually don't know that.  I'm sorry?  I don't think I

20 know that other states have that provision.

21 Q    Okay.  You approved some precinct consolidations in early

22 May for the June 23 election, is that right?

23 A    I did.

24 Q    And I believe you testified that your recollection was

25 that you approved precinct consolidations in six or seven

Case 1:20-cv-00911-WO-JLW   Document 1-6   Filed 09/26/20   Page 109 of 139

1  counties in the CD 11 June 23 runoff, is that right?

2  A    That's my recollection now as well, yes.

3  Q    And those consolidations affected thousands of voters, is

4  that right?

5  A    That's correct.

6  Q    One of the reasons offered by counties for needing to

7  consolidate precincts was poll worker shortage, correct?

8  A    That was stated by some of the counties.  That was not the

9  only factor that we considered.

10  Q    It was one of the reasons offered by the counties,

11  correct?

12  A    Correct.

13  Q    You are -- and North Carolina will need substantially more

14  poll workers for the general election in November, correct?

15  A    We always use more poll workers in a presidential

16  election.

17  Q    You are not confident that North Carolina county boards of

18  elections will be able to adequately staff early voting sites

19  and polling locations on election day, isn't that true?

20  A    I'm concerned about election day in particular.  I do

21  think we have the means to staff our one-stop early voting

22  sites.

23  Q    Are you testifying today that you are confident you will

24  be able to staff early voting sites?

25  A    I'm more assured that we can do that.  I can't be

1   confident.  We're working on that.

2   Q    The average age of poll workers in North Carolina is

3   around 70, and the role requires significant interaction with

4   the public.  So you anticipate that poll workers in at-risk

5   categories may be advised not to serve or may be unable to

6   serve this year, correct?

7   A    I'm aware that we may have poll workers who are unable to

8   serve, correct.

9   Q    And you've only run one statewide election, a primary, in

10  your tenure as the State Board of Elections director, and

11  that's the basis of your knowledge about how counties statewide

12  will deal with potential poll worker shortages, correct?

13  A    I don't know that that's actually the basis.  I've worked

14  in elections administration for 14 years.  I've had to recruit

15  poll workers myself, and we did not have a pandemic on March 3.

16  So I'm basing it more on the experience of other states and

17  also what we experienced for June 23.

18  Q    Which was not a statewide election, correct?

19  A    That's correct.  It was 18 counties that were involved.

20  Q    Okay.  And you've never administered a statewide

21  presidential general election, isn't that correct?

22  A    Not as Executive Director.  I have actually been in

23  election administration for two other presidential elections as

24  a State Board staff member and as a county director.

25  Q    And you discussed those roles with Mr. Peters earlier,

1    isn't that right?

2    A    I did identify those roles, yes.

3    Q    North Carolina has approximately 2,700 precincts, isn't

4    that right?

5    A    That's correct.

6    Q    And in order to provide each precinct with five to nine

7    workers, you anticipate needing 20- to 25,000 workers for

8    election day across the state, isn't that right?

9    A    That's correct.

10   Q    And as of last week through the State Board's Democracy

11   Heroes Campaign, the State Board had enlisted 600 of the 20,000

12   to 25,000 of the necessary poll workers, isn't that right?

13   A    As of last week, and then we issued another -- we'll

14   continue to update the counties, and another about 500 were

15   sent out yesterday.  So approximately in a week, week and a

16   half, two weeks, we had had another 500 sign up, and that's

17   without doing all of the provisions and steps that we're

18   planning to take with Democracy Heroes.

19   Q    So you now have about 1,100 -- am I understanding your

20   testimony correctly that you have about 1,100 people signed up

21   to do that?

22   A    A thousand to 1,100 through our efforts.  I don't know

23   what the efforts of the counties has actually generated.

24   Q    And the State Board of Elections has access to the contact

25   information from all the individuals who sign up through this

1  centralized Democracy Heroes enrollment site, correct?

2  A    If they provide that on the survey, yes, we have that

3  information.

4  Q    You couldn't provide them to the counties if they didn't

5  provide their contact information, correct?

6  A    That's correct.

7  Q    All right.  So I want to ask you about uniform hours now.

8         In your letters to the North Carolina General

9  Assembly, you recommended that the legislature consider

10 changing or modifying the uniform hours requirement for

11 one-stop early voting sites, correct?

