# EXHIBIT 9

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE

SUPERIOR COURT DIVISION

No. 20-CVS-8881

NORTH CAROLINA ALLIANCE FOR
RETIRED AMERICANS; BARKER
FOWLER; BECKY JOHNSON; JADE
JUREK; ROSALYN KOCIEMBA; TOM
KOCIEMBA; SANDRA MALONE; and
CAREN RABINOWITZ,

        Plaintiffs,

v.

THE NORTH CAROLINA STATE BOARD
OF ELECTIONS; and DAMON CIRCOSTA,
in his official capacity as CHAIR OF THE
NORTH CAROLINA STATE BOARD OF
ELECTIONS,

        Defendants, and,

PHILIP E. BERGER, in his official capacity as
President Pro Tempore of the North Carolina
Senate, and TIMOTHY K. MOORE, in his
official capacity as Speaker of the North Carolina
House of Representatives,

        Intervenor-Defendants.

**AMENDED COMPLAINT**

Plaintiffs, complaining of Defendants, say and allege:

## INTRODUCTION

1.    The current public health crisis caused by the novel coronavirus (hereinafter,

"COVID-19") has upended daily life in North Carolina and threatens to wreak havoc on its

electoral system. On March 10, Governor Roy Cooper declared a state of emergency and has

since issued orders requiring North Carolinians, consistent with guidance from public health

officials, to "[m]aintain at least six (6) feet social distancing from other individuals"; wear face

coverings when leaving home; and minimize unnecessary interactions with individuals outside of

their homes in an effort to slow the rapidly increasing number of positive COVID-19 cases.[1] Because there is no known cure for COVID-19, and infections continue to rise, these measures designed to slow the spread of the virus are likely to continue through the November 3, 2020 general election ("November election").

2.    For these reasons, the State Board of Elections (the "State Board") has acknowledged that voting by mail will expand dramatically, predicting an 800-percent increase in upcoming elections. The State Board has further acknowledged that in-person voting will be significantly impacted due to a shortage of poll workers and polling sites that can accommodate large numbers of voters while complying with social distancing guidelines. With the November election fast approaching, the State is woefully underprepared, not only for the rapid expansion of absentee voters, but also for voters who will attempt to cast their ballots in person and may be forced to choose between their health and their constitutional right to vote.

3.    Plaintiffs Barker Fowler, Becky Johnson, Jade Jurek, Rosalyn and Tom Kociemba, Sandra Malone, and Caren Rabinowitz bring this lawsuit to eliminate the barriers to a free and fair election and to ensure that they, along with all other eligible North Carolinians, have a meaningful opportunity to exercise their constitutional right to vote in November.

4.    Specifically, Plaintiffs challenge the State's failure to provide sufficiently accessible in-person voting opportunities that comply with social distancing guidelines during the COVID-19 pandemic, and its continued enforcement of several absentee voting restrictions and procedures that will unduly burden or deny the franchise to countless voters if applied during the November election, while the COVID-19 outbreak still threatens public safety.

---

[1] *See* Governor Roy Cooper, Exec. Order No. 141 (May 20, 2020), https://files.nc.gov/governor/documents/files/EO141-Phase-2.pdf [hereinafter Exec. Order No. 141]; Governor Roy Cooper, Exec. Order No. 147 (June 24, 2020), https://files.nc.gov/governor/documents/files/EO147-Phase-2-Extension.pdf.

5.      These challenged laws and procedures include: (1) limitations on the number of days and hours of early voting that counties may offer, N.C.G.S. § 163-227.2(b); (2) the requirement that all absentee ballot envelopes must be signed by a witness, despite recommendations from medical professionals and the government that all residents should practice social distancing and minimize unnecessary contact with individuals outside of the home, Bipartisan Elections Act of 2020, 2020 N.C. Sess. Laws 2020-17, § 1.(a) ("HB 1169") (the "Witness Requirement"); (3) the State's failure to provide pre-paid postage for absentee ballots and ballot request forms during the pandemic, *id.* § 163-231(b)(1) (the "Postage Requirement"); (4) laws requiring county boards of elections to reject absentee ballots that are postmarked by Election Day but delivered to county boards more than three days after the election, notwithstanding the United States Postal Service's ("USPS") well-documented mail delivery delays and operational difficulties, *id.* § 163-231(b)(2) (the "Receipt Deadline"); (5) the practice in some counties of rejecting absentee ballots for signature defects, or based on an official's subjective determination that the voter's signature on the absentee ballot envelope does not match the signature on file with election authorities, without providing sufficient advance notice and an opportunity to cure (the "Signature Matching Procedures"); (6) laws prohibiting voters from receiving assistance from the vast majority of individuals and organizations in completing or submitting their absentee ballot request forms, 2019 N.C. Sess. Laws 2019-239, § 1.3(a) ("SB 683"), (the "Application Assistance Ban"); and (7) laws severely restricting voters' ability to obtain assistance in delivering their marked and sealed absentee ballots to county boards, and imposing criminal penalties for providing such assistance, N.C.G.S. § 163-226.3(a)(5) (the "Ballot Delivery Ban").

6.      Taken together, these barriers (the "Challenged Provisions") to in-person and

Case 1:20-cv-00911-WO-JLW   Document 1-10   Filed 09/26/20   Page 4 of 43

absentee voting are not only unduly burdensome, as applied to the November election, but they also pose significant risks to voters' health and safety and will result in the disenfranchisement of untold numbers of North Carolinians, especially those who are medically and financially vulnerable. Protecting the safety of all North Carolinians during a public health crisis, while enforcing the constitutional rights to vote and to a free and fair election, will require advance planning and immediate proactive measures and accommodations to ensure adequate opportunities to cast an effective ballot (by mail or in person) notwithstanding the COVID-19 pandemic.

7.      Plaintiffs therefore request that this Court issue an Order protecting the rights of North Carolina voters to participate in the November election by: (i) permitting counties to expand the early voting days and hours during the pandemic in order to increase opportunities to vote in person and minimize crowding, long lines, and the risk of exposure to COVID-19; (ii) suspending the Witness Requirement for single-person or single-adult households; (iii) requiring the State to provide pre-paid postage on all absentee ballots and ballot request forms; (iv) requiring election officials to count all absentee ballots mailed through USPS and put in the mail by Election Day if received by county boards up to nine days after Election Day, which coincides with the earliest deadline for the receipt of uniformed-service or overseas voters' ballots; (v) enjoining election officials from rejecting ballots based on alleged signature discrepancies or mismatches without adequate guidance and training from the State Board and without providing voters notice and an opportunity to cure their ballots; (vi) allowing voters to obtain assistance from other individuals or organizations of their choice in completing and submitting their absentee ballot applications; and (vii) allowing voters to obtain assistance from other individuals or organizations of their choice in delivering ballots to election officials, and

- 4 -

allow third parties to provide such assistance without fear of incurring criminal penalties.

## PARTIES

8.  Plaintiff North Carolina Alliance For Retired Americans ("the Alliance") is incorporated in North Carolina as a 501(c)(4) nonprofit, social welfare organization. The Alliance has over 50,000 members across all 100 of North Carolina's counties. Its members are comprised of retirees from public and private sector unions, community organizations, and individual activists. Some of its members are disabled, and many are elderly. It is a chartered state affiliate of the Alliance for Retired Americans. The Alliance's mission is to ensure social and economic justice and full civil rights that retirees have earned after a lifetime of work. The Challenged Provisions frustrate the Alliance's mission because they deprive individual members of the right to vote and to have their votes counted, threaten the electoral prospects of Alliance-endorsed candidates whose supporters will face greater obstacles casting a vote and having their votes counted, and make it more difficult for the Alliance and its members to associate to effectively further their shared political purposes. Because of the burdens on absentee and in-person voting created by the Challenged Provisions, the Alliance will be required to devote time and divert resources from other efforts to educating its members about these requirements and assisting them in complying so that their votes are received by Election Day, accepted, and counted. These efforts will reduce the time and resources the Alliance has to educate its members and legislators on public policy issues critical to the Alliance's members, including the pricing of prescription drugs and the expansion of Social Security and Medicare and Medicaid benefits.