12 A    There was a recommendation that indicated that we should

13 consider the one-stop sites, yes.

14 Q    And you recommended that because, and I quote, "county

15 boards of elections need flexibility to determine hours because

16 they are affected directly by and respond differently to the

17 COVID-19 pandemic," is that right?

18 A    That's correct.

19 Q    Mr. Peters didn't number it, but you recall the second

20 letter you sent to the legislature on April 22, correct?

21 A    I did send another letter on the 22nd of April, yes.

22        **MS. RIGGS:**  Okay.  I want to mark that just so we can

23 see that.  Mark that as Exhibit 2, and I'll just put it on the

24 ELMO for you to look at.

25

BY MS. RIGGS:

Q    Director Bell, I want to ask you about your recommendation
with respect to considering modifying one-stop site and hours
requirements.  You said in this letter that you expected a
change would reduce costs for county boards of elections, isn't
that right?

A    It's stated there, yes.

Q    And you're generally aware that some county boards of
elections feel that complying with the uniform hours
requirement has cost their county board of elections money, is
that right?

A    Could you state your question again, please?

Q    Absolutely.

         You're generally aware that some county boards of
elections feel that complying with the uniform hours
requirement currently in place has cost their county board of
elections money?

A    Some have stated that, yes.

Q    And you're aware that the additional cost has influenced
some county boards of elections' decisions to reduce the number
of early voting sites, particularly from 2014 to 2018, isn't
that right?

A    I think I've stated I don't know if that's a direct
correlation.

Q    You don't remember -- do you -- so you're testifying today

1  that you don't know or haven't -- it hasn't been reported to

2  you that the additional cost influenced some county boards of

3  elections' decisions to reduce the number of early voting

4  sites?

5  A    I don't recall what I said in the deposition.  You can

6  state it for me.

7         THE COURT:  Well, first of all, there's a question

8  out there.  Have some county boards reported to you or were you

9  aware that some county boards have reported to the State Board

10 of Elections that the uniform hours requirement had cost the

11 counties money?

12        THE WITNESS:  They have to factor in their budgets,

13 and so if the uniform hours meant that they would be open more

14 hours than previous, then, you know, they may have factored

15 that in to changing their sites, but they look at usage and

16 determine whether it's -- you know, whether they actually had

17 enough participation to justify being open.  I mean, there's a

18 lot of variables to why.

19        THE COURT:  Okay.  I didn't quite capture your

20 question.  You can finish it up, if you want to.

21 BY MS. RIGGS:

22 Q    And so sitting here today, you're testifying that --

23 sitting here today, you're testifying that you're not aware

24 that some county board of elections officials -- that that

25 additional cost has influenced their decision to reduce the

Case 1:20-cv-00911-WO-JLW   Document 1-6   Filed 09/26/20   Page 115 of 139

1 number of early voting sites?

2 A    That may be a factor.  I don't have a specific report or

3 study or anything where they've said that, but there are

4 indications that there have been some in 2016 where they didn't

5 open as many sites.

6 Q    Because of the cost associated with the uniform hours

7 requirement?

8 A    That may be why they chose to not.

9 Q    Would it refresh your recollection if I showed you your

10 deposition testimony on this topic?

11 A    Feel free.

12 Q    I'm reading from page 97, line 25, to 98, line 6.  And,

13 Director Bell, I asked you:

14         "And sitting here today, are you aware that -- of --

15 that some county board of elections officials -- that

16 additional cost has influenced their decision to reduce the

17 number of early voting sites, particularly from 2014 to 2018?"

18         And you testified:

19         "I -- that has been presented to me or stated to me,

20 yes."

21 A    That's right.  I just said that it could have been a

22 factor, and there have been conversations.  There's not been a

23 specific study or report presented to me to that effect.