9.  The Alliance also brings this action on behalf of its members who face burdens on their right to vote as a result of the Challenged Provisions. Because all of the Alliance's members are of an age that places them at a heightened risk of complications from coronavirus, they are

- 5 -

overwhelmingly likely to vote absentee this year and consequently face the burdens that the Challenged Provisions place on absentee voters. For example, some of the Alliance's members live in parts of the State where access to the Internet is sporadic and therefore cannot easily request an absentee ballot without assistance. Others are likely to face difficulty finding a witness, acquiring postage, or delivering an absentee ballot themselves should they be unable to return it through the mail in sufficient time for their ballot to be counted. Additionally, many of the Alliance's members will be absentee voting for the first time, and thus will be more susceptible to disenfranchisement by the Receipt Deadline and Signature Matching Procedures. Finally, those of the Alliance's members who are committed to voting in person, or forced to because they do not receive their absentee ballots on time, will have to choose between their health and their right to vote due to a shortage of safe, in-person voting opportunities.

10.     Plaintiff Barker Fowler is a 22-year-old registered voter in Rowan County, North Carolina. Ms. Fowler is a college senior at the University of Mississippi in Oxford, Mississippi, though she is currently at home in Salisbury, North Carolina with her parents due to the pandemic. She is finishing her degree this summer and is uncertain of where she will be this October and November, as she is applying for seasonal jobs out of state. Ms. Fowler typically votes absentee because she attends school in Mississippi, and she will likely have to do so again for the November election. Nevertheless, she is concerned about her ballot arriving in time to be counted, particularly given her experience attempting to vote absentee in the March 3 presidential primary, for which she requested an absentee ballot a month before the election but did not receive it until approximately five days after the election had already passed. Her ballot was postmarked in early February, meaning that it was in transit for more than three weeks. Given her experience attempting to vote absentee in March, Ms. Fowler is very concerned about

North Carolina's Receipt Deadline, as she is not confident that, even if she were to receive her ballot on time to postmark it by Election Day, that it would arrive within three days. Moreover, she does not typically keep stamps and, as a college student facing economic uncertainty due to the pandemic, is concerned about the added time and expense required to procure proper postage.

11.     Plaintiff Becky Johnson is a 73-year-old registered voter in Forsyth County, North Carolina. Ms. Johnson is a dedicated voter who usually casts her ballot in person during the early voting period. Given her age and the risks of contracting COVID-19, Ms. Johnson has been extremely careful and does not regularly leave her home, nor does she invite others into her house. When she needs to venture into the public, she engages in strict social distancing practices and always carries a mask with her. She even orders her groceries online because she does not want to expose herself to the virus through contact with others. For the same reason, Ms. Johnson plans to vote by mail in the November election; she cannot be sure that others at the polls will be as careful as she is, and she does not want to risk exposure to COVID-19. Ms. Johnson is worried, however, that her absentee ballot may not count. She is well aware of the USPS's operational difficulties and the resulting mail delays that have occurred during the pandemic, which could prevent her ballot from being delivered on time, even if she mails it well before Election Day. Given these concerns, Ms. Johnson would prefer to seek contactless assistance from a trusted friend or neighbor to return her sealed ballot. Additionally, Ms. Johnson lives alone, and she is unsure how she will comply with the Witness Requirement. She does not want to risk exposure to COVID-19 in order to have her ballot signed by a third party. Further, Ms. Johnson knows that her signature has changed over time and now looks different each time she signs a document, and she is concerned that her ballot will be rejected if her absentee ballot envelope signature does not exactly match the signature on file with her county board of

- 7 -

elections.

12.     Plaintiff Jade Jurek is a 60-year-old registered voter in Wake County, North Carolina. Ms. Jurek has multiple sclerosis which can make voting difficult for her. Though she has voted by absentee ballot a few times in the past, she strongly prefers voting in person. Ms. Jurek usually votes during the early voting period, so that she can cast her ballot when she is feeling her best. Ms. Jurek initially considered voting by mail in the November election, but she is concerned about USPS delays and the risk of disenfranchisement. To ensure that her ballot gets counted, she is committed to voting in person, as she usually does. Ms. Jurek voted in person during the primary election and encountered long lines, a crowded polling place, and extended wait times. Though some voters at the polls were taking necessary precautions to prevent the spread of COVID-19, many were not wearing masks or gloves, and Ms. Jurek found that it was not possible to remain socially distant for the full duration of the voting process. She would be much more comfortable casting her ballot if the State were to expand early voting days and hours, so that she would have the opportunity to select a day and a location that is less crowded, which will allow her to adhere to social distancing guidelines through the entire voting process.

13.     Plaintiff Rosalyn Kociemba is a registered voter in Buncombe County, North Carolina. She is a 77-year-old member of the Buncombe County Senior Democrats, and she typically votes absentee so that she can spend Election Day working at the polls. For the past five years, she has served as an official poll worker on Election Day, but this year, she plans to stay home due to the COVID-19 pandemic. Ms. Kociemba and her husband both have underlying health conditions that make them especially vulnerable to COVID-19. Therefore, Ms. Kociemba plans to vote absentee again in the November election. Although she usually hand-delivers her

- 8 -

absentee ballot to her county board of elections, she would prefer a contactless option this year given the potential health risks. Ms. Kociemba is also worried about slowdowns in mail delivery service given the USPS's operational difficulties during the pandemic, which could prevent her ballot from being delivered by USPS before the Receipt Deadline. As a result, she would like to seek assistance from trusted neighbors and community members to return her sealed ballot.

14.     Plaintiff Tom Kociemba is a registered voter in Buncombe County. He is 75 years old, a sales and marketing professional, and a member of the Buncombe County Senior Democrats. Mr. Kociemba typically votes absentee because he is busy working at the polls on Election Day. Due to the COVID-19 pandemic, however, Mr. Kociemba does not want to take the unnecessary risk of being at an in-person voting location, particularly because he has underlying health conditions that make him vulnerable to serious illness from a COVID-19 infection. Therefore, Mr. Kociemba withdrew from serving as a poll worker (a role in which he has served for the past seven years) and will vote absentee in November. Although he usually hand-delivers his absentee ballot to his county board of elections, he would prefer a contactless option this year in order to avoid interacting with those who may not be following all the precautions necessary to prevent the spread of COVID-19. Nevertheless, he is worried that his ballot may not be delivered by the Receipt Deadline due to slowdowns in mail delivery service and the operational difficulties that USPS has encountered during the pandemic. Mr. Kociemba would like to seek assistance from trusted neighbors and community members to ensure that his sealed ballot is delivered on time.

15.     Plaintiff Sandra Malone is a 53-year-old registered voter in Wake County. Ms. Malone usually votes in person and she would like to continue voting in person this year. However, she is concerned about the safety of polling places during the COVID-19 pandemic,

- 9 -

and the lack of adequate options for early voting sites and hours that would allow her to pick a date and time with fewer voters, which would allow her to follow social distancing guidelines through the entire voting process. Ms. Malone is also concerned that if she opts to vote by mail instead, her absentee ballot may not reach election officials by the Receipt Deadline, given evidence of the USPS's overcapacity and operational difficulties. Moreover, she is worried that her ballot may be rejected for a signature mismatch, as her signature changes every few years and rarely looks exactly the same.

16. Plaintiff Caren Rabinowitz is a 69-year-old registered voter in Guilford County. Ms. Rabinowitz recently moved to North Carolina from New York. As a new resident, this will be her second time voting in the State. She voted in person in the March 3 primary. Because Ms. Rabinowitz has underlying health conditions that place her at high risk for serious illness if she contracts COVID-19, she plans to vote by mail in the November election to avoid exposure to the virus. Dropping off her absentee ballot in person would be especially difficult because she does not drive and must rely on public transportation. Ms. Rabinowitz is concerned that her vote will not be counted if, for reasons outside of her control—like the USPS's ongoing mail delivery delays—her absentee ballot arrives after the Receipt Deadline. Further, Ms. Rabinowitz lives alone, and because she recently moved to the State, she does not have any friends or family nearby and is concerned about having to venture out in public or invite a stranger into her home to satisfy the Witness Requirement.

17. Defendant North Carolina State Board of Elections is an agency responsible for the regulation and administration of elections in North Carolina, including voting absentee.

18. Defendant Damon Circosta is the Chair of the North Carolina State Board of Elections. Mr. Circosta is sued in his official capacity.