24 Q    Yeah, I wasn't asking about a report.  Thank you, though.

25         I want to ask you now a few questions about your

1  emergency order from this past Friday that Mr. Peters discussed
2  with you, and it's been marked as Exhibit 2.
3        I understood -- oh, I'll give you a minute to find
4  it.
5  A    I'm sorry.  I have a stack of papers here.
6        Okay.
7  Q    I understood from your discussion with Mr. Peters that
8  this order extended the deadline previously set as July 31 for
9  the submission of early voting plans to August 7.  Can you
10 point me to where that order moves that deadline?  I'm sorry if
11 I'm missing it.
12 A    I believe that it was actually -- General Counsel Katelyn
13 Love sent this out on my behalf, and I believe it was in her
14 email that this -- or this was attached that she stated August
15 the 7th would be the date.
16 Q    Okay.  But it's not in this order?
17 A    I don't believe so, not specifically.
18 Q    So on Friday, you moved that deadline back a week?
19 A    That's right, for the counties.
20 Q    You're generally aware, aren't you, that because of a
21 July 29, 2016, Fourth Circuit ruling affecting the early voting
22 period, county boards of elections were resubmitting their
23 early voting plans in late August of 2016, aren't you?
24 A    That's my understanding, yes.
25 Q    You issued this emergency order because in your judgment

1  the current electoral scheme with respect to one-stop early

2  voting and in light of other states' experiences is not

3  sufficient to accommodate the disruptions caused by COVID-19,

4  is that right?

5  A    Correct.

6  Q    And your July 17 emergency order does not lift the uniform

7  hours requirement, does it?

8  A    It does not.

9  Q    And your emergency order creates a waiver process for

10 counties in their one-stop early voting plans submitted to the

11 State, is that right?

12 A    Yes.

13 Q    The waiver goes to the Executive Director, you, not the

14 State Board, is that right?

15 A    Correct.

16 Q    What is the process by which you will decide whether or

17 not to grant a waiver?

18 A    We state in this emergency order that factors will be the

19 length of lines, the ability to do social distancing; and if I

20 were not here today, I could probably finish the numbered memo

21 that gives it more clarity, but, fortunately, I have others who

22 are working on that.

23 Q    Okay.  Is that an exhaustive list?

24 A    Those are the primary factors.

25 Q    Will the numbered memo explain the weight you'll give to

1  each of those factors?

2  A    It will define the criteria more and provide them with

3  either a form or the questions that they will need to respond

4  to.

5  Q    And I understood your testimony earlier to be that

6  unanimous plans that are compliant with the emergency order

7  will just -- there won't be any State Board of Elections

8  review, is that right?

9  A    We provide a general review; but if it's unanimous and

10 compliant, then there's no reason to not allow for it.

11 Q    What about plans that are unanimous but a waiver is

12 needed?  Will those be -- how will those be reviewed by the

13 State Board of Elections?

14 A    If they are unanimous but request a waiver?

15 Q    Yes.

16 A    Then, as we are planning, it will go under my review

17 because they are unanimous.  The waiver would be under my

18 review.

19 Q    What if you denied the waiver?

20 A    That is actually something that the general counsel and I

21 have been discussing, but we have not come to a decision.

22 Q    I want to ask you about a part of the emergency order that

23 is on the bottom of page 6, No. 3.  It says:

24          "Any county board of elections that only has one

25 one-stop early voting site shall arrange for a backup and

1  backup staff in the event that its site must be shut down or in

2  the event that there is lack of sufficient staffing due to

3  COVID-19."

4            If there's lack of sufficient staffing due to

5  COVID-19, how would a county board have backup staff?

6  A    That's meaning if the individuals who were assigned to

7  that site and working -- if someone became ill or unable to

8  fulfill their duties, then there's not a sufficient staff at

9  that site.  So we would bring in the backup team.

10 Q    The emergency order also notes that the State Board of

11 Elections will provide a centralized location on its website

12 for precinct consolidation information throughout the voting

13 period.  Will that be before you approve those precinct

14 consolidations?

15 A    The reason we would post it to the State site is because I

16 have approved the consolidation.  The discussion of those

17 consolidations happens at the county board level.

18 Q    But your approval -- the county can't just consolidate

19 precincts without your approval, isn't that right?

20 A    That's correct.

21 Q    So how would a voter find out about proposed precinct

22 consolidations?

23 A    Proposed precinct consolidations are part of a county

24 board meeting.

25 Q    So they have to attend a county board meeting?

1  A    They are public meetings.

2  Q    Are they accessible by -- is every county board of

3  elections meeting currently accessible by some virtual

4  mechanism?