- 10 -

## JURISDICTION AND VENUE

19.      This Court has jurisdiction of this action pursuant to Article 26 of Chapter 1 of the General Statutes.

20.      Under N.C.G.S. § 1-81.1(a1), the exclusive venue for this action is Wake County Superior Court.

## FACTUAL ALLEGATIONS

### I.      COVID-19 has upended the electoral process in North Carolina.

21.      COVID-19 has caused widespread disruption to daily lives and routines across the globe, which has impacted elections around the country and in North Carolina. By March 10, North Carolina had reported five confirmed cases of COVID-19. Since then, the number of confirmed cases in the State has skyrocketed, and the virus has spread to all of North Carolina's 100 counties. *Id.*

22.      On March 14, four days after Governor Cooper issued his first executive order declaring a state of emergency—which remains in effect as of this filing—the Governor closed public schools statewide and imposed social distancing guidelines. Since then, the Governor has issued no fewer than 29 executive orders designed to keep North Carolinians safe during the ever-evolving public health crisis.

23.      Even as North Carolina gradually begins to reopen, efforts to prevent the spread of COVID-19 remain in place, including executive orders prohibiting mass gatherings—defined as "an event or convening that brings together more than ten (10) people indoors or more than twenty-five (25) people outdoors at the same time in a single confined indoor or outdoor space,

- 11 -

such as an auditorium, stadium, arena, or meeting hall."[2]

24.     Governor Cooper has also strongly advised residents 65 years of age and older, or who are immunocompromised, to stay home. *Id.* Visitation to long-term care facilities, including nursing homes, adult care homes, family care homes, mental health group homes, and intermediate care facilities for individuals with intellectual disabilities has been limited to "compassionate care situations." *Id.*

25.     Efforts to minimize the spread of the virus or the risk of infection will require North Carolinians to exercise caution by following social distancing guidelines and avoiding large group gatherings, which "offer more opportunity for person-to-person contact with someone infected with COVID-19[.]"[3] The need for such precautions shows no signs of easing as COVID-19 cases continue to rise, even though the State is still experiencing what some have termed the first wave of infections.

26.     The State Board has announced that it expects a surge in absentee ballots from approximately four percent during previous elections to 40 percent for the November election, and that it anticipates a total of 4.5 million individuals will vote by mail and in person this November. As a result, the Board has asked the General Assembly to eliminate certain restrictions that reduce access to voting by mail.

27.     In a March 26, 2020 letter to Governor Cooper and the General Assembly, the State Board's Executive Director urged the General Assembly to: (1) alter early voting sites and hours requirements to allow counties to better accommodate in-person voters during the COVID-

---

[2] Governor Roy Cooper, Exec. Order No. 151 (July 16, 2020),
https://files.nc.gov/governor/documents/files/EO151-Phase-2-Extension-1.pdf [hereinafter Exec. Order No. 151]; Governor Roy Cooper, Exec. Order No. 147 (June 24, 2020),
https://files.nc.gov/governor/documents/files/EO147-Phase-2-Extension.pdf; Exec. Order No. 141 (May 20, 2020).

[3] *See* Exec. Order No. 151.

- 12 -

19 pandemic; (2) relax or eliminate the Witness Requirement, as well as restrictions on third-party assistance of voters in care facilities; (3) establish a fund to pay for outbound and returned absentee ballots; (4) create an online option for requesting absentee ballots, and allow them to be submitted by fax and email; and (5) enable county boards of elections to assist voters by pre-filling their information on absentee ballot request forms.

28.     The State Board's Executive Director renewed this plea on April 22, 2020 and April 29, 2020, also requesting funds to account for the unprecedented expansion of absentee voting and to make polling places accessible to voters during the public health crisis—a need which the State is woefully unprepared to meet.

29.     Although the General Assembly has reduced the number of signatures necessary to satisfy the Witness Requirement from two to one, allowed the State Board to create an online portal for absentee ballot requests, and permitted voters to return their absentee ballot request forms via email or fax this year, it has yet to adopt any of the above-referenced measures in full.

30.     North Carolina's inaction, despite the imminent risk of widespread disenfranchisement under the State's current election procedures, threatens to repeat the chaos and disorder that has played out in one election after another across the country since the pandemic began.

31.     In Wisconsin's April 7 primary, for instance, election officials knew ahead of time that in-person voting opportunities would be significantly limited due to the loss of poll workers who were over the age of 65 and feared exposure to COVID-19, and the severe reduction in the number of available polling locations. *See Democratic Nat'l Comm. v. Bostelmann*, No. 20-CV-249-WMC, 2020 WL 1638374, at *1 (W.D. Wis. Apr. 2, 2020). Like here, the likely consequences of holding an election in that context were clear: "(1) a dramatic

- 13 -

shortfall in the number of voters on election day . . ., (2) a dramatic increase in the risk of cross-contamination of the coronavirus among in-person voters, poll workers and, ultimately, the general population in the State, or (3) a failure to achieve sufficient in-person voting to have a meaningful election *and* an increase in the spread of COVID-19." *Id.*

32.     When Wisconsin proceeded to conduct its primary election in April without adequate safeguards to address these issues, chaos and widespread disenfranchisement ensued, and cities throughout Wisconsin were forced to close polling places. In Milwaukee, more than 18,000 voters cast their ballots in person at only five polling locations, resulting in large crowds, long lines, and excessive wait times, often without regard for social distancing protocols. USPS struggled to keep up with the dramatic increase in mail voting, resulting in thousands of voters who did not receive their requested absentee ballots in time to vote and return them by Election Day, and over 100,000 more whose ballots were submitted by mail but were not delivered to election officials until well after Election Day. The disruptions in the mail delivery of absentee ballots—both in the initial distribution to voters and their return to municipal clerks' offices—were so extensive that Wisconsin's U.S. Senators wrote to the Inspector General for the USPS seeking an investigation into "absentee ballots [not] reach[ing] Wisconsin voters in time for the spring election."[4]

33.     Ohio encountered similar issues in its April 28 primary. The Ohio Secretary of State reported that election officials were experiencing "missed mail deliveries" as well as delivery times "in excess of ten days" for first-class mail.[5]

---

[4] WBAY.com, *Senators Johnson, Baldwin call for investigation of Wisconsin absentee ballots* (Apr. 9, 2020), https://www.wbay.com/content/news/Senators-Johnson-Baldwin-call-for-investigation-of-Wisconsin-absentee-ballots-569521331.html.

[5] Letter from Frank LaRose, Ohio Sec'y of State, to Ohio Congressional Delegation (Apr. 23, 2020), *available at* https://www.dispatch.com/assets/pdf/OH35713424.pdf.

- 14 -

34.     In Pennsylvania's June 2 primary, USPS's operational difficulties delayed the delivery of mail ballots in both directions—from election officials to voters and from voters back to county election offices. As one county elections department explained, "[t]he source of this slowdown is a combination of systems operating at a slower rate due to the circumstances created by the COVID-19 pandemic and USPS prioritizing official election mail coming from [the County] in a manner that is not consistent with protocols that the County was informed would be in place."[6] Some county election officials went so far as to advise voters to avoid mailing back their ballots altogether and instead to hand-deliver them directly to their county board of elections, or risk disenfranchisement.

35.     Pennsylvania's primary was also marred by long lines and confusion over consolidated polling places, and tens of thousands of vote-by-mail ballots that never made it to voters, which led the Governor to issue an executive order on the eve of the election, granting a seven-day extension of the deadline for the receipt of mail ballots in six counties.

36.     In Georgia's June 9 primary, polling place consolidations and closures due to COVID-19 combined with malfunctioning voting machines created long lines at polling places throughout the State, with some voters casting their ballots after midnight.

37.     In Kentucky's June 23 primary, the city of Louisville—with a population of approximately 600,000, 20 percent of whom are Black—had only one polling place. Long lines and traffic jams predictably followed, and a court order was required to re-open the lone polling place after it had closed for the day to allow voters who were stuck in traffic to cast their ballots.

38.     In Washington, D.C.'s primary on June 2, some voters waited in line for over four

---

[6] Harri Leigh, *A record number of mail-in ballot applications, but will they arrive in time?* FOX43 (May 26, 2020), https://www.fox43.com/article/news/politics/elections/a-record-number-of-mail-in-ballot-applications-but-will-they-arrive-in-time/521-de6f5ff0-38eb-47a5-a935-313e6a6a1ee3.

- 15 -

hours, many of whom had requested absentee ballots but did not receive them in time to submit them by Election Day.

39.    Michigan's August 4 primary further underscored the effect of mail delays on voting during the pandemic. As of August 6, about 10,000 absentee ballots that had been cast in the primary just two days earlier had been rejected for arriving after Election Day or due to signature mismatch. The Michigan Secretary of State's office said the number of rejected ballots would likely rise as more ballots arrived.