5  A    If they do not meet in person, they've been instructed to

6  hold a telephonic or some sort of platform where they -- people

7  can remote in.

8  Q    I understand they've been instructed to do that.  Are you

9  aware if they are actually doing that?

10 A    They've been instructed to do so and reminded to do so.

11 Q    It's a yes or no question.  Are you aware if they have

12 been doing it or not?  You can say, "I don't know."

13 A    I don't know.

14 Q    Okay.  Thank you.

15         You issued personal protective equipment for the

16 June 23 election, is that right?

17 A    Yes.

18 Q    To poll workers and offered it to voters, is that right?

19 A    There were sufficient masks for every voter if they chose

20 to wear one.

21 Q    Those were not N95 masks, were they?

22 A    No, they were similar to what your colleague is wearing.

23 Q    What would you classify that kind of mask as?

24         **THE CLERK:**  Plaintiffs have 5 minutes remaining.

25         **MS. RIGGS:**  Thank you.

1        **THE WITNESS:**  I don't know the exact term.  I think

2   they're considered disposable or surgical masks, or something

3   to that nature.

4   **BY MS. RIGGS:**

5   Q    And were the PPE masks provided to voters of the same

6   quality as that provided to the poll workers?

7   A    Yes.  Poll workers were also provided with face shields,

8   D-65s.

9   Q    There's no statutory right for a voter to seek to cure a

10  deficient absentee application, is that correct?

11  A    Meaning the return envelope, the container envelope?

12  Q    Yes.

13  A    Is there a cure?

14  Q    Is there a statutory cure?

15  A    No.

16  Q    And, in fact, the statute says the county board Of

17  elections -- there's no appeal from a decision from the county

18  board of elections whether or not to accept an application, is

19  that correct?

20  A    There is not an appeal in a statute, correct?

21  Q    And did I understand your testimony to be that counties

22  are already always offering voters an opportunity to cure a

23  deficient absentee application?

24  A    It is my knowledge of the practice that they do seek to

25  try to remedy that with the voter, if that's possible.  You

1  can't have -- there's certain things that cannot be cured.

2  Q    Such as?

3  A    If the board determines that there was no witness

4  signature, then you can't say fix this envelope by bringing in

5  a witness because that would not mean that the witness actually

6  witnessed them voting.

7  Q    Okay.  So there's no ability for those voters -- if they

8  misunderstood the witness requirement and didn't have a

9  witness, for those voters to cure their absentee ballots?

10 A    We could contact them and spoil that particular ballot.

11 Q    Do you know if that's the regular practice right now?

12 A    That was a procedure in my county office.

13 Q    Do you know if that's a regular practice across the 100

14 county boards of elections you and your office currently

15 supervise?

16 A    I don't know, but I believe many do.

17          **MS. RIGGS:**  No further questions.

18          **THE COURT:**  Who goes next?

19          **MS. MOSS:**  I just have two follow-ups.

20                     REDIRECT EXAMINATION

21 **BY MS. MOSS:**

22 Q    Director Bell, do you know whether Davidson County will

23 have a MAT for the November election?

24 A    I don't know at this time.

25 Q    Do you know whether any of the 100 counties will lack a

1   MAT in the upcoming general election?

2   A    I don't know one way or the other at this time.

3   Q    And do you know definitively that any county closed an

4   early voting polling site in 2018 that was open in 2016 because

5   of the uniform hours requirement?

6   A    I would not -- I don't have specific indication one way or

7   the other, other than conversations, but I do believe there are

8   other -- there are many factors as to whether someone keeps a

9   polling place open or not.

10  Q    So if I asked you to identify a polling place and a county

11  that you know was closed because of the uniform hours

12  requirement, you can't provide an example?

13  A    Not at this time, no.

14          **MS. MOSS:**  That's all I have.  Thank you.

15          **THE COURT:**  Mr. Peters?

16          **MR. PETERS:**  Thank you, Your Honor.

17                        REDIRECT EXAMINATION

18  **BY MR. PETERS:**

19  Q    Ms. Bell, a couple follow-up questions.

20          You've been asked some questions about MATS,

21  Multipartisan Assistance Teams.  Can you tell us generally is a

22  MAT something -- that a county would have a standing MAT for

23  all of its elections, or is it something that's recruited

24  election by election?