40.    Recent statements from the USPS strongly suggest that North Carolinians will face similar challenges in submitting and receiving election mail this fall. A recent report by the Inspector General of the U.S. Postal Service confirmed that USPS "cannot guarantee a specific delivery date or alter standards to comport with individual state election law."[7] Just weeks ago, USPS announced "major operational changes" "that could slow down mail delivery" *even further*.[8] USPS will no longer pay overtime and is slashing office hours. Carriers are being directed, for the first time in USPS history, *to leave mail behind* at distribution centers if it would delay them from their routes instead of "mak[ing] multiple delivery trips to ensure timely distribution of letters and parcels," as they have historically done.[9] Since the announcement, some Americans have gone "upwards of three weeks without packages and letters, leaving them without medication, paychecks, and bills."[10]

---

[7] Office of the Inspector General, *Timeliness of Ballot Mail in the Milwaukee Processing & Distribution Center Service Area*, USPS (July 7, 2020), https://www.uspsoig.gov/sites/default/files/document-library-files/2020/20-235-R20.pdf.

[8] Jacob Bogage, *Postal Service memos detail 'difficult' changes, including slower mail delivery*, WASH. POST (July 14, 2020), https://www.washingtonpost.com/business/2020/07/14/postal-service-trump-dejoy-delay-mail/ [hereinafter Bogage, *Postal Service memos detail 'difficult' changes*].

[9] *Id*. Bogage, *Postal Service memos detail 'difficult' changes*.

[10] Ellie Rushing, *Mail delays are frustrating Philly residents, and a short-staffed Postal Service is struggling to keep up*, Philadelphia Inquirer (Aug. 2, 2020),

41.     The November election in North Carolina will encounter the same obstacles that have derailed other elections around the country and, unless the Challenged Provisions are enjoined, the result will be widespread disenfranchisement of countless lawful North Carolina voters.

## II.     The Challenged Provisions impose barriers to in-person voting during the COVID-19 pandemic.

42.     Because polling places draw large numbers of individuals into enclosed spaces where, during the pandemic in particular, they have often been required to wait for hours in long lines, in-person voting presently poses a risk of transmission that can be mitigated—though not eliminated—only through the implementation of strict social distancing requirements among other health and safety measures.

43.     In-person voting involves certain variables, including the physical space in which the polling place is located and the time it takes for individuals after they arrive at the site to vote their ballots, that directly operate to increase (or decrease) a voter's risk of becoming infected with or transmitting COVID-19 at the polling place.

44.     Safety measures necessary to mitigate (although not eliminate) the risk of transmission include: (1) maximizing the number of polling places and expanding voting opportunities to minimize crowding and long lines; (2) ensuring social distancing is strictly enforced among poll workers and voters; and (3) ensuring availability and widespread use of personal protective equipment, hand sanitizer, and other appropriate disinfecting products.

45.     Such procedures are essential in ensuring access to the franchise because North Carolinians have historically relied heavily on in-person voting, and many are expected to

---

https://www.inquirer.com/news/philadelphia/usps-tracking-in-transit-late-mail-delivery-philadelphia-packages-postal-service-20200802.html.

continue to do so in 2020. In the 2018 general election, for example, less than three percent of all votes were cast by mail.

46.     Despite the need for expanded in-person voting opportunities and reduced crowds, voters in the November election will encounter just the opposite: fewer voting locations and hours, packed polling places, and long lines.

47.     In the June 23, 2020 Republican primary, for example, Haywood County reduced the number of polling sites from 29 to 11, and Macon County consolidated 15 polling places into just 3 sites. The State Board's Executive Director has also expressed concerns that COVID-19 will result in polling place consolidation and relocation to allow for adequate social distancing.

48.     Notably, the State Board has recognized the need for expanded early voting sites to allow county boards to "reduce crowd density, shorten the time voters spend in line and at polling locations, and improve sanitation and cleanliness" so that "every eligible North Carolinian has the ability to vote without endangering herself."

49.     As a result, the State Board recently issued an emergency order requiring all county boards to open at least one early voting site for a minimum of 10 hours in the first and second weekends of the early voting period and requiring county boards to offer at least one early voting site per 20,000 registered voters.

50.     While these reforms are certainly a step in the right direction, without an expansion of the early voting period, county boards that offer only the minimum required number of early voting sites during the fixed 17-day early voting schedule will not alleviate the crowding, long lines, and attendant health risks that the State Board sought to avoid.

51.     The COVID-19 pandemic will force counties to offer fewer polling locations than they otherwise would have under normal circumstances. Faced with poll workers unwilling to

- 18 -

risk exposure and potential voting sites that are either reluctant to open their doors to large crowds or inadequately equipped to follow social distancing guidelines, the State has already seen significant polling place consolidation. Indeed, it will be increasingly difficult for many counties to operate more than a few satellite early voting sites, which means that fewer cumulative early voting hours, larger crowds, and long lines await those who attempt to vote in person, creating public health risks and imposing severe burdens on the right to vote.

52.     To alleviate the inevitable crowds and long lines that await in-person voters for the November election, the State must expand opportunities to cast a ballot in person, including by extending the early voting period.

53.     Increasing the number of early voting days not only offsets the reduction in cumulative voting hours caused by the COVID-19 pandemic, but also minimizes the risk of daily congestion and affords North Carolinians additional options in selecting an early voting day when their polling site will be less crowded and allow for adequate social distancing.

### III.    The Challenged Provisions unlawfully restrict access to absentee voting during the COVID-19 pandemic.

54.     Adopted in 2001, "no-excuse" absentee voting, which allows any qualified citizen to vote by mail without justification, was one of several measures adopted by the State to alleviate crowds at the polls on Election Day and expand access to the franchise. N.C.G.S. § 163-226(a). Because of absentee voting and other reforms, North Carolina saw a five-percent increase in overall voter participation—from 59 to 64 percent—between the 2000 and 2004 general elections.

55.     Under normal circumstances, voting by mail expands access to the ballot box for voters whose work schedules, health conditions, family obligations, or lack of transportation make in-person voting difficult.

- 19 -

56.    But these are not normal times. As discussed above, the COVID-19 pandemic has upended daily life in North Carolina, and voters in the upcoming November election will encounter unprecedented barriers to the ballot box, which will require the State to adopt additional safeguards and suspend restrictions that will otherwise deny voters access to a free and fair election.

**A.    The Witness Requirement forces voters who live alone or in single-adult households to endanger their health in order to vote in the November election.**

57.    The Witness Requirement mandates that each voter who returns a mail ballot must have the envelope in which that ballot is submitted to elections officials signed by both the voter and another individual 18 years of age or older certifying that they witnessed the voter complete the ballot. N.C.G.S. § 163-231(a)(1)–(4).

58.    This means that, once a voter receives their absentee ballot, North Carolina law requires them to complete it in front of another adult—which often requires the voter to solicit a witness from outside their household—notwithstanding the public health risks posed by the ongoing COVID-19 pandemic.

59.    As the State Board acknowledged in its March 26 memorandum, which recommended a reduction in the number of witnesses required to cast an absentee ballot from two to one, "[e]liminating the witness requirement altogether . . . would further reduce the risk" to public health posed by COVID-19.[11]

60.    In April, the Board reiterated its request to amend the Witness Requirement, recognizing that voters who did not have other available witnesses in the household would be

_____

[11] *See* March 26, 2020 Letter from Karen Brinson Bell, Exec. Dir., N.C. State Bd. of Elections, to Gov. Roy Cooper, et al. (Mar. 26, 2020), *available at* https://s3.amazonaws.com/dl.ncsbe.gov/sboe/SBE%20Legislative%20Recommendations_COVID-19.pdf.

forced to "invite another adult into [their] home to complete the voting process," which "increases the risk of transmission or exposure to disease."[12]

61.    While the General Assembly, through HB 1169, reduced the number of required witnesses from two to one (for elections held in 2020 only), the Witness Requirement, even in its current form, still imposes a significant burden on many North Carolinians.

62.    More than one-fourth of North Carolina households are one-member households, as is the case for Plaintiff Caren Rabinowitz.

63.    Even voters living in multi-member households will struggle to meet the Witness Requirement because it mandates that a witness must be at least 18 years old and not otherwise barred from serving as a witness.[13]

64.    The burden of the Witness Requirement is exacerbated by the fact that the witnesses must be present at the time the voter marks their ballot, places it in and seals the container envelope, and completes the envelope's certification. N.C.G.S. § 163-231(a)(1)–(4).