25  A    I think it depends on the county, but if -- that would be

1   something that they would recruit election by election.  I

2   would say that there are returning people, but it can be

3   election by election.

4   Q    So would it be fair to say that if a county did not have a

5   MAT for, say, the primary, that that doesn't mean there's not

6   -- won't be one in place for the general election?

7   A    Correct.

8   Q    Now, you were asked some questions about curbside voting.

9   Do you -- by "you," I mean the State Board and you as the

10  Executive Director.  Do you provide information to voters about

11  how they can vote?

12  A    Yes.  We have our website.  We have the judicial guide

13  that goes out.  I've been giving presentations.  We have an

14  outreach team that gives presentations.  And the counties do

15  their own efforts similar to that.

16  Q    And does that guidance and education you regularly

17  provide -- does it include things like how to do curbside

18  voting?

19  A    Yes.

20  Q    You were asked some questions about printing of the

21  containers and whether or not you could print in batches and

22  that sort of thing.

23        Does it create a problem if you change the ballot --

24  or the container design midway through such that the containers

25  you send out to people at the beginning of September are

1  different from the ones you're sending out at the end of

2  September?  Does that create problems from an election

3  administration standpoint?

4  A    I think there's two factors there.  Yes, you're then

5  administering voting differently for, you know, the first

6  voters versus the second group of voters.

7          Also, when we talk about batch printing, depending on

8  the print house, many of these large-scale printers, it's not

9  like the way we put envelopes into our personal printers.

10  They're not existing envelopes.  A lot of times what these

11  printers are doing is a big sheet of paper that they print, and

12  so the information, you know, that's on the front of the

13  envelope is being printed at the same time as the back of the

14  envelope, and so then they cut and fold them into envelope --

15  you know, seal them and glue them to create an envelope.  So

16  it's a sheet of paper that is created into an envelope.  So if

17  we were to make changes, then there could also be the need for

18  the county to get a whole new batch of design and not be able

19  to use the previous batch.

20  Q    And does that have cost implications?

21  A    Absolutely.  I mean, you pay for what they've printed or

22  you pay for what they've ordered for you, and, you know, they

23  could just be tossed, and we've done that before, and it's not

24  a fun thing to say to your commissioners, "I truly threw that

25  out with the recycle bin."

1  Q    And do you have any experience as to in the past, when

2  there had been printing done in batches, why it was done in

3  batches?

4  A    I have a personal experience.  The staff member thought

5  that they had ordered an adequate supply and had that on the

6  shelf, and it turned out to not be the envelopes that we

7  needed.  So I contacted a printer.  He did a small batch and

8  made it readily available, but I paid for that because it was a

9  smaller quantity than if I had been able to order in bulk,

10  which we did do.

11          But I'm also very mindful that, you know, when I look

12  back at that point in time -- you know, if we think about the 4

13  to 5 percent participation that we normally have, we also order

14  in smaller batches, and now we're talking about larger volumes,

15  which is something else the counties have to consider and the

16  printers have to consider.  And they're also working under the

17  same constraints of COVID-19 and protection for their employees

18  and the supply chain that even makes paper available to us

19  right now.  It's the same trees that we have to have for paper

20  towels and toilet tissue.  So there's a lot of factors in how

21  we're getting our envelopes.

22          And the indication from the two printers that I know

23  staff has been in contact with is that they need a 4-week

24  turnaround to make this happen, at least.

25  Q    And you mentioned the supply chain.  Has it been the case

1  at times that the reason that printing has happened in batches

2  is not because of any need from the board of elections, county

3  or state, but because the printer only had so much paper

4  available and was waiting for more paper to come in?

5  A    That's right.  They will quote us a price.  If you order a

6  thousand, this is what your cost is, and maybe they only have

7  enough to print 250 -- and I probably should go with higher

8  numbers, but let's just say they can get the 250 to you right

9  here and now.  If you're agreeable that they could come --

10 continue to fulfill the order, they will do that.

11 Q    All right.  You've been asked some questions about the

12 emergency order that you issued last week.  That order does not

13 waive the uniform hours requirement, does it?

14 A    It does not.

15 Q    So what is the purpose of that order and particularly what

16 the order directs with regard to weekend hours?