65.    Thus, voters who live alone or in a household without eligible witnesses cannot vote until they find a witness, or invite a third party into their home, at a time when it is essential

---

[12] *See* April 22, 2020 Letter from Karen Brinson Bell, Exec. Dir., N.C. State Bd. of Elections, to Gov. Roy Cooper, et al. (Apr. 22, 2020), *available at* https://s3.amazonaws.com/dl.ncsbe.gov/Outreach/Coronavirus/State%20Board%20CARES%20Act%20r equest%20and%20legislative%20recommendations%20update.pdf. Although the State Board requested a reduction of the number of witnesses required from two to one, its reasoning—that voters "would have to invite another adult into [their] home"—applies equally to even a single witness requirement if the voter does not reside with another adult.

[13] Under N.C.G.S. §§ 163-226.3(a)(4) and 163-237(b), an individual who is a candidate for nomination or election cannot serve as a witness unless the voter is the candidate's near relative. In addition, the following individuals are prohibited from serving as witnesses if the voter is a patient or resident of a hospital, clinic, nursing home, or rest home: An owner, manager, director, employee of the hospital, clinic, nursing home, or rest home in which the voter is a patient or resident; an individual who holds any elective office under the United States, this State, or any political subdivision of this State; and an individual who holds any office in a State, congressional district, county, or precinct political party or organization, or who is a campaign manager or treasurer for any candidate or political party; provided that a delegate to a convention shall not be considered a party officer.

- 21 -

for North Carolinians to minimize unnecessary interactions with individuals outside of their homes and to follow social distancing guidelines, both for their own health and the safety of the general public.

66.     Complying with this requirement is impractical for many North Carolinians, and it forces them to choose between either protecting their health or exercising their right to vote.

67.     Meanwhile, the State's interest in enforcing the Witness Requirement is minimal at best. Witness signatures are ineffective fraud prevention measures, illustrated by the fact that North Carolina is one of only five states that still enforces them.

68.     Notably, North Carolina does not impose the same Witness Requirement upon uniformed-service voters or overseas voters registered in North Carolina who vote mail ballots.

69.     It also defies logic to suggest that the Witness Requirement will deter individuals who plan to commit perjury and cast an absentee ballot fraudulently. Such individuals are unlikely to draw the line at forging a witness's signature. Instead, the requirement burdens and punishes those who attempt to follow the letter of the law and are least likely to be engaged in any misconduct.

**B.      The Postage Requirement imposes monetary and transaction costs which are exacerbated by the pandemic.**

70.     A significant number of voters will be forced to mail their absentee ballots (because they either lack access to transportation or are unwilling to risk potential exposure to COVID-19 in order to deliver their ballots in person) and must pay a postage fee to do so.

71.     Thus, in order to submit their absentee ballots while minimizing the risk of COVID-19 infection, many North Carolinians must incur monetary expenses and other transaction costs that bear most heavily on financially vulnerable members of the electorate who are least able to navigate these burdens.

- 22 -

72.     This burden does not fall on all absentee voters in North Carolina. Uniform-service and overseas voters may submit absentee ballot requests by email, thereby avoiding incurring the postage to do so. *Id.* § 163-258.4(c). Moreover, these same voters need not pay for postage to mail back their completed absentee ballots, because "[a]ny American voter living overseas can mail his or her completed ballot back to the United States *free of charge* at the nearest American embassy, consulate, or Diplomatic Post Office (DPO). If the voter has authorized access to a military base, they can mail a ballot *free of charge* at the nearest Army Post Office (APO) or Fleet Post Office (FPO)." *Id.* (emphasis added).[14]

73.     As unemployment rates skyrocket in response to COVID-19's devastating impact on the economy, the burden imposed by the Postage Requirement will create obstacles to voting for the growing number of North Carolinians now facing financial hardship.

74.     As of this filing, well over 1.2 million North Carolinians have already applied for unemployment insurance with the State since March 15, with a staggering number of applicants citing the COVID-19 crisis as the reason for the loss of their employment. During normal times, North Carolina typically processes around 200,000 unemployment claims per year. Without question, COVID-19-related unemployment and other collateral consequences of the public health emergency will also increase the percentage of North Carolinians living in poverty, which already exceeded 14 percent before the pandemic began.

75.     But the monetary cost of stamps is not the only burden that the Postage Requirement will impose upon voters in the November election. Voters who do not already possess stamps must risk their health by either venturing out to the post office or other

---

[14] *See* U.S. Postal Serv., *Election Mail*, https://about.usps.com/postal-bulletin/2020/pb22539/html/cover_006.htm.

establishments that sell stamps, or by delivering their ballots in person. While there are some services that allow voters to print postage online, these services also require a printer, scale, and paid subscription.

76. And although a voter can order stamps online through the USPS website, delivery of those stamps takes five to seven days under *normal* circumstances, such stamps are not sold individually but must be purchased on a sheet of stamps that costs a minimum of $11.00, and the purchaser must pay for the shipping and handling of the stamps themselves.

77. Unless the State provides pre-paid postage for absentee ballots, both the monetary and transaction costs of submitting a ballot by mail will burden and deter voters in the upcoming election.

**C.      The Receipt Deadline will result in large-scale disenfranchisement for voters who must rely on USPS to deliver their ballots.**

78. After a ballot has been deposited in the mail, the voter has no control over when that ballot arrives, but may nonetheless have their ballot rejected and their right to vote denied if the mail service—in most cases, USPS—fails to deliver the ballot to local election officials by the Receipt Deadline.

79. Under N.C.G.S. § 163-231(b)(1), (2), an absentee ballot is timely only if it is *received* by election officials no later than 5:00 p.m. on Election Day. If the ballot envelope is postmarked by Election Day, then the Receipt Deadline extends to 5:00 p.m. on the third day after the election.

80. In other words, whether an absentee ballot is counted in North Carolina will depend largely on the postal service's delivery timelines, which have been compromised due to the COVID-19 pandemic and large-scale restructuring of USPS.

81. As has been widely reported in the news, USPS is experiencing significant

budgetary shortfalls and personnel shortages that could severely compromise the agency's capacity to process an increasing volume of election mail.

82. The agency is also hard hit by the COVID-19 pandemic. As of July, around 5,400 postal workers across the country, including at least four in North Carolina, had tested positive for COVID-19, at least 75 had died, and more than 6,300 were self-quarantined because of prior exposure to COVID-19.

83. USPS's struggles have serious implications for North Carolina's absentee voters. Over the next few months, the USPS will be called upon to deliver an unprecedented number of absentee ballots across the country—from county election officials to voters, and then back again—yet the agency's ongoing budgetary crisis, which has already led to capacity shortages and delivery delays, means that additional cuts to routes, processing centers, or staff are likely to follow, further exacerbating the ongoing mail processing delays caused by COVID-19.

84. Depending on where in North Carolina the voter resides (for instance, rural areas often have infrequent mail pick-up times), ensuring timely delivery by the Receipt Deadline could require voters to send their ballots more than a week before the election—and even then, they still may not arrive on time.

85. Short of paying for private mail carriers or the USPS's more expensive expedited delivery options, voters who are late deciders or are otherwise unprepared to make their candidate selections and submit their votes weeks before Election Day have little assurance that the USPS will deliver their ballots on time, thus posing a significant risk of disenfranchisement.

86. While some North Carolinians opt to vote early and are prepared to choose their preferred candidates well in advance, others may not be ready to do so until much later in the election cycle. Forcing these voters to cast their ballots weeks in advance just to avoid mail

- 25 -

service disruptions or delays deprives them of the opportunity to participate fully in the political process and restricts their ability to consider additional or late-breaking information they may need to inform their voting choice.

87.     Furthermore, voting by mail far in advance of Election Day also requires that the voter receive their absentee ballot in time to do so. Given the unprecedented number of expected absentee ballots in upcoming elections, as well as the USPS's well-documented struggles, that is far from certain.

88.     The deadline to request an absentee ballot is seven days before Election Day, and voters who timely request absentee ballots may not receive them until shortly before or even after the election—a complaint common among voters during the March 3 primary. USPS has expressly warned that this seven-day window is likely insufficient for voters to complete and mail their ballots in time for delivery to election officials before state return deadlines.

89.     In contrast to the deadlines placed on voters living in North Carolina and elsewhere in the country, ballots from uniformed-service and overseas voters are considered timely if they are transmitted by Election Day and received before close of business on the day before the county canvass, which cannot occur before 11:00 a.m. on the tenth day after an election. *See* N.C.G.S. §§ 163-258.10, 163-258.12(a), 163-182.5(b).