17 A    We maintain the uniform hours.  We did have an

18 interpretation -- a legal interpretation that the uniform hours

19 are 8:00 to 7:30 weekdays and then that final Saturday of 8:00

20 to 3:00.  A county during the week can expand their hours

21 before 8:00 a.m. and after 7:30 p.m., or after 7:30 p.m., if

22 they choose, but they'll still be uniform in that application.

23         In terms of the weekends, what we recognize is that

24 we have to be able to get as many voters -- let me -- we can

25 have -- if we increase the number of hours and the number of

1  sites available to them and the number of options available to
2  them and spread that across the county and spread that across
3  the 17-day period, then we will be able to vote more people
4  during the one-stop period.

5          And what becomes so critical about that is that if
6  we're now voting instead of 4 or 5 percent during absentee by
7  mail and now we're up to 20, 30, or 40 percent, and now during
8  our one-stop period, when we have the most participation in
9  most counties in our state -- that's how most people choose to
10 vote.  So if we can still get 40, 50, or 60 percent of the
11 voters participating then, spreading it over the 17 days where
12 we don't need as many sites to be open as we do election day --
13 therefore, we don't need as many workers in that period of
14 time -- but yet we've got the additional hours on the weekend,
15 we've got, you know, the requirement that they have more sites
16 based upon that number of voters, then we are spreading the
17 opportunity.

18         We're also helping to ensure that when we get to
19 election day, that we have a very small amount of voters that
20 are left; and when we have situations where we don't have
21 enough workers on election day and we don't have enough sites
22 available -- we're planning to be completely open.  We're
23 planning to be completely staffed, but things will happen.  And
24 so that's why we've even got enhancements within our SEIMS
25 system so that if we do have to move one of those polling

 1  places on election day, that it will not impact as many voters.

 2  We've spread it over that early voting period, and we've

 3  absorbed it with the absentee period.

 4          Did that make sense?  I said a lot.  I'm sorry.

 5  Q    That's all right.  Thank you.

 6          There's been a lot of discussion about whether more

 7  hours are provided, whether more locations are provided and how

 8  that affects voter turnout.  As you look at this as an

 9  elections administrator, how do you weigh the more hours versus

10  more locations?

11  A    You have to have both.  I mean, it gives us -- it gives us

12  quantity and quality, because we're also still adhering to the

13  uniform hours; we're still adhering to the other criteria

14  within the law that says that we will not favor based on party

15  or demographics or location.  And they can establish those

16  sites to make it available to as many voters as possible.

17  Q    All right.  And then one last thing.  I believe you

18  mentioned this, but I just want to make sure that this is

19  clear.

20          As you plan for things like how the MATS will work

21  and as you plan for how voting can be conducted in polling

22  places, is the State Board working with the Department of

23  Health and Human Services to plan how to do that safely?

24  A    We are and with the State Emergency Management who is

25  helping us.  They actually have -- are going to be providing

 1  our PPE so that we have more funds available to the counties.

 2  So, yes, we're working with both agencies.

 3          **MR. PETERS:**  Okay.  Thank you.  I have no further

 4  questions.

 5          **THE WITNESS:**  Thank you.

 6          **THE COURT:**  Okay.  A couple of quick things.  One,

 7  several times throughout your testimony, you talked about the

 8  majority/minority plan --

 9          **THE WITNESS:**  Yes, sir.

10          **THE COURT:**  -- coming from a county board.

11          Would you just generally for the record explain what

12  you mean by majority/minority plan, like how many members of

13  the board there are, who appoints them, and how those

14  majority/minority plans arise?

15          **THE WITNESS:**  Yeah, in terms of one-stop, it doesn't

16  have anything to do with the appointment of the board members.

17  If, for example -- and we have had this -- we have four members

18  out of five who vote in favor of the plan that the elections

19  director generally presents, then those four represent a

20  majority, and that's how that plan would be presented to the

21  State Board.  That would mean that the one member who didn't

22  agree then states what they would like.  We ask them to provide

23  a minority --

24          **THE COURT:**  So each county board consists of five

25  members?