90.     In addition, unlike traditional absentee ballots, uniformed-service and overseas absentee ballots, "[i]f . . . timely received, . . . may not be rejected on the basis that [they have] . . . an unreadable postmark, or no postmark." *Id.* § 163-258.12(b). But a traditional absentee ballot received by the county boards within three days after Election Day is nonetheless invalid if it lacks a legible postmark. *See id.* § 163-231(b)(2).

91.     Thus, in the same election, ballots cast by uniformed-service and overseas voters

- 26 -

can be received and counted for an additional *six* days or more after the deadline imposed on absentee voters in North Carolina. And while the uniformed-service and overseas voter receipt deadline is tethered to the county canvass date, the earlier Receipt Deadline for stateside voters is not supported by a sufficient state interest to justify the burden it imposes on access to the franchise during the COVID-19 pandemic, particularly for those affected by delayed USPS mail service.

92.     The later deadlines provided for uniformed-service and overseas absentee voters also demonstrate that the State's election apparatus is fully capable of extending the same allowances to resident North Carolinians in the midst of a public health emergency, and the State's failure to do so cannot be justified by any sufficient governmental interest.

93.     In fact, the United States Supreme Court, on an application for a stay of a Wisconsin federal court injunction, recently left intact the district court remedy extending Wisconsin's receipt deadline for all mail ballots that were postmarked by Election Day. *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1208 (2020).

**D.     Signature Matching Procedures will result in the arbitrary rejection of validly-cast ballots.**

94.     For absentee voters whose ballots happen to be delivered before the Receipt Deadline, another hurdle awaits: arbitrary signature verification procedures. Once received, county election officials must review the sealed container envelopes of all absentee ballots to ensure that the voter signed the certification affirming their right to vote, and that the envelope is signed by a witness. *See* N.C.G.S. § 163-231.

95.     Election officials may reject an absentee ballot where the voter's signature beneath the certification is missing; but in some counties, election officials further endeavor to verify whether the voter's signature on the ballot "matches" the signature of the voter on file

- 27 -

with the election office, a process otherwise known as "signature matching."

96.      The State Board provides no guidance to county election officials engaged in signature matching, nor is it clear whether signature matching can permissibly occur under current North Carolina law. Thus, counties are left to their own devices in determining whether and how to apply Signature Matching Procedures and, ultimately, if the ballot should be counted.

97.      Unsurprisingly, North Carolina counties have developed wildly inconsistent approaches to reviewing and verifying ballot signatures, with some seeming to require only the *presence* of the voter's signature, while others attempt to compare and match signatures on ballot envelopes with voter records. The counties that engage in signature matching do so without uniform standards or training, resulting in a process that varies even from one election official to the next.

98.      This lack of guidance or identifiable standards is problematic because signature matching, as one federal court put it, is inherently "a questionable practice" and "may lead to unconstitutional disenfranchisement." *Democratic Exec. Comm. of Fla. v. Detzner*, 347 F. Supp. 3d 1017, 1030 (N.D. Fla. 2018).

99.      Studies conducted by experts in the field of handwriting analysis have repeatedly found that signature verification conducted without adequate standards and training is unreliable, and non-experts are significantly more likely to misidentify authentic signatures as forgeries.

100.     Even when conducted by experts, signature matching can lead to erroneous results in the ballot verification context because handwriting can change quickly for a variety of reasons entirely unrelated to fraud, including the signer's age, medical condition, psychological state of mind, pen type, writing surface, or writing position.

101.     It is, thus, inevitable that election officials will erroneously reject legitimate

- 28 -

ballots due to misperceived signature mismatches, which, without notice and a reasonable opportunity to cure, will result in the disenfranchisement of eligible voters. And, indeed, in jurisdictions that broadly require elections officials to engage in signature matching, thousands of lawful voters are regularly disenfranchised as a result.

102. In the November election, Signature Matching Procedures will be applied to hundreds of thousands of absentee ballots (and perhaps more), subjecting voters to the risk that their ballots will be rejected erroneously without notice or an opportunity to cure, or that they will be forced to take additional, unnecessary steps to provide supplemental evidence—in the middle of a pandemic, no less—just to have their ballots counted.

E. **Voters who need assistance to navigate barriers to absentee voting have extremely limited options.**

103. Despite the significant barriers to absentee voting during the COVID-19 pandemic, many North Carolinians will not have any practical means of obtaining assistance to request or submit their absentee ballots.

104. In October 2019, the General Assembly passed the Application Assistance Ban, which imposed new restrictions on the absentee ballot application process.

105. The law states: "A request for absentee ballots is not valid if . . . [t]he completed written request is completed, partially or in whole, or signed by anyone other than the voter, or the voter's near relative or verifiable legal guardian," and requires county boards to invalidate all requests for absentee ballots that are "returned to the county board by someone other than [a near relative, verifiable legal guardian, the multi-partisan assistance team], the United States Postal Service, or a designated delivery service . . . ." SB 683, § 1.3(a) (amending N.C.G.S. § 163-

- 29 -

230.2(c) and (e)).[15]

106.    No one else may assist voters to ensure they receive absentee ballots—even if the voter has no near relative or verifiable legal guardian nearby and no accessible multi-partisan assistance team ("MAT") member available.

107.    The only exception to this prohibition is limited to voters who need assistance "due to blindness, disability, or inability to read or write" and do not have "a near relative or legal guardian available to assist." SB 683, § 1.3(a) (adding N.C.G.S. § 163-230.2(e1)).

108.    The law also prohibits organizations and individuals from assisting a voter in *returning* an absentee ballot request form, stating: "The completed request form for absentee ballots shall be delivered to the county board of elections only by any of the following: (1) The voter. (2) The voter's near relative or verifiable legal guardian. (3) A member of a multipartisan team trained and authorized by the county board of elections . . . ." SB 683, § 1.3(a) (amending N.C.G.S. § 163-230.2(c)).

109.    Although recent emergency legislation (HB 1169) now allows voters and a limited group of designated third parties acting on the voter's behalf (i.e., the voter's "near relative or verifiable legal guardian") to submit absentee ballot request forms online beginning in September 2020, these measures fail to address the needs of countless voters who lack the resources to take advantage of them.

110.    First, over 20 percent of North Carolina households do not have internet access,

---

[15] A "multi-partisan assistance team" ("MAT") must consist of at least two registered voters of the county who represent the two political parties with the highest number of affiliated voters in the State, as determined by January 1 of the current year. If a MAT has more than two members, voters who are unaffiliated with a political party or affiliated with a political party different than the top two political parties in the State may be team members. To the extent there are not enough registered voters who are affiliated with the top two political parties to serve on the MAT, the county board may appoint someone who is unaffiliated with a party to serve as a team member. HB 1169 § 2.5.(a).

- 30 -

and over 12 percent do not have a computer. Many of these voters do not have fax machines and would be unable to fax their absentee ballot requests either, leaving them with only two options: (1) mail a completed ballot request form, requiring postage which they may not have at their disposal, and risk not having their request delivered in a timely manner, or (2) submit the form in person, assuming the voter has access to transportation, and risk exposure to COVID-19.

111.    Second, any assistance voters may obtain from multipartisan assistance teams ("MATs") is limited at best. HB 1169 requires the North Carolina Department of Health and Human Services ("DHHS") and the State Board to issue guidance on the use of MATs within hospitals, clinics, nursing homes, assisted living, or other congregate living situations, but is silent on whether and how MATs will be accessible to voters who do not reside in any of the above-referenced facilities.

112.    North Carolina law also imposes severe limitations on an absentee voter's ability to obtain assistance in submitting their ballot, by prohibiting anyone other than the voter's "near relative or . . . verifiable legal guardian" from "tak[ing] into possession" a voter's absentee ballot "for return to a county board of elections." N.C.G.S. § 163-226.3(a)(5).

113.    Thus, voters who do not have near relatives or legal guardians available to assist them may only return an absentee ballot "by mail or by commercial courier service, at the voter's expense, or in person." *Id.* §§ 163-231(a), 163-229(b), 163-231(b).

114.    The law does not even allow voters to obtain ballot delivery assistance from MATs, which are only permitted to help voters with absentee ballot requests. In fact, it is a felony for anyone other than a near relative or verifiable legal guardian to possess for delivery another voter's absentee ballot. *Id.* § 163-226.3(a)(5).