Case 1:20-cv-00911-WO-JLW   Document 1-6   Filed 09/26/20   Page 131 of 139

          1              THE WITNESS:  Yes, sir.

          2              THE COURT:  And a majority/minority plan just refers

          3    specifically to a majority of the board members, whether it's

          4    4/1, 3/2 --

          5              THE WITNESS:  They liked that plan.

          6              THE COURT:  -- like this plan, and you consider both

          7    plans when you are making those decisions?

          8              THE WITNESS:  The State Board does, yes.

          9              THE COURT:  All right.  And, second -- so you talked

         10    about Dowless and the canvass and discovery of the fraud, and

         11    then you talked about an audit.  And I got a little bit

         12    confused in terms of whether or not you were saying overall

         13    election fraud is a small thing, or whether under the audit

         14    that was conducted they only -- whatever that audit may have

         15    been, they only discovered two fraudulent ballots out of

         16    4 million, or something like that.

         17              So when you said election fraud is a small thing, are

         18    you talking about the audit specifically, or are you talking

         19    about overall?  I wasn't clear what you were testifying to.

         20              THE WITNESS:  There have been national reports and a

         21    general consensus that we don't have a voter fraud problem, but

         22    because of concerns, it's my understanding that the previous

         23    election Executive Director ordered an audit in 2017 following

         24    the 2016 election to determine if there were substantial cases

         25    or anything.  And so that's where there were about four --

there were over 4 million who voted in 2016, so they looked at
that, and that's where they had the two cases where it was
actually, if I recall, two different family members who thought
that they were carrying out the wishes of their relatives.

THE COURT:  So there were -- Tutor who testified
about the Dowless scheme.  That was in 2018.

THE WITNESS:  That's right.  They had been tracking
him before then, but yes.

THE COURT:  Did he have some issues in 2016 as well?
I think Tutor had mentioned something about 2016.

THE WITNESS:  Yes, I think there were -- there was an
investigation in 2016.  I don't think there was enough to
substantiate or move forward.  There was nothing substantial
enough to present a case to the State Board and then to refer
it to the DA is my understanding.

THE COURT:  All right.  So in terms of -- so you look
at Dowless, and in terms of voter fraud and preventing voter
fraud -- clearly, Mr. Tutor believes if somebody wants to
cheat, they're going to cheat -- what are the things that are
in place that help prevent voter fraud in your experience?

THE WITNESS:  So I think the case with McCrae Dowless
in '18, he manipulated the system in terms of how they were
collecting the ballots from those who were voting absentee.
Obviously, we had witnesses at that point, and that didn't stop
him.

          So we have made recommendations following that case,
and some of those have been put into law.  And, you know, it's
things like the absentee request log being very specific as to
who can assist with an absentee request.  It removed the
ability for nonrelatives, legal guardians, or the voter
themselves or the MAT team -- people outside of those
individuals can no longer assist with that absentee request
form, for example.  So we logged that so that we're aware of
who was turning in those forms.  So we monitor that.

          There's been some other provisions that were passed
back in the fall where we maintained the confidentiality of who
has returned the absentee ballot until election day so that
they can't go around harvesting them and altering them, and
that will stay in place.  The Intelligent Mail barcoding that I
was talking about, the voter has the ability to track.  That's
not something that is made public as to anyone.

          **THE COURT:**  All right.  At the start, you mentioned
kind of the standard appear at the polling place and vote:  You
have a precinct worker there, you identify yourself, your
address, and then you sign the little form, and then they
witness your -- essentially witness your signature.

          What's the purpose of all that?

          **THE WITNESS:**  When I present myself to vote, then I'm
indicating who I am and this is my residence, and by stating
that, that I am who I say I am.  And if not, then someone has

1  the ability to challenge me.

2          THE COURT:  Okay.  Anything in response to my

3  questions?

4          MR. PETERS:  Just one quick one that I think you may

5  have touched on earlier, but since you're asking, I want to

6  make sure it's clear.

7  BY MR. PETERS:

8  Q    The judge asked about the majority and minority plans that

9  were submitted to the State Board of Elections.  When the State

10 Board considers a nonunanimous vote and is looking at a

11 majority plan or a minority plan, am I correct that it can

12 choose to approve the majority plan, it can choose to approve

13 the minority plan, or it can choose to adopt a new plan

14 altogether?