115.    This leaves voters with limited, if any, reliable options for returning their ballots

- 31 -

without risking disenfranchisement due to mail delivery delays, incurring burdensome transaction and monetary costs, or potentially exposing themselves to health risks by submitting their ballots in person.

116.    To justify these restrictions, Defendants will most likely point to the fraudulent scheme orchestrated by operatives working for Republican candidate Mark Harris's campaign in North Carolina's Ninth Congressional District race during the 2018 general election. Following an investigation, the State Board found "overwhelming evidence that a coordinated, unlawful, and substantially resourced absentee ballot scheme operated during the [election] in Bladen and Robeson Counties[,]" and was led by Harris campaign associate Leslie McCrae Dowless.[16]

117.    As the Board explained, Dowless's scheme was simple and crude: he and his associates forged absentee ballot request forms, collected unsealed ballots from voters, marked the ballots to pad vote totals for Dowless's clients, and delivered the ballots to election officials by mail. Order ¶¶ 60–65. The Board determined that Dowless "frequently instructed his workers to falsely sign absentee by mail container envelopes as witnesses[.]" *Id.* ¶ 62. "In some cases, Dowless's workers fraudulently voted blank or incomplete absentee by mail ballots at Dowless's home or in his office." *Id.* ¶ 63. And Dowless's fraudulent scheme appeared to have focused on areas of Bladen and Robeson Counties where minority voters are disproportionately concentrated. *See id.* ¶¶ 47, 122, 124–25, 151.

118.    Based on the State Board's finding that Dowless and his associates coordinated the widespread forgery of absentee ballot request forms and the collection of *unsealed* and *unmarked* absentee ballots, which they fraudulently marked—all actions which were already

---

[16] *Investigation of Election Irregularities Affecting Counties Within the 9th Congressional District*, N. C. State Bd. of Elections, March 13, 2019 ("Order"), ¶ 19, https://dl.ncsbe.gov/State_Board_Meeting_Docs/Congressional_District_9_Portal/Order_03132019.pdf.

- 32 -

prohibited by existing laws criminalizing forgery—the State Board "conclude[d] unanimously that irregularities or improprieties occurred" on behalf of the Harris campaign "to such an extent that they taint[ed] the results of the entire election and cast doubt on its fairness." *Id.* ¶ 150.

119.    The ban on third-party assistance in submitting absent ballot request forms or sealed absentee ballots would have done little to prevent or uncover Dowless's scheme, and the Ballot Delivery Ban was in place when the fraud occurred. Dowless and his associates forged request forms and ballots and submitted them in the mail as if they had come from the voter. In fact, Dowless's associates ensured that ballots were mailed from post offices that were geographically close to the voters' homes. Neither the Application Assistance Ban nor the Ballot Delivery Ban targets the focal point of Dowless's scheme: forgery and voter impersonation, both of which are already prohibited by State law. Dowless's actions were revealed when voters either complained about unidentified individuals picking up their ballots or voted in person after Dowless's team had attempted to submit their forged ballots.

120.    The Ballot Delivery Ban further denies voters access to safe and reliable means of returning their ballots—through an assistor of their choice—and forces those who lack the resources to return their ballots in person to rely on the postal service, notwithstanding the operational difficulties that have impaired the agency's ability to meet its delivery service commitments in the upcoming election. Not only are the restrictions unnecessary to detect or prevent fraud—nor would they have been effective—but they also deprive countless North Carolinians who are especially vulnerable to the effects of COVID-19 of their right to participate in the November election.

121.    Rather than simply targeting the Republican operatives' criminal conduct, the General Assembly's Application Assistance Ban significantly hindered efforts to assist voters

and mobilize communities with historically depressed turnout rates, particularly during the pandemic in which a disproportionate number of Black North Carolinians are contracting COVID-19.

## CAUSES OF ACTION

### COUNT I
### Violation of the North Carolina Constitution
### Equal Protection, Art. I, § 19
### (Unconstitutional Burden on Right to Vote)

122. Plaintiffs hereby incorporate all other paragraphs as if fully set forth herein.

123. Article I, § 12 of the North Carolina Constitution provides in relevant part: "The people have a right to assemble together to consult for their common good, to instruct their representatives, and to apply to the General Assembly for redress of grievances."

124. Article I, § 14 of the North Carolina Constitution provides in relevant part: "Freedom of speech and of the press are two of the great bulwarks of liberty and therefore shall never be restrained."

125. Article I, §§ 12 and 14 of the North Carolina Constitution protect the right of voters to participate in the political process, express political views, affiliate with or support a political party, and cast a vote. "Voting, like donating money to a candidate or signing a petition for a referendum, constitutes 'expressive activity' that 'express[es] [a] view' about the State's laws and policies." *Common Cause v. Lewis*, No. 18 CVS 014001, 2019 WL 4569584, at *119 (N.C. Super. Sept. 03, 2019), *aff'd*, 956 F.3d 246 (4th Cir. 2020) (citation omitted).

126. Article I, § 19 of the North Carolina Constitution provides in relevant part that "[n]o person shall be denied the equal protection of the laws."

127. Collectively, these provisions prohibit the State from imposing burdens on the fundamental right to vote unless they are justified by a sufficiently important state interest.

- 34 -

128.    North Carolinians have relied heavily on in-person voting, particularly during the early voting period, to participate in the political process. In-person voting ensures access to the franchise for those who encounter difficulty voting by mail, either due to unreliable mail service, the attendant costs—including the monetary or transactional costs of obtaining postage or securing a witness—or the accompanying risk of disenfranchisement. Moreover, for many North Carolinians, casting a ballot at a polling place will be their preferred method of exercising the franchise due to the historical significance of in-person voting.

129.    The COVID-19 pandemic, however, will result in a dramatic expansion of voting by mail, which expands access to the franchise for eligible voters for whom in-person voting is difficult or impossible. For many North Carolinians, voting by mail provides the only feasible opportunity to cast a ballot without putting their health at risk.

130.    The barriers to in-person and absentee voting in the November election, which will occur in the midst of a global pandemic, include: (1) limitations on the number of days and hours of early voting that counties may offer; (2) the Witness Requirement, as applied to voters residing in single person or single-adult households; (3) the monetary and transaction costs of the Postage Requirement for absentee ballots; (4) the Receipt Deadline, as applied to voters who submit their ballots by mail through USPS; (5) arbitrary and error-prone Signature Matching Procedures; and (6) restrictions preventing voters from obtaining assistance from most third parties in requesting and submitting absentee ballots. These barriers unconstitutionally burden the fundamental rights of North Carolinians to participate in our democracy, and, when taken together, the cumulative impact of these restrictions creates a severe burden on the right to vote for many eligible citizens.

- 35 -

131.    Because the barriers to in-person and absentee voting impose severe burdens on the fundamental right to vote during the COVID-19 pandemic, and because these barriers (and the failure to implement additional safeguards to facilitate access to the franchise) cannot be justified by any sufficiently important state interest, the limitations on in-person voting and the challenged absentee voting restrictions violate the North Carolina Constitution.

## COUNT II
### Violation of the North Carolina Constitution's
### Free Elections Clause, Art. I, § 10

132.    Plaintiffs hereby incorporate all other paragraphs as if fully set forth herein.

133.    Article I, § 10 of the North Carolina Constitution states, in its entirety, that "[a]ll elections shall be free." This provision has no counterpart in the U.S. Constitution.

134.    North Carolina has strengthened the Free Elections Clause since its adoption to reinforce its principal purpose of preserving the popular sovereignty of North Carolinians. The original clause, adopted in 1776, provided that "elections of members, to serve as Representatives in the General Assembly, ought to be free." N.C. Declaration of Rights, VI (1776). Nearly a century later, North Carolina revised the clause to state that "[a]ll elections ought to be free," expanding the principle to include all elections in North Carolina. N.C. Const. art. I, § 10 (1868) (emphasis added). Another century later, North Carolina adopted the current version which provides that "[a]ll elections *shall* be free." N.C. Const. art. I, § 10 (emphasis added). As the North Carolina Supreme Court later explained, this change was intended to "make [it] clear" that the Free Elections Clause and the other rights secured to the people by the Declaration of Rights "are commands and not mere admonitions" for proper conduct on the part of the government. *N.C. State Bar v. DuMont*, 304 N.C. 627, 639, 286 S.E.2d 89, 97 (1982) (internal quotation marks omitted).