15 A    They can adopt a new plan altogether, and that's part of

16 why we have a period of time between when the counties submit

17 and the State Board consider -- State Board Members consider is

18 we actually provide them with some pretty extensive data so

19 that they can see how these two plans that were presented to

20 them -- how they map out and if they want to take a different

21 course of action, and I have actually seen them do that.

22         THE COURT:  All right.

23         MR. PETERS:  That's it.  Thank you.

24         THE COURT:  Anything further?

25         MS. RIGGS:  Sorry, Your Honor.  May I ask two

1  questions in follow up to your questions?

2          **THE COURT:**  You may.

3          **MS. RIGGS:**  Thank you, Your Honor.

4                          RECROSS-EXAMINATION

5  **BY MS. RIGGS:**

6  Q    Director Bell, would you agree with me that the fact that

7  an absentee request form must provide the voter's Social

8  Security number or driver's license number -- and it might be

9  the last four -- is -- impedes the ability of voter -- folks to

10  fraudulently submit absentee requests?

11          **MR. PETERS:**  Your Honor, I object to this to the

12  extent that there's been no testimony previously and nothing

13  from your questions about Social Security numbers.

14          **MS. RIGGS:**  Well, I think -- and I'll stand to be

15  corrected, but I understood you wanted -- the Court wanted to

16  understand --

17          **THE COURT:**  What are the things in place to help

18  prevent fraud?  And she indicated we've changed the -- I think

19  her answer was something along the lines of we've changed the

20  process for requesting an absentee ballot.  And so in terms --

21  and then we know what the statute requires.

22          I'll overrule.  You can answer, if you know.

23          **THE WITNESS:**  I'm trying to recall whether that was

24  already in place, but that is part of the form, and as I had

25  mentioned, I mean, there were a series of things.  We also knew

1  some things --

2          THE COURT:  That's another factor that would help

3  prevent absentee ballot fraud --

4          THE WITNESS:  Yes, sir.

5          THE COURT:  -- would you agree with that?

6          THE WITNESS:  Yes, sir.

7  BY MS. RIGGS:

8  Q    And do you agree that the recent change to not make public

9  who has requested an absentee ballot until after that absentee

10 ballot has been received by the county board of elections is

11 another factor that would deter absentee theft and respond to

12 the situation like with the CD 9 Dowless issue?

13 A    That was done in response to CD 9 is my -- yes.

14         THE COURT:  Have you given any thought to the fact

15 you're mailing an absentee ballot request to every household

16 and what may happen with that?

17         THE WITNESS:  Since it's a publicly available form,

18 that's how we chose --

19         THE COURT:  I'm not criticizing.

20         THE WITNESS:  Right.

21         THE COURT:  Rural mailbox, nothing to prevent people

22 from riding around and taking them, is there?

23         THE WITNESS:  There's not, but, you know, it's the

24 return of those to us.  So anyone could complete one, I

25 suppose, but it's --

 1          THE COURT:  I think we've got a timer going off.  Is
 2   Ms. Welch over there scrambling around?
 3          THE WITNESS:  Whether we mail them to a household or
 4   whether they download it off of a website, someone could
 5   complete it.  It's just the part of how we receive it and the
 6   indications on those request forms that we're tracking.
 7          THE COURT:  Okay.  Anything else?
 8          MS. RIGGS:  Nothing, Your Honor.
 9          THE COURT:  Okay.  You may step down.
10          (Witness excused.)
11          THE COURT:  Anything else we need to do today?
12          MR. THOMPSON:  Not from our perspective, Your Honor.
13          MR. PETERS:  I'm not aware of anything.
14          MS. KLEIN:  Nothing from the Plaintiffs, Your Honor.
15          THE COURT:  We'll be in recess until tomorrow morning
16   at 9:00.
17          (At 5:19 p.m., proceedings adjourned.)
18
19
20
21
22
23
24
25

1                    *  *  *  *  *

2                C E R T I F I C A T E

3      I certify that the foregoing is a correct transcript
       from the record of proceedings in the above-entitled
4      matter.

5

6                                 _____
7      Date: 07/26/2020      Joseph B. Armstrong, RPR
                             United States Court Reporter
8                            324 W. Market Street
                             Greensboro, NC  27401
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Evidentiary Hearing Volume 2 of 3 - July 21, 2020