- 36 -

135.    "[T]he object of all elections is to ascertain, fairly and truthfully, the will of the people—the qualified voters." *Hill v. Skinner*, 169 N.C. 405, 415, 86 S.E. 351, 356 (1915). "Our government is founded on the will of the people. Their will is expressed by the ballot." *People ex rel. Van Bokkelen v. Canaday*, 73 N.C. 198, 220 (1875). "[F]air and honest elections are to prevail in this state." *McDonald v. Morrow*, 119 N.C. 666, 673, 26 S.E. 132, 134 (1896).

136.    The constitutional obligation to ensure that elections are both free and fair and reflect the will of the people, at a minimum, requires that the State ensure that all North Carolinians have a reasonable opportunity to vote—that is, not only to cast their ballots but to also have their ballots counted—without undue risk to their health and safety.

137.    The State has an obligation under the Free Elections Clause to ensure that each step of the voting process, whether by mail or in person, does not unnecessarily endanger voters' health, subject voters to a significant risk of arbitrary disenfranchisement, or force voters to choose between exercising their fundamental right to vote and safeguarding their health and the health of their communities.

138.    The State's failure to provide safe, accessible, and reliable means for its citizens to vote in the upcoming November election, both in person and by mail, denies Plaintiffs and all North Carolina voters the rights guaranteed to them under the Free Elections Clause. As state election officials have suggested, the COVID-19 pandemic has all but ensured that safe access to in-person voting will be severely restricted due to a significant reduction in the number of polling places and staff, and the health risks posed by packing more voters and poll workers into a small number of consolidated voting sites, for a fixed number of voting days and hours.

139.    At the same time, voting by mail presents a significant risk of disenfranchisement. Absentee voters will encounter several unconstitutional barriers, when attempting to vote in the

- 37 -

November election (in the midst of the COVID-19 pandemic), including: (1) the Witness Requirement, as applied to voters residing in single person or single-adult households; (2) the monetary and transaction costs of the Postage Requirement for absentee ballots; (3) the Receipt Deadline, as applied to voters who submit their ballots by mail through USPS; (4) arbitrary and error-prone Signature Matching Procedures; and (5) restrictions preventing voters from obtaining assistance from most third parties in requesting and submitting absentee ballots.

140.    The burdens imposed by these restrictions are exacerbated by the ongoing public health crisis and will subject voters to a significant risk of disenfranchisement in the November election for reasons outside their control.

141.    The challenged barriers thus obstruct the will of North Carolinians, particularly those who—because of financial insecurity, health concerns, family care responsibilities, lack of transportation, or medical vulnerabilities—are unable to overcome the dramatically increased costs and burdens of participating in the political process during the COVID-19 pandemic. North Carolina's failure to eliminate these barriers thus violates the Free Elections Clause.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendants, and:

a.      Declare, under N.C.G.S. § 1-253, *et seq.*, that North Carolina's failure to provide sufficiently accessible in-person voting opportunities for the November election that comply with social distancing guidelines during the COVID-19 pandemic violates the Free Elections Clause, Art. I, § 10, and the Equal Protection and Law of the Land Clauses, Art. I, §§ 12, 14, and 19;

- 38 -

b.  Declare, under N.C.G.S. § 1-253, *et seq.*, that in the context of COVID-19 pandemic and the upcoming November election, the Witness Requirement, as applied to voters residing in single person or single-adult households; the Postage Requirement and Receipt Deadline, as applied to voters who submit their ballots by mail through USPS; the Signature Matching Procedures; and the Application Assistance Ban and Ballot Delivery Ban are unconstitutional, as applied to the November election, and invalid because they violate the rights of Plaintiffs and other North Carolina voters under the Free Elections Clause, Art. I, § 10, and the Equal Protection and Law of the Land Clauses, Art. I, §§ 12, 14, and 19;

c.  Require the State Board and all local election officials to expand the early voting period for the November election by an additional 21 days, and preliminarily and temporarily enjoining the enforcement of N.C.G.S. § 163-227.2(b) to the extent that it prevents the State Board or local election officials from extending early voting for an additional 21 days, or any other law that prevents the State Board or local election officials from expanding the number of early voting days;

d.  Preliminarily and temporarily enjoin the Witness Requirement, as applied to voters residing in single person or single-adult households, for the November election;

e.  Require the State Board to provide uniform standards and training to all election officials that use Signature Matching Procedures to verify absentee ballots;

f.  Enjoin the State Board and all county boards of elections from rejecting absentee ballots through signature matching unless the State Board provides uniform

standards and training to all counties engaged in signature matching, and voters receive reasonable notice and an opportunity to cure any alleged signature defect;

g.    Require the State Board and all local election officials to provide pre-paid postage for all absentee ballot request forms and absentee ballots for the November election using Qualified Business Reply Mail (QBRM), and temporarily enjoin the enforcement of N.C.G.S. § 163-231(b)(1) to the extent that it requires voters to mail their absentee ballots or applications at their own expense during the COVID-19 pandemic;

h.    Require the State Board to extend the Receipt Deadline, for ballots submitted by mail through USPS by Election Day, to mirror the deadline afforded to uniformed-service and overseas absentee voters for the November election; to define the term "postmark," in connection with Plaintiffs' requested relief, to refer to any type of imprint applied by the USPS to indicate the location and date the USPS accepts custody of a piece of mail, including bar codes, circular stamps, or other tracking marks; to require Defendants to ensure that absentee ballots sent to voters, and the return envelopes provided to voters for sending ballots back, include an Intelligent Mail Barcode using Intelligent Mail Full-Service to assist in ensuring that ballots mailed by Election Day are not erroneously rejected if they lack a postmark; and, where a ballot does not bear a postmark date, to require the State Board and county boards of elections to presume that the ballot was mailed on or before Election Day if it arrives within the Receipt Deadline unless the preponderance of the evidence demonstrates it was mailed after Election Day;

i.    Preliminarily and temporarily enjoin the enforcement of the Application Assistance Ban and Ballot Delivery Ban, including any laws that impose criminal or other penalties for violations of the Application Assistance Ban and Ballot Delivery Ban.

j.    Award Plaintiffs their costs and expenses, under applicable statutory and common law, including N.C.G.S. §§ 6-20 and 1-263; and

k.    Grant Plaintiffs such other and further relief as the Court deems necessary.

Dated: August 17, 2020

Marc E. Elias*
Uzoma N. Nkwonta*
Ariel B. Glickman*
Jyoti Jasrasaria*
Lalitha D. Madduri*
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005
Telephone: 202.654.6200
Facsimile: 202.654.6211
MElias@perkinscoie.com
UNkwonta@perkinscoie.com
AGlickman@perkinscoie.com
JJasrasaria@perkinscoie.com
LMadduri@perkinscoie.com

*Attorneys for Plaintiffs*
  *Seeking Pro Hac Vice Admission

Respectfully submitted,

By: _____

Burton Craige, NC Bar No. 9180
Narendra K. Ghosh, NC Bar No. 37649
Paul E. Smith, NC Bar No. 45014
PATTERSON HARKAVY LLP
100 Europa Drive, Suite 420
Chapel Hill, NC 27517
Telephone: 919.942.5200
BCraige@pathlaw.com
NGhosh@pathlaw.com
PSmith@pathlaw.com

*Attorneys for Plaintiffs*

- 41 -

## CERTIFICATE OF SERVICE

I certify that I served the foregoing document by first-class mail to counsel for the defendants, intervenors, and proposed intervenors, addressed as follows:

Alexander McC. Peters
Paul M. Cox
N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602
*Attorney for Defendants*

Nicole Jo Moss, N.C. Bar No. 31958
Cooper & Kirk, PLLC
1523 New Hampshire Avenue NW
Washington DC, 20036

Nathan A. Huff, N.C. Bar No. 40626
Phelps Dunbar LLP
GlenLake One
4140 Parklake Avenue, Suite 100
Raleigh, North Carolina 27612-3723
*Attorneys for Intervenors*

R. Scott Tobin
TAYLOR ENGLISH DUMA LLP
4208 Six Forks Road. Suite 1000
Raleigh, NC. 27609

Bobby R. Burchfield
Matthew M. Leland
KING & SPALDING LLP
1700 Pennsylvania Ave, N.W., Suite 200
Washington. D.C. 20006-4707
*Attorneys for Proposed Intervenors*

This the 18th day of August, 2020.

Narendra K. Ghosh, NC Bar # 37649
nghosh@pathlaw.com
PATTERSON HARKAVY LLP
100 Europa Dr., Suite 420
Chapel Hill, North Carolina 27517
(919) 942-5